No. 2015-1878

# In the
# United States Court of Appeals
# for the Federal Circuit

WONDERLAND NURSERY GOODS CO., LTD.,

*Plaintiff-Appellant,*

v.

THORLEY INDUSTRIES LLC, dba 4Moms,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Pennsylvania, No. 2:12-cv-00196-NBF.
The Honorable **Nora Barry Fischer**, Judge Presiding.

## CORRECTED BRIEF AND ADDENDUM OF PLAINTIFF-APPELLANT

DAVID I. ROCHE
(*Principal Counsel*)
DANIEL TALLITSCH
BAKER & MCKENZIE LLP
300 East Randolph Street
Chicago, IL 60601
(312) 861-8000
david.roche@bakermckenzie.com
daniel.tallitsch@bakermckenzie.com

*Counsel for Plaintiff-Appellant*
*Wonderland Nursery Goods Co., Ltd.*

COUNSEL PRESS · (866) 703-9373 PRINTED ON RECYCLED PAPER

Form 9

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Wonderland Nurserygoods Co. v. Thorley Industries LLC

No. 15-1878

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) Appellant Wonderland Nurserygoods Co. certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

Wonderland Nurserygoods Co. Ltd.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

No parent corporation and no publicly held company owns 10% or more of the stock of Wonderland Nurserygoods Co. Ltd.

4. ☑ The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

David I. Roche, Daniel A. Tallitsch, and Yi Fang of Baker & McKenzie LLP. Edward I. Levicoff and Avrum Levicoff of The Levicoff Law Firm, P.C.

08/13/2015
Date

/s/ Daniel A. Tallitsch
Signature of counsel

Daniel A. Tallitsch
Printed name of counsel

Please Note: All questions must be answered
cc: counsel of record

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST .......... i

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... v

STATEMENT OF RELATED CASES .......... viii

JURISDICTIONAL STATEMENT .......... 1

I. STATEMENT OF THE ISSUES .......... 2

II. STATEMENT OF THE CASE .......... 3

  A. The Parties .......... 3

  B. Procedural History .......... 4

III. STATEMENT OF THE FACTS .......... 6

  A. The '609 Patent .......... 6

    1. The Asserted Claims .......... 6

    2. The Preferred Embodiments .......... 10

  B. The accused mamaRoo product. .......... 16

IV. THE DISTRICT COURT'S CLAIM CONSTRUCTION .......... 22

  A. "Crank" .......... 22

  B. "Connected Fixedly" .......... 23

  C. "Guiding Elements" .......... 25

  D. "Between" .......... 26

  E. "First Motion Mechanism" .......... 26

F. "For driving" ..... 27

V. SUMMARY OF THE ARGUMENT ..... 27

A. The Stipulated Judgment of Noninfringement of Claim 3 Was Based On Erroneous Claim Constructions ..... 27

1. The district court's construction of "crank" improperly reads in the shape and orientation of the preferred embodiment ..... 27

2. In construing "connected fixedly," the district court excluded a species of connections in the absence of an unequivocal disavowal ..... 28

B. The District Court Erred In Granting Summary Judgment of Noninfringement of Claim 14 ..... 30

1. The district court failed to apply its construction of "for driving" and misconstrued the term "between" ..... 30

2. The district court erred by failing to apply its construction of "guiding elements" or misconstruing that term ..... 31

VI. ARGUMENT ..... 32

A. Standard of Appellate Review ..... 32

B. The Stipulated Judgment of Noninfringement of Claim 3 Should Be Vacated. ..... 33

1. Slider-crank mechanisms as used in machine design. ..... 34

2. The district court erred by construing the term "crank" contrary to its plain meaning ..... 36

3. The district court erred by construing the term “connected fixedly” contrary to its plain meaning ..... 42

C. Summary Judgment of NonInfringement of Claim 14 Should Be Vacated. ..... 45

1. The district court’s summary judgment ruling directly conflicts with the rulings of the USPTO, as affirmed by the Federal Circuit ....................................................................46

2. The district court erred in concluding that the mamaRoo does not contain the limitation of claim 12 calling for "the first motion mechanism [to be] disposed between said base and said bottom seat."...............................................51

a. The district court's failure to apply its construction of "for driving" led to an erroneous conclusion regarding the identity of the first motion mechanism in the accused mamaRoo.............................51

b. The district court granted summary judgment based on an incorrect construction for the claim term "between" ..............................................................55

3. The district court erred in concluding that the mamaRoo does not contain the limitation of claim 14 calling for "guiding elements"...................................................................58

a. There is at least a question of fact regarding whether the flat, bordered paths on the mamaRoo are "guiding elements"...................................................58

b. The district court granted summary judgment based on an erroneous construction for the claim term "guiding elements" ................................................60

CONCLUSION ..........................................................................................62

**TABLE OF AUTHORITIES**

***Page(s)***

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011)....24, 29, 43

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....33

*Animatics Corp. v. Quicksilver Controls, Inc.*,
102 Fed. Appx. 659 (Fed. Cir. 2004)....43

*ArcelorMittal Fr. v. AK Steel Corp.*,
786 F.3d 885 (Fed. Cir. 2015)....33

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013)....45

*Cybor Corp. v. FAS Technologies*,
138 F.3d 1448 (Fed. Cir. 1998)....32

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,
279 F.3d 1022 (Fed. Cir. 2002)....61

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010)....61

*Facenda v. N.F.L. Films, Inc.*,
542 F.3d 1007 (3d Cir. 2008)....33

*Generation II Orthotics, Inc. v. Medical Tech. Inc.*,
263 F.3d 1356 (Fed. Cir. 2001)....33

*Grober v. Mako Prods., Inc.*,
686 F.3d 1335 (Fed. Cir. 2012)....45

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
783 F.3d 1262 (Fed. Cir. 2015)....32

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001)....................................................................33

*InterDigital Communications, LLC v. International Trade Com'n*,
690 F.3d 1318 (Fed. Cir. 2012)....................................................................32

*Kara Tech. Inc. v. Stamps.com Inc.*,
582 F.3d 1341 (Fed. Cir. 2009)....................................................................37

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)......................................................................61

*Markman v. Westview Instruments*,
517 U.S. 370 (1996) ....................................................................................32

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)...............................................................38, 61

*Phonometrics, Inc. v. Northern Telecom Inc.*,
133 F.3d 1459 (Fed. Cir. 1998)....................................................................61

*Plantronics, Inc. v. Aliph, Inc.*,
724 F.3d 1343 (Fed. Cir. 2013)....................................................................37

*Pressure Products Med. Supplies, Inc. v. Greatbatch Ltd.*,
599 F.3d 1308 (Fed. Cir. 2010)....................................................................22

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015) ...................................................................................32

*Thorner v. Sony Computer Entertainment America LLC*,
669 F.3d 1362 (Fed. Cir. 2012)...............................................................32, 33

*Ventana Med. Sys. v. Biogenex Labs., Inc.*,
473 F.3d 1173 (Fed. Cir. 2006)....................................................................33

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)...................................................................38, 57

*Wonderland Nursery Goods Co., Ltd. v. Thorley Industries LLC*,
Case No. 2015-1034, 601 Fed. Appx. 991 (Fed. Cir. May 6, 2015) ............ viii, 46

**Rules, Statutes & Other Authority**

Fed. R. Civ. P. 56(a)........................................................................................33

Federal Circuit Rule 47.5 ............................................................................... viii

28 U.S.C. § 1295(a)(1)........................................................................................1

28 U.S.C. § 1338(a) ..........................................................................................1

http://en.wikipedia.org/wiki/Crank_(mechanism) ..................................................42

http://www.merriam-webster.com/dictionary/between. ..........................................55

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Plaintiff-Appellant states that:

(1) No appeal in this case has ever been heard before this Court or any other appellate court;

(2) Other than the following case, no other case pending in this Court or in any other court will directly affect or be directly affected by this Court's decision in this case: *Wonderland Nursery Goods Co., Ltd. v. Thorley Industries LLC,* Case No. 2015-1034, 601 Fed. Appx. 991, 992 (Fed. Cir. May 6, 2015) (affirmed without opinion by Judges O'Malley, Clevenger, and Hughes).

## JURISDICTIONAL STATEMENT

This is an appeal from a Final Judgment in a patent infringement lawsuit entered by Judge Nora Barry Fischer of the United States District Court for the Western District of Pennsylvania, in *Wonderland Nurserygoods Co., Ltd. v. Thorley Industries, LLC*, Case No. 2:12-cv-00196-NBF. The statutory basis for the District Court's subject matter jurisdiction is 28 U.S.C. § 1338(a). The statutory basis for this Court's appellate jurisdiction is 28 U.S.C. § 1295(a)(1).

## I. STATEMENT OF THE ISSUES

(1) Whether the district court erred in construing the term "crank" to have a particular shape and orientation.

(2) Whether the district court erred in construing the term "connected fixedly" to include only a single species of connections to the exclusion of another.

(3) Whether the district court erred in concluding that the accused mamaRoo product does not contain the limitation of claim 12 calling for "the first motion mechanism [to be] disposed between said base and said bottom seat for driving said base to move back and forth"; in particular:

> (a) Whether the district court failed to apply its construction of "for driving" when it found that the "first motion mechanism" of the accused mamaRoo product includes a slider-crank mechanism; and/or
>
> (b) Whether the district court erred in construing the term "between" to have a narrow and "precis[e]" definition when the patentee did not act as a lexicographer or disavow the full scope of the claims.

(4) Whether the district court erred in concluding that the mamaRoo does not contain the limitation of claim 14 calling for "guiding elements"; in particular:

> (a) Whether the district court failed to apply its construction of the term "guiding elements"; and/or
>
> (b) Whether the district court erred in construing the term "guiding

elements," which are a component of the "guide path unit," to exclude paths.

## II. STATEMENT OF THE CASE

### A. The Parties

Plaintiff Wonderland Nurserygoods Co., Ltd. ("Wonderland") filed this patent infringement case against Defendant Thorley Industries LLC *d/b/a* 4Moms ("Thorley") seeking, among other things, a permanent injunction and damages for infringement of Wonderland's U.S. Patent No. 8,047,609 ("the '609 patent"). (A1; A37.) The '609 patent is entitled and concerns an "Infant Rocking Chair and Driving Device for Driving the Same." (A86.)

Wonderland and Thorley ("the Parties") are direct competitors, each making and selling products for infants and young children, such as infant rocking chairs, strollers, and play-yards. (A1; A38.) Wonderland is headquartered in Taiwan. (A1.) Thorley's business operations are headquartered in Pittsburgh, Pennsylvania. (*Id.*) The product at issue in this case is Thorley's "mamaRoo" infant rocking chair. (A41-42.) Wonderland initially asserted that Thorley infringes claims 1-3, 12-14, and 19-20 of the '609 Patent by selling the mamaRoo. (A32.) For reasons provided below, Wonderland dropped its assertion of all claims except for claims 3 and 14 of the '609 patent. (A2409-10.) Claims 3 and 14 are, thus, the only claims at issue on appeal.

**B. Procedural History**

The '609 patent issued on November 1, 2011. (A86.) Shortly thereafter, on January 12, 2012, Thorley filed a request for *inter partes* reexamination of some, but not all, of the claims of the '609 patent: claims 1-3, 12-13, and 19-20. (A707.) Thorley did not request reexamination of claim 14. (*Id.*) On February 14, 2012, the USPTO instituted *inter partes* reexamination of all claims requested by Thorley, except for claim 3. (A2413-17.) The USPTO determined that Thorley failed to establish a reasonable likelihood of prevailing on claim 3. (A2416.)

On February 16, 2012, two days after Thorley's request for reexamination of the '609 patent was granted, Wonderland filed this lawsuit. (A109.) In response, Thorley moved for a stay pending reexamination. (A2.) However, after finding that Wonderland would suffer competitive harm by a stay, the district court denied Thorley's motion and set a schedule for claim construction, fact and expert discovery, and summary judgment. (*Id.*)

On September 26, 2012, after initial briefing on claim construction, the district court held a technology tutorial and *Markman* hearing. (A2.) On January 11, 2013, after the parties' submitted post-*Markman* claim construction briefs, the district court issued a memorandum opinion and written order construing certain disputed terms of the '609 patent, including several terms at issue in this appeal—*i.e.*, "crank", "connected fixedly", and "guiding elements". (A20-28.)

Following the district court's claim construction order, the parties stipulated to noninfringement of claims 1-3 of the '609 patent based on the district court's interpretation of the "crank" and "connected fixedly" limitations. (A32-34.) The district court entered an order approving the stipulation and granting non-final, partial judgment of noninfringement of claim 1-3 of the '609 patent, subject to Wonderland's right to appeal. (A35-36.)

After the completion of fact and expert discovery, the Parties filed cross-motions for summary judgment on, *inter alia*, the issue of infringement of claims 12-14. (A37.) The Court granted Thorley's motion for summary judgment of noninfringement of claim 12-14, in part, and denied Wonderland's cross-motion for summary judgment of infringement, finding that the mamaRoo does not contain the limitation of claim 12 calling for "the first motion mechanism [to be] disposed between said base and said bottom seat." (A71-74.) In doing so, the Court construed two additional claim terms: "between" and "for driving". (A67-81.) The district court also found that the mamaRoo does not contain the limitation of claim 14 calling for "guiding elements." (A42-44.)

A trial date was set for January 27, 2015, to adjudicate the remaining asserted claims. (A115-16.) However, on the first day of trial, the district court, ***sua sponte***, elected to stay the case pending completion of the *inter partes* reexamination proceeding. (A130-31.) In the reexamination proceeding, which is

now complete, the USPTO cancelled claims 1-2, 12-13, and 19-20. (A2409-10.)

On July 6, 2015, the Parties stipulated that Wonderland would drop its assertion of claims 1-2, 12-13, and 19-20 of the '609 patent. (*Id.*) The Parties also agreed to the filing of a joint motion to lift the stay and enter final judgment of noninfringement of the remaining asserted claims 3 and 14. (*Id.*) That motion was granted and Final Judgment was entered. (A84-85.) Wonderland now appeals that Final Judgment.

## III. STATEMENT OF THE FACTS

### A. The '609 Patent

The '609 patent is directed at "infant rocking chairs," with "a driving device for driving a seat body of an infant rocking chair to move back and forth as well as up and down." (A103 at 1:16-19.) The patent discloses that "conventional infant rocking chairs" produce only "back-and-forth" or "up-and-down" motion, whereas a "curved swinging motion in which a back-and-forth motion is combined with an up-and-down motion" is preferable to "impart greater comfort to the infant." (*Id.* at 1:21-27, 34-42.)

#### 1. The Asserted Claims.

Wonderland asserts infringement of claims 3 and 14 of the '609 patent, which are dependent upon claims 1-2 and 12-13, respectively. (A2409-10; A105-06 at 6:48-7:11, 7:59-8:24.) The asserted claims, and the claims from which they

depend, are reproduced below in their entirety, with the primary areas of dispute highlighted:

> 1. A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising:
>
> a base adapted to be disposed between the seat body and the bottom seat;
>
> a supporting element connected to said base and adapted to support the seat body;
>
> a first motion mechanism including a horizontal first guide path unit adapted to be disposed at the bottom seat, and a first movable member disposed on said base and movable along said first guide path unit; and a motor for driving said first movable member,
>
> wherein said motor includes:
>
> a motor shaft,
>
> a crank connected fixedly to said motor shaft at one end thereof,
>
> and a link having two ends connected respectively and pivotally to said base and the other end

of said crank such that rotation of said motor shaft results in reciprocal movement of said first movable member.

2. The driving device as claimed in claim 1, wherein said first guide path unit includes a pair of spaced-apart guiding elements, said first movable member including two parallel rows of rollers that are disposed respectively on two opposite sides of said base and that are movable respectively along said guiding elements.

3. The driving device as claimed in claim 2, further comprising a second motion mechanism, adapted to be disposed between the seat body and the bottom seat, for driving said supporting element to move up and down relative to said first movable member.

12. An infant rocking chair comprising:

a seat body;

a bottom seat;

a base disposed between said seat body and said bottom seat and movable on said bottom seat;

a supporting element connected to said base for

supporting said seat body;

a first motion mechanism disposed between said base and said bottom seat for driving said base to move back and forth on said bottom seat;

and a second motion mechanism disposed between said supporting element and said bottom seat for driving said supporting element to move up and down relative to said base.

13. The infant rocking chair as claimed in claim 12, wherein said first motion mechanism includes a first pair of guiding elements spaced apart from each other, and two parallel rows of rollers that are disposed respectively on two opposite sides of said base and that are movable respectively along said first pair of guiding elements.

14. The infant rocking chair as claimed in claim 13, wherein said second motion mechanism includes a second pair of guiding elements spaced apart from each other, a supporting frame attached fixedly to the bottom end of said supporting element, and a pair of rollers that

are disposed rotatably on said supporting frame and that are movable respectively along said second pair of guiding elements.

(A105-06 at 6:48-7:11, 7:59-8:24.)

**2. The Preferred Embodiments.**

The '609 patent discloses three preferred embodiments of an infant rocking chair with different driving devices to accomplish a curved swinging motion. (A38.) The first preferred embodiment is depicted in Figures 1-6, the second preferred embodiment is depicted in Figures 7-10, and the third preferred embodiment is depicted in Figures 11-15. (A104-05 at 2:56-3:13.)




FIG. 1




FIG. 2

In the first preferred embodiment, shown above, a base 2 is disposed between a seat body 11 and a bottom seat 12 and is movable on the bottom seat 12. (A104 at 3:33-34, 4:60-62.) A supporting element 3 is connected to the base 2 and is adapted to support the seat body 11. (*Id.* at 3:28-29; A89 at Fig. 2.) As will be discussed in Section VI.C.2.a, it is critical that a first motion mechanism 4 consists of a first guide path unit 41 (in the form of guiding rods 411) and a first movable member 42 (in the form of rollers 421). (A104 at 4:21-28.) In other words, the rollers 421 and rods 411 of the first motion mechanism 4 are "for driving the base to move back and forth" in that they "permit the base to be driven back and forth" by a motor. (*Id.*; A106 at 8:5-7; A595-96.)

Notably, the motor does not constitute part of the first motion mechanism 4. (A105 at 6:55-67.) Instead, the motor is claimed as a component ***different from*** the first motion mechanism 4. (*Id.*) The motor of the first preferred embodiment comprises a vertical motor shaft 60,[1] a crank 61, and a link 62. (A104 at 4:50-62; A105 at 6:55-67.) This description of the first embodiment is in direct conflict with the district court's finding that the mamaRoo's crank and link are part of the first motion mechanism.

[1] Notably, the vertical motor shaft 60 is part of a power mechanism 6. The power mechanism 6 is described and shown to include a variable speed motor separated from the vertical motor shaft 60 by speed reduction gearing. (A104 at 3:50-51; A87 at Fig. 1; A90 at Fig. 3.)

The crank 61 is connected fixedly at one end to the vertical motor shaft 60 and pivotally connected at the other end to the link 62, which in turn is pivotally connected to the base 2. (*Id.*) The crank 61 is drawn in the shape of an arm, but the specification of the '609 patent does not limit the crank 61 to that shape. (A87 at Fig. 1.) Rotation of the motor shaft 60 is converted by the crank 61 and link 62 into reciprocal movement of the first movable member 42 of the base 2. (A104 at 4:50-62.) In that respect, the "motor" forms a slider-crank mechanism for converting the rotary motion of the crank 61 into reciprocal motion of the base 2 in a horizontal plane. (*Id.*) A comparison of Figures 3 and 5, below (annotations in red), shows how the motor—which is said by the claims to include the motor shaft 60, crank 61, and link 62—acts to drive the base back and forth along a horizontal plane when the crank is rotated about the motor shaft. (A105 at 6:55-67.)




FIG. 3




FIG. 5

Finally, the first preferred embodiment includes a second motion mechanism 5 disposed between the supporting element 3 and the bottom seat 12. (A104 at 4:33-49, 60-65.) The second motion mechanism 5 consists of rollers 522 disposed on the bottom of a supporting frame 521 (which in turn is fixed to the bottom of the supporting rod 3) and guiding elements in the form of rods 511. (*Id.*; A106 at 8:18-24.) The rollers 522 and rods 511 are "for driving said supporting element [3] to move up and down relative to said base [2]" in that it permits such movement. (A104 at 4:33-49, 60-65; A105 at 5:5-14; A106 at 8:18-24; A595-96.)



FIG. 7



FIG. 8

The second preferred embodiment, shown above, is similar in construction to the first preferred embodiment, but omits the guiding rods 511 and slider-crank

mechanism of the first preferred embodiment (*i.e.*, the crank 61 and link 62). (A105 at 5:22-40.) Instead, the second preferred embodiment includes threaded rod 7, which sits between the bottom seat 12 and the base 2, is rotatable by the power mechanism 6, and includes a first helical slot 71 with a variable depth and a second helical slot 72 with a uniform depth. (*Id.*) The supporting rod 3 is formed with a first projecting tooth 91 that extends from a bottom end thereof into contact with the surface of the first helical slot 71. (*Id.*) The base 2 is formed with a second projecting tooth 27 that extends downwardly therefrom into the second helical slot 72. (*Id.*)

The second preferred embodiment includes a first motion mechanism 8 in the form of guiding rods 82 and first rollers 82. (A105 at 5:41-47.) The second preferred embodiment also includes a second motion mechanism 9. In particular, the helical slot 71 and the first projecting tooth 91 form the guiding element and the second movable member, respectively, of a second motion mechanism 9. (*Id.* at 5:35-38, 48-52.)

In the second preferred embodiment, rotation of the threaded rod 7 causes the seat body 11 to move both back and forth and up and down. (A105 at 5:53-64.) In particular, when the threaded rod 7 is rotated, the second projecting tooth 27 of the base 2 engages with the lateral walls of the second helical slot 72 whereby the base 2 and the supporting rod are moved back and forth along the length of the

threaded rod. (*Id.*) At the same time, the first projecting tooth slides along the first helical slot 71 and follows its depth such that rotation of the threaded rod 7 causes the supporting rod 3 to move up and down. (*Id.*) Notably, the first projecting tooth 91 only engages with the bottom wall and does not engage with the lateral walls of the first helical slot 71 (i.e., the guiding element only provides guidance in the vertical direction for the second movable member, and does not provide any lateral guidance). (*Compare* A95-97 at Figs. 8-10 *with* A105 at 5:65-6:14.)

For purposes of this appeal, the third preferred embodiment is essentially the same as the first preferred embodiment. (A105 at 6:15-22.) However, it is notable that the third preferred embodiment is described as having "springs 541 that are disposed ***between*** the bottom seat 12 and the free ends 532 of the curved guiding rods 53 . . ." (A 105 at 6:30-32, emphasis added.) In this case, the term "between" is used in a broad sense since it is in intermediate relation to the bottom seat 12 and free ends 532, but is not "in the space that separates" as narrowly construed by the district court. (A71.) This is significant because the district court's construction of "between" conflicts with the specification's use of that term.

**B. The Accused mamaRoo Product.**

The accused mamaRoo product is an infant rocking chair that includes a driving device for moving a seat body back and forth and up and down in a curved motion, as shown in Thorley's advertisement below:







(A1094 (citing www.4moms.com/mamaRoo); A1361-62 at ¶¶5-8; A1872 at ¶¶5-8.)[2]

Thorley has sold and continues to sell the mamaRoo in the United States. (A1861 at ¶1.) Published Patent Application US 2010/0052376 is a patent application filed by Thorley that is directed to and describes various aspects of the mamaRoo. (A1872 at ¶4; A1402.)

The mamaRoo includes a base that is disposed between a seat body and a bottom seat and is movable on the bottom seat. (A1362-64 at ¶¶ 9-13; A1873-74 at ¶¶9-13.)

---

[2] This and other photographs of the mamaRoo included in this brief accurately represent the various components and features of the accused product. (A1361 at ¶2; A1871 at ¶2; A 1378 at ¶[16].)




The mamaRoo also includes a supporting element for supporting the seat body that is connected to the base by the "double scissor" mechanism identified below. (A1364-65 at ¶¶14-15; A1874 at ¶¶14-15; A1419-20 at [0046]-[0054].)




The mamaRoo includes wheels and rails that form a first motion mechanism

(for back and forth movement), are disposed between the base and the bottom seat, and permit and otherwise direct the base to be driven back and forth in the directions indicated below. (A1365-66 at ¶¶17-20; A1874-75 at ¶¶17-20.)




In distinction to the wheels and rails, which permit the back and forth movement (*i.e.*, the first motion mechanism), the mamaRoo also includes a slider-crank mechanism—or "slide crank assembly" as identified by Thorley—that ***causes*** the reciprocating horizontal motion to the base. (A1417 at [0012]; A1419 at [0045].) In the slider-crank mechanism, the link identified below as a crank rotates about its axis. (*Id.*) By virtue of the connecting arm, which connects the crank to the base, rotation of the crank is converted into reciprocating motion of the base. (*Id.*)




A video of the slider-crank mechanism in operation has been provided on CD-ROM. (A2571; A1872 at ¶3.)

The double-scissor mechanism of the mamaRoo includes four wheels that ride on the surface of the base, each within four parallel, spaced-apart paths delineated by ribbed, rectangular boxes. (A1429 at [0049].)




The paths guide the wheels of the double-scissor mechanism to keep them within the same horizontal plane and allow "smooth translational movement" of the double scissor mechanism. (A1420 at [0049].) The double scissor mechanism and delineated paths are disposed between the supporting element and the bottom seat. (A1366 at ¶21; A1876 at ¶21.) The double scissor mechanism and paths form a second motion mechanism that permits the supporting element to move up and down relative to the base. (A1419-20 at [0046], "vertical reciprocating assembly [which comprises the double scissor mechanism] . . . is configured to

provide vertical movement to the support device 7 [*i.e.*, the supporting element identified above]"; A595-96.)

## IV. THE DISTRICT COURT'S CLAIM CONSTRUCTION

In this case, the district court engaged in rolling claim construction. *See Pressure Products Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010) ("district courts may engage in rolling claim construction"). A first set of claim terms, including the terms "crank", "connected fixedly", and "guiding elements", were construed during the *Markman* phase of the case. A second set of claim terms, including "between" and "for driving", were construed during summary judgment phase of the case. Additional terms relevant to this appeal were stipulated to by the parties, including the term "first motion mechanism."

### A. "Crank"

The term "crank," which appears in claim 1, relates to a component used in a multitude of mechanisms, including a common one that is relevant in the context of the '609 patent: a "slider-crank" mechanism. (A105 at 6:60-67.) As explained below, slider-crank mechanisms are used to convert rotational motion into linear motion. Technical dictionaries and treatises define "cranks" as "a link in a mechanical linkage that can turn about a center of rotation." (A1063; A1323, "It is customary to call a rotating link a crank.")

The constructions proposed by Wonderland and Thorley are set forth below:

| Term | Wonderland's Proposed Construction | Thorley's Proposed Construction |
|---|---|---|
| "crank" | a link in a mechanical linkage or mechanism that can turn about a center of rotation[3] | an arm attached at a right angle to a shaft which turns about the axis of the shaft |

(A1085.) Wonderland proposed a construction consistent with definitions provided by technical dictionaries and treatises. Conversely, Thorley's proposal introduces shape and orientation requirements that were clearly designed to manufacture noninfringement arguments.

The district court chose to ignore the multiple technical dictionaries and treatises cited by Wonderland. Instead, relying upon a general purpose dictionary definition cherry-picked by Thorley, the district court adopted Thorley's construction: "Crank means 'an arm attached at the right angle to a shaft which turns about the axis of the shaft.'" (A23.)

### B. "Connected Fixedly"

The term "connected fixedly", which appears in claim 1, characterizes the relationship between the crank and the motor shaft. (A105 at 6: 62-63.) The term "connected" dictates that the crank and the motor shaft are joined together, while

[3] Wonderland proposed an alternative, more narrow construction that limits the term crank to its application in a crank-slider mechanism: "a device or part of a device for communicating motion or for converting reciprocating motion into rotary motion or vice versa." Either of Wonderland's proposed constructions would resolve the dispute between the Parties.

the term "fixedly" dictates that the crank and motor shaft cannot move relative to each other. (A420-21.) The adverb "fixedly" distinguishes the connection in question from another type of connection disclosed in the '609 patent—a pivotal connection—where one of the joined components can pivot with respect to the other. (A104 at 4:51-55.)

The Federal Circuit has recognized that there are at least two species of "connections": (1) where the two components are formed by a single unit or body (*i.e.*, integral connections); (2) where the two components are physically separate and are mechanically joined (*i.e.*, mechanical connections). *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1335 (Fed. Cir. 2011) (construing the claim language "an eccentric weight portion connected to said cylindrical gear portion" to "encompass[] 'united,' one-piece counterweights as well as counterweights consisting of two pieces that are 'joined together.'")

As shown in the table below, Wonderland proposed that the term "fixedly connected" covers all species of fixed connections, while Thorley proposed that the term be construed to cover only one species of fixed connections to the exclusion of others:

| Term | Wonderland's Proposed Construction | Thorley's Proposed Construction |
|---|---|---|
| "connected fixedly" | joined or linked securely | separate pieces joined or linked securely to one another |

(A1086.)

Ignoring the ordinary meanings of "connected" and "fixed," and refusing to acknowledge that connections can be integral, the district court adopted Thorley's construction, which is limited to one species of fixed connections: "Connected Fixedly means 'separate pieces joined or linked securely to one another.'" (A28.)

### C. "Guiding Elements"

The term "guiding elements" appears in claims 13-14 as components of both the first and second motion mechanisms that engage with and guide wheels. (A106 at 8:12-24.) The guiding elements are primarily shown in the '609 patent as rods; however, the guiding element for the second motion mechanism of the second preferred embodiment is in the form of a bottom wall of a channel (i.e., slot 71). (A105 at 5:48-52.) Moreover, in rejecting claim 13 during reexamination, the USPTO Examiner found guiding elements in the prior art in the form of flat, horizontal surfaces. (A2507; A1067.)

In that regard, Wonderland proposed a construction of "guiding elements" that would encompass all forms of guiding elements, while Thorley sought to manufacture another noninfringement argument by limiting the scope of the claims to guiding elements in the form of "tracks":

| Term | Wonderland's Proposed Construction | Thorley's Proposed Construction |
|---|---|---|
| "guiding elements" | a set of pathways which control or direct movement | a set of tracks forming a predefined path which direct movement |

(A1085.)

The district court accepted Thorley's arguments and construed guiding elements to mean "a set of tracks which direct movement." (A26.)

### D. "Between"

The term "between" appears multiple times throughout the specification and claims, including claim 12. No special meaning was assigned to the term in the specification, and no scope was disavowed during prosecution or reexamination. In that regard, during briefing on claim construction, Wonderland proposed a construction consistent with how the term is used in the specification, while Thorley proposed a construction that finds no support in the specification:

| Term | Wonderland's Proposed Construction | Thorley's Proposed Construction |
|---|---|---|
| "between" | in intermediate relation to | in the space that separates |

(A69.)

Without finding any exception that would justify departing from the ordinary meaning of "between," the district court nonetheless construed "the term 'between' with precision to specify the location of an objection 'in the space that separates.'" (A71.)

### E. "First Motion Mechanism"

The parties stipulated that the term "first motion mechanism," present in both claims 1 and 12, means "a combination of machine parts." (A1084)

### F. "For Driving"

In its ruling on summary judgment, the district court construed "the term 'for driving' to denote 'controlling or directing motion.'" (A69.) Clarifying, the district court held that its construction "does not require all of the components that contribute to driving, but still requires a minimum level of control or direction of the motion." (*Id.*)

## V. SUMMARY OF THE ARGUMENT

### A. The Stipulated Judgment of Noninfringement of Claim 3 Was Based On Erroneous Claim Constructions

The parties' stipulated judgment of noninfringement of claim 3 should be vacated as the stipulation was based on erroneous constructions of the terms "crank" and "connected fixedly".

#### 1. The district court's construction of "crank" improperly reads in the shape and orientation of the preferred embodiment.

The term "crank" in claim 3 has a plain and ordinary meaning: "a link in a mechanical linkage or mechanism that can turn about a center of rotation." (A1063; A1323.) Multiple technical dictionaries and treatises demonstrate that cranks can have any shape and orientation so long as the shape and orientation does not interfere with the desired motion. (*Id.*; A1319.)

Nonetheless, without any justification, the district court chose to depart from the plain and ordinary meaning and read limitations from the preferred embodiment into the term "crank". In particular, the district court erred in construing the term "crank" to mean "an arm attached at a right angle to a shaft which turns about the axis of the shaft." (A23.) The district court improperly limited the scope of the claims to the preferred embodiment by construing the term "crank" to be shaped like an "arm" and to be oriented precisely at a right angle to a shaft, when no particular shape or orientation is required by the claims.

Accordingly, the Federal Circuit should hold that the correct construction is the one that Wonderland proposed to the district court—"a link in a mechanical linkage or mechanism that can turn about a center of rotation."

**2. In construing "connected fixedly," the district court excluded a species of connections in the absence of an unequivocal disavowal.**

The term "connected fixedly" has an ordinary meaning—"joined or linked securely"—that encompasses both mechanical and integral connections. (A420-21.) Nothing in the '609 patent or its file history suggests a clear and unequivocal disavowal of integral connections.

In this case, the term "connected fixedly" characterizes the relationship between the crank and the motor shaft. (A105 at 6: 62-63.) The term "connected" dictates that the crank and the motor shaft are joined together, while the use of

"fixedly" dictates that the crank and motor shaft cannot move relative to each other. (A420-21.) The adverb "fixedly" distinguishes the connection in question from another type of connection disclosed in the '609 patent—a pivotal connection—where one of the joined components can pivot with respect to the other. (A104 at 4:51-55.)

These descriptions are consistent with the Federal Circuit's recognition of at least two species of "connections": (1) where the two components are formed by a single unit or body (*i.e.*, integral connections); and (2) where the two components are physically separate and are mechanically joined (*i.e.*, mechanical connections). *See, e.g.*, *Am. Piledriving Equip.*, 637 F.3d at 1335 (construing the claim language "an eccentric weight portion connected to said cylindrical gear portion" to "encompass[] 'united,' one-piece counterweights as well as counterweights consisting of two pieces that are 'joined together.'")

Nonetheless, without finding a clear and unequivocal disavowal of claim scope, the district court construed the term "connected fixedly" to exclude integral connections—*i.e.*, to mean "separate pieces joined or linked securely to one another." (A28.) The Federal Circuit should thus reverse the district court and hold that the correct construction is the one that Wonderland proposed – "joined or linked securely." (A1086.)

### B. The District Court Erred In Granting Summary Judgment of Noninfringement of Claim 14

Summary judgment of noninfringement of claim 14 should be vacated because a reasonable jury could find that the accused mamaRoo embodies a "first motion mechanism disposed between said base and said bottom seat for driving said base to move back and forth" and "guiding elements." The district court arrived at a contrary conclusion only after failing to apply its own constructions of "for driving" and "guiding elements" and/or misconstruing the terms "between" and "guiding elements." (A67-74, 78-80.)

#### 1. The district court failed to apply its construction of "for driving" and misconstrued the term "between".

The district court correctly construed the phrase "first motion mechanism…for driving" to mean "a combination of machine parts" that: (a) is separate from the device that creates motion—*i.e.*, the motor, which "includes both a crank and a link"; and (b) provides "a minimum level of control or direction of the motion." (A69.) However, failing to apply that construction, the district court proceeded to err by finding that the gears and linkage forming the slider-crank mechanism of the accused mamaRoo product were components of the "first motion mechanism." (A74.)

The district court also erroneously construed the term "'between' with precision to specify the location of an object 'in the space that separates.'" (A71.)

The district court's construction of "between" is improper because it excludes a preferred embodiment of the '609 patent and is inconsistent with how the '609 patent uses the term "between" in the specification. The Federal Circuit should hold that the correct construction of "between" is the one that is most consistent with the '609 patent disclosure—"in intermediate relation to"—in which case the mamaRoo embodies a "first motion mechanism disposed between said base and said bottom seat" even if the district court correctly identified the first motion mechanism of the mamaRoo.

### 2. The district court erred by failing to apply its construction of "guiding elements" or misconstruing that term.

The District Court failed to apply its own construction of "guiding elements" in concluding the pathways bounded by raised, indication lines on the base of the mamaRoo are not "guiding elements". (A26; A80.) Using the Court's construction, the mamaRoo has guiding elements because a pathway is a "track".

To the extent that the term "track", found within the district court's construction of "guiding elements", requires a three-dimensional structure, the District Court erred in its construction by effectively limiting the scope of the claims to the "rods" of the preferred embodiment, when no such limitation is required by the claims. The Federal Circuit should hold that the correct construction of "guiding elements" is the one that Wonderland proposed to the

District Court– "a set of pathways which control or direct movement." (A1085.)

# VI. ARGUMENT

## A. Standard of Appellate Review

Claim construction is a matter of law that is reviewed *de novo*. *Markman v. Westview Instruments*, 517 U.S. 370, 389-90 (1996); *Cybor Corp. v. FAS Technologies*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*). However, subsidiary facts based on the extrinsic record are reviewed for clear error. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841-42 (2015); *Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1265 (Fed. Cir. 2015).

It is a well-established rule that "[c]laim terms are generally given their ordinary meaning as understood by persons skilled in the art in question at the time of the invention." *InterDigital Communications, LLC v. International Trade Com'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012); *see also Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). As this Court has repeatedly emphasized, there are "only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner*, 669 F.3d at 1365.

Wonderland's stipulation of noninfringement based on the district court's claim construction does not preclude appellate review. Rather, appellate review of

a district court's claim construction ruling is proper where the parties have stipulated to noninfringement based on that construction. *See, e.g., Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Ventana Med. Sys. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1177 (Fed. Cir. 2006); *Generation II Orthotics, Inc. v. Medical Tech. Inc.*, 263 F.3d 1356, 1363 (Fed. Cir. 2001); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1330 (Fed. Cir. 2001).

A district court's grant of summary judgment is reviewed according to the law of the regional circuit, here the Third Circuit, where summary judgment is reviewed *de novo*. *ArcelorMittal Fr. v. AK Steel Corp.*, 786 F.3d 885, 888 (Fed. Cir. 2015) (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1013 (3d Cir. 2008)). Summary judgment is not appropriate unless, drawing all justifiable inferences in the nonmovant's favor, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B. The Stipulated Judgment of Noninfringement of Claim 3 Should Be Vacated.

The parties stipulated to judgment of noninfringement of claim 3 to allow appellate review of the district court's construction of "crank" and "connected fixedly". (A32-33.) Because the district court's constructions are erroneous, judgment of noninfringement of claim 3 should be vacated.

### 1. Slider-crank mechanisms as used in machine design.

The basic concept of a slider-crank mechanism provides a critical context to understanding why the district court's constructions of "crank" and "connected fixedly" are in error. Slider-crank mechanisms—also referred to as sliding-block linkages (A1323 at Fig. 6.1.5)—are widely used in machine design. Slider-crank mechanisms are used to convert rotary motion to reciprocating motion or *vice versa*. (A425-26.)

A slider-crank mechanism is composed of three important components: a crank, a connecting rod, and a slider (or block), annotated below. A crank is simply "a rotating link." (A1323, "It is customary to call a rotating link a crank"; A1063.) A slider is a component that reciprocates back and forth in a certain direction. (A1323, ". . . the motion of the slide will be that of pure translation, thus obtaining the . . . sliding-block, linkage.") The connecting rod connects the crank to the slider whereby rotation of the crank causes the slider to reciprocate back and forth. (*Id.*, "It is customary to call . . . the connecting link a connecting rod, or coupler.")

Depicted below is one example of a slider-crank mechanism for converting rotary motion to reciprocating motion:




(A1126.)

In the example above, the crank rotates about its pivot axis in the indicated direction, while the slider is confined to reciprocate back and forth along a fixed plane in the indicated directions. Rotation of the crank 180° from its original position, shown above, causes the connecting rod to pull the slider to the left, to the position shown below:




(A1126.) Rotation of the crank another 180° causes the connecting rod to push the slider to the right until it reaches its original position.

Both the patent-in-suit and the accused mamaRoo product use slider-crank mechanisms to cause the infant seat to move back and forth in a horizontal direction. (A104 at 4:50-57; A1419 at [0045].) The only relevant difference between the two mechanisms is that the '609 patent depicts the crank as having the shape of an arm, while the mamaRoo uses a disc-shaped crank. (A87 at Fig. 1,

item 61; A1409, item 87.)

Notably, none of the links of a slider-crank mechanism (*i.e.*, the crank, connecting rod, or slider) are confined to any particular shape. Instead, "links may be of any form so long as they do not interfere with the desired motion." (A1323.) It is well known that a crank, in particular, can have a disk shape (depicted above) ***or*** an arm shape (depicted below) without interfering with the desired motion of the slider-crank mechanism.




(A1126; A1319, depicting arm- and disc-shaped cranks.)

**2. The district court erred by construing the term "crank" contrary to its plain meaning.**

The term "crank" in claim 3 has a plain and ordinary meaning to persons of ordinary skill in the art of infant rocker design: "a link in a mechanical linkage or mechanism that can turn about a center of rotation." (A1063; A1323.) Nothing in the claim language, the specification, or the prosecution history justifies a departure from that plain and ordinary meaning. The patentee has not chosen to act as a lexicographer nor has it disavowed any claim scope.

Nonetheless, without justification, the district court departed from the plain and ordinary meaning and read limitations from the preferred embodiment into the term "crank". In particular, the district court's claim construction requires a crank: (1) to have a very specific shape—*i.e.*, an arm; and (2) to have a very specific orientation—*i.e.*, at a right angle to a shaft. (A23.) The district court's excessively-narrow construction is erroneous and improperly reads in the particular shape and orientation of the crank of the preferred embodiment shown in the figures of the '609 patent. (A87 at Fig 1, *see* "crank 61"); *see Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343 (Fed. Cir. 2013) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.") (quoting *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009)). No basis existed for the district court to limit the term "crank" in this way.

Nothing in the claim language, the specification, or the prosecution history states or even suggests that a crank ***must*** be arm-shaped, nor do any of those guiding documents state or suggest that a crank ***must*** be oriented at a right angle to the shaft. The district court did not cite to the claim language, specification, or the prosecution history of the '609 patent to support its definition of "crank". Instead, the district court relied upon a general purpose dictionary to support its interpretation of crank. In doing so, the district court improperly favored a general

purpose dictionary over a technical dictionary and multiple mechanical engineering treatises which clearly demonstrate that cranks can have any shape and, therefore, need not be arm-shaped.

The flaws in the district court's construction result, in part, from undue reliance on a general purpose dictionary, the Merriam-Webster's Collegiate Dictionary, as opposed to a technical dictionary (such as the McGraw-Hill Dictionary of Engineering, cited above) or treatise (such as Norton's and Mark's, also cited above). *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("We have especially noted the help that ***technical*** dictionaries may provide to a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms) (emphasis added) (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)). In this case, the term "crank" is a technical term for which a general purpose dictionary is less than adequate.

In particular, cranks shaped as a disk are well-known in the art, as demonstrated in Design of Machinery by Robert L. Norton, an authoritative mechanical engineering treatise. (A1319.) Norton on Design of Machinery shows two kinds of cranks, one of which is a disc-type crank and the other an arm-type crank. (*Id.*) Each is specifically called out by Norton as a "Crank":




From: *Design of Machinery*, by Robert L. Norton (red letter annotations and red arrows added)

(*Id.*)

Similarly, the technical dictionary definition of "crank" does not ascribe any particular shape to a crank. Instead, a "crank" is defined as a "link":

> **crank** [MECH ENG] A link in a mechanical linkage or mechanism that can turn about a center of rotation.

(A1063.) Even further, another authoritative treatise on mechanical engineering, Marks' Standard Handbook for Mechanical Engineers, explains that "[i]t is customary to call a rotating link a crank," and clarifies that the links forming the crank "may be of any form so long as they do not interfere with the desired

motion." (A1323.) Thus, the two treatises (Norton and Marks Handbook) and the McGraw-Hill engineering dictionary all fully support Wonderland's proposed definition of "crank." Further, those references do not limit a crank to something in the form or shape of an arm, nor do they require the crank to be oriented at a right angle to a shaft.

Those technical definitions are consistent with what one of ordinary skill in the art would understand—the shape of a crank can vary without interfering with the desired motion. As an example, the diagrams below demonstrate how an arm-shaped crank and a disc-shaped crank can impart the same motion in a slider-crank mechanism:

| Disc-Shaped Crank | Arm-Shaped Crank |
| --- | --- |
|  |  |
|  |  |
|  |  |
|  |  |

Further demonstrating this concept is a modern depiction of the very first known example of a "crank" that was used to effectuate reciprocal movement. The Hierapolis sawmill, a Roman water-powered stone sawmill dating to the third century AD, is depicted below having two cranks performing the exact same function—one in the shape of an arm (for the "B" saw) and one in the shape of a disc (for the "A" saw):




(A1306, annotations added in red). Notably, Norton's two cranks reproduced above are very similar to the two that are depicted in the diagram of the 3rd Century sawmill at Hierapolis.

In its memorandum opinion, the district court found the Hierapolis sawmill example to be "unconvincing" because the "'crank' appears to contain a right angled arm." (A22.) In doing so, however, the district court disregarded that the demonstrative above depicts two different cranks. While the crank on the right is indeed shaped as an arm, the crank on the left, which serves the same function, is shaped as a disc. The district court also found it ironic that the top of the Wikipedia article in which the demonstrative was found states that "[a] crank is an arm attached at right angles to a rotating shaft by which reciprocating motion is imparted to or received from the shaft." The district court apparently did not see the very next sentence which states "the arm may be a bent portion of the shaft, or a separate arm ***or disk*** attached to it." *See* Wikipedia, *Crank*, http://en.wikipedia.org/wiki/Crank_(mechanism) (last visited September 11, 2015) (emphasis added).

For the reasons provided above, the district court's construction of "crank" from claim 3 should be reversed, and this Court should adopt Wonderland's proposed construction: "a link in a mechanical linkage or mechanism that can turn about a center of rotation." (A1085.)

**3. The district court erred by construing the term "connected fixedly" contrary to its plain meaning.**

Claim 1 uses the term "connected fixedly" with reference to the connection between the crank and the motor shaft. (A105 at 6:62-63.) The ordinary meaning

of "connected" is "joined or linked together". (A420.) The ordinary meaning of "fixed" is: "securely placed or fastened." (A421.) A fixed connection is the antithesis of the "pivotal" connections described in the '609 patent, where one component is connected to, but can rotate with respect to, another component. (*See*, A104 at 4:51-55; A105 at 6:64-67).

Thus, the term "connected fixedly" in claim 1 has a plain and ordinary meaning to persons of ordinary skill in the art of infant rocker design: "joined or linked securely." (A1086.) In other words, the term "connected fixedly" encompasses integral connections (where two components are integrally formed as a single piece) and mechanical connections (where two separate pieces are joined). *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1335 (Fed. Cir. 2011) (construing the claim language "an eccentric weight portion connected to said cylindrical gear portion" to "encompass[] 'united,' one-piece counterweights as well as counterweights consisting of two pieces that are 'joined together.'"); *Animatics Corp. v. Quicksilver Controls, Inc.*, 102 Fed. Appx. 659, 666 (Fed. Cir. 2004) (non-precedential) (holding that the district court erred in construing the term "connected" contrary to its plain and ordinary meaning to require "physically separate circuits that are electrically connected" in the absence of "a clear and unambiguous disclaimer.") Nothing in the claim language, the specification, or the prosecution history justifies a departure from that plain and ordinary meaning.

Once again, however, the district court departed from the term's plain and ordinary meaning by limiting "connected fixedly" to one species of connections (mechanical connections) to the exclusion of another species of connections (integral connections). In particular, the district court's construction excludes integral connections entirely from the scope of the claims by adding a very specific concept to its construction of "connected fixedly", *i.e.*, the notion that there must be "separate pieces" involved that are mechanically connected together. (A28.) There is no basis for this departure from the plain and ordinary meaning of "connected fixedly." Indeed, there is nothing in the patent or file history that states or suggests that the crank must be mechanically connected to the shaft. Similarly, there is nothing in the patent or file history that states or suggests that the crank cannot be integrally connected to the shaft. The requirement that the term "connected fixedly" requires two separate pieces, goes beyond what the term in question specifies, and is an unwarranted reading of 'separateness' into the claim.

The basis for the district court's re-definition of the term "connected fixedly" is unsound. The district court has essentially redefined the term "connected fixedly" based on its interpretation of a selected dictionary definition that includes that explanatory comment—"usually by something intervening". (A27.) However, parsing a particular dictionary's explanatory comment is not the proper way to construe a claim term.

The district court suggests that the exclusion of "integral connections" from its construction of "connected fixedly" is warranted because: (a) "the '609 patent uses 'connected' only to describe two pieces being joined together; and (b) "the author of the '609 patent used "integrally" elsewhere, and thus, its exclusion from claim 1 shows the author's intent that there must be separate pieces 'connected fixedly." (A27.) In essence, the district court based its claim construction on a theory of disavowal. However, the "evidence" cited by the district court fails to even approach the high bar of "'an unambiguous disavowal that clearly and unmistakably disclaims' the plain meaning of a disputed claim term." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090 (Fed. Cir. 2013) (quoting *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1342 (Fed. Cir. 2012). Because there is no such clear disavowal in the patent or file history, the term "connected fixedly" should be given its ordinary meaning, which is: "joined or linked" (based on "connected") and "securely" (based on "fixedly"). (A420-21.)

Thus, Wonderland urges the court to give the term "connected fixedly" its ordinary meaning: "joined or linked securely". (A1086.)

### C. Summary Judgment of Noninfringement of Claim 14 Should Be Vacated.

The district court granted summary judgment of noninfringement of claim 14 based on the limitation of claim 12 calling for "the first motion mechanism [to be] disposed between said base and said bottom seat for driving said base to move

back and forth on said bottom seat" and the limitation of claim 14 calling for "guiding elements." In doing so, the district court: (1) failed to apply its construction of "for driving" in finding that the mamaRoo's gears and linkage were part of the "first motion mechanism" and misconstrued the term "between"; and (2) failed to apply its construction of the term "guiding elements" or misconstrued that term. Accordingly, summary judgment of claim 14 should be vacated.

### 1. The district court's summary judgment ruling directly conflicts with the rulings of the USPTO, as affirmed by the Federal Circuit.

On January 12, 2012, Thorley filed a request with the U.S. Patent and Trademark Office ("USPTO") for *inter partes* reexamination of claims 1-3, 12-13, and 19-20. (A707.) Thorley did not request reexamination of claim 14. (*Id.*) While the USPTO denied the request as to claim 3, the USPTO granted reexamination as to claims 1-2, 12-13, and 19-20. (A2413-17.) The USPTO Examiner found that claims 1-2, 12-13, and 19-20 were not patentable in view of the prior art in a Right of Appeal Notice dated February 15, 2013. (A2430-32.) The Examiner's decision was affirmed by the USPTO Patent Trial and Appeal Board on June 30, 2014 (A2539-40), and by this Court on May 6, 2015. *Wonderland Nursery Goods Co. v. Thorley Indus. LLC,* 601 Fed. Appx. 991, 992 (Fed. Cir. 2015), *aff'd without opinion.*

Notable for this appeal is that the Examiner concluded that the limitation of claim 12 calling for "a first motion mechanism . . . for driving said base to move back and forth on said bottom seat" did not include the power mechanism (or associated gears and linkage) that actually causes the base to move back and forth, but instead merely includes components that "permit" the base to move back and forth:

> The Examiner further points out that although the claim limitation recites, inter alia, "for driving said base to move back and forth," the disclosed driving of the base in the description of the reexamined patent . . . is not provided by the *first motion mechanism* but by the *power mechanism* (which is not recited in claim 12). Thus, the limitation set forth in claim 12 reciting "for driving said base to move back and forth" is being interpreted by the Examiner as requiring that the first motion mechanism permit the base to be driven back and forth.

(A2484-85.)

In that regard, the Examiner concluded that the first motion mechanism of Nafte (U.S. Patent No. 4,752,980) consisted of rollers 14 and guide rails 15, and did ***not*** include Nafte's motor 30, crank 31, or link 32. (A2448-49.)




FIG. 1

(A1617.)

Moreover, the Examiner concluded that the first motion mechanism of Nordella (U.S. Patent No. 8,022,708) consisted of channels 86 and rollers/guide wheels 83, and did ***not*** include hydraulic cylinder 162. (A2463.)

FIG. 1




(A2553.)

Even further, the Examiner concluded that the first motion mechanism of Kanaya (U.S. Patent No. 5,257,851) consists of tracks 20 and wheels 40, and did

***not*** include Kanaya's power mechanism. (A2484-85.)




(A673; A2564.)

Also notable for this appeal is that the Examiner interpreted the "guiding elements" limitation to be inclusive of flat surfaces. For instance, the Examiner concluded that Surbaugh's runways 14 (and ***not*** the adjacent shoulders 16) are guiding elements. (A2507.)




Fig. 2

(A1067.)

Finally, the Examiner recognized that the claim term "between" was not used by the '609 patent "with precision" to specify the location of an object "in the space that separates." Indeed, the Examiner stated that the term "between," as used in the '609 patent, "is broad enough to refer to a comparison of the relative levels of the elements." (A2498.)

**2. The district court erred in concluding that the mamaRoo does not contain the limitation of claim 12 calling for "the first motion mechanism [to be] disposed between said base and said bottom seat."**

**a. The district court's failure to apply its construction of "for driving" led to an erroneous conclusion regarding the identity of the first motion mechanism in the accused mamaRoo.**

A reasonable jury would—or, at an absolute minimum, could—conclude

that the "first motion mechanism" of the accused mamaRoo consists solely of the wheels and rails along which its base moves on the bottom seat. This is how both the specification of the '609 patent, in describing the preferred embodiment, ***and*** the Examiner, during reexamination, applied the claim term "first motion mechanism".




Notably, Thorley does not dispute and, in fact, has admitted that the wheels and rails of the mamaRoo identified above are "disposed between said base and said bottom seat." (A1365 at ¶17; A1874 at ¶17.)

As discussed above in the statement of facts, the '609 patent identifies the first motion mechanism of all three preferred embodiments as guiding rods and rollers. (*See*, A104 at 4:21-28; 5:41-42; 6:15-18.) The '609 patent expressly distinguishes the first motion mechanism from the components that make up the power mechanism and slider-crank mechanism of the preferred embodiments. (*See*, A104 at 4:21-32, 50-65; A105 at 6:55-67.) Similarly, as discussed in Section

VI.C.1, the USPTO Examiner found that the Nafte, Nordella, and Kanaya prior art references all included first motion mechanisms that consisted solely of wheels/rollers in combination with rails, tracks, or paths—*i.e.*, the components that "permit" movement— to the exclusion of the mechanisms that actually cause movement. (A2448-49, 84-85.)

Neither the '609 patent nor the USPTO Examiner applied, or justify applying, the term first motion mechanism to include a power mechanism or associated gearing and linkage. Yet, that is exactly what the district court did when it found that the first motion mechanism of the mamaRoo includes not only wheels and rails, but also the gears and links that make up the mamaRoo's slider-crank mechanism. (A73.) The district court purports to base its finding on the language of claim 12 that states that the first motion mechanism is "for driving said base to move back and forth on said bottom seat." (*Id.*) The district court's finding is clearly erroneous. Not only does it contravene how the '609 patent and USPTO apply the term "first motion mechanism" (described above), but it departs from ***the district court's own*** construction of the "for driving" limitation.

In construing "the term 'for driving' to denote 'controlling or directing motion,'" the district court expressly noted that "the claim drafters did not require 'for driving' to include 'each and every component that contributes to driving' because the drafters separately recited a 'motor for driving' in Claim 1, and this

motor includes both a 'crank' and a 'link.'" (A69.) The district court also appreciated that the "for driving" language "does not require all of the components that contribute to driving, but still requires a minimum level of control or direction of the motion." (*Id.*)

Similarly, during reexamination, the USPTO Examiner stated that "the limitation set forth in claim 12 reciting 'for driving said base to move back and forth' is being interpreted by the Examiner as requiring that the first motion mechanism permit the base to be driven back and forth." (A2484-85.) In other words, the Examiner interpreted first motion mechanism ***not*** to include a power mechanism, crank, or link.

The district court's ruling (which was, effectively, an inexplicable reversal of its own claim construction) constitutes error as a matter of law. Additionally, by imposing the additional requirement that gearing and linkage (*i.e.*, the slider-crank mechanism of the mamaRoo) are necessarily part of the "first motion mechanism…for driving", the Court erroneously created a basis for finding that all of the first motion mechanism was not "between" (*i.e.*, in the space that separates) the base and the bottom seat. If the Court had followed its own construction of "first motion mechanism…for driving" (*i.e.*, "a combination of machine parts" that provides "a minimum level of control or direction of the motion," and does not include the motor, crank, or link), then there would be no basis for a finding of

non-infringement, regardless of what meaning is given to the term "between" in claim 12.

**b. The district court granted summary judgment based on an incorrect construction for the claim term "between".**

The term "between" in claim 12 has a plain and ordinary meaning to persons of ordinary skill in the art of infant rocker design: "in intermediate relation to." (A2213, citing http://www.merriam-webster.com/dictionary/between.) Using this correct construction of "between," the first motion mechanism of the mamaRoo, even if applied to include gears and links, are disposed between the base and bottom seat.

Nothing in the claim language, the specification, or the prosecution history justifies the district court's departure from the plain and ordinary meaning of "between". Notwithstanding, the district court interposed a narrow and "precise" requirement into the term to "to specify the location of an object 'in the space that separate.'" (A71.) This added limitation is improper and constitutes error as a matter of law. Moreover, it is in direct contradiction to how the term "between" is used in the specification.

The specification of the '609 patent uses the term "between" to mean "in intermediate relation to" in several instances. For example, springs 541 in Figure 12 below are said to be "disposed ***between*** the bottom seat 12 and the free ends 532

of the curved guiding rods 53," when they are clearly not "in the space that separates" the bottom seat from the free ends 532. (A 105 at 6:30-32 (emphasis added).) However, consistent with Wonderland's proposed construction, the springs 541 clearly are in intermediate relation to the free ends 532 and bottom seat 12.




FIG. 12




Furthermore, the district court's interpretation of "between" improperly operates to exclude preferred embodiments. If the "first motion mechanism…for driving" limitation is applied, as the district court has, to include not only wheels and rollers, but also gearing and linkage that form a slider-crank mechanism (and if the term "between" is construed to mean "in the space between", rather than "in intermediate relation to"), each of the preferred embodiments disclosed in the '609

patent that have a crank and link would fall *outside* the scope of claim 12. This is because the crank of the first and third preferred embodiments of the '609 patent (like that of the mamaRoo device) is not directly below the base, although it is in intermediate relation to the base and bottom seat. This is shown below:




FIG. 3




FIG. 2

An interpretation that excludes the preferred embodiments "is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case." *Vitronics Corp. v. Conceptronic,* 90 F.3d 1576, 1583 (Fed. Cir. 1996).

The reexamination file history for the '609 patent also shows that the district court erred by giving the term "between" a narrow and precise construction. In particular, the Examiner did not find reason to apply a narrow or precise construction to the term between. Instead, the Examiner stated that the the term "between," as used in the '609 patent, "is broad enough to refer to a comparison of

the relative levels of the elements." (A2498.)

Thus, either the "first motion mechanism…for driving" limitation should not include the gearing and linkage or the term "between" must be accorded a meaning other than "in the space that separates". In either case, the district court wrongly concluded that the mamaRoo does not embody the limitation of claim 12 calling for the "first motion mechanism [to be] disposed between said base and said bottom seat." (A74.)

**3. The district court erred in concluding that the mamaRoo does not contain the limitation of claim 14 calling for "guiding elements".**

**a. There is at least a question of fact regarding whether the flat, bordered paths on the mamaRoo are "guiding elements".**

The district court construed the term "guiding elements" to mean "a set of tracks which direct movement." (A26.) The district court explained that the term, as construed, allows for a broader definition beyond the embodied parallel rods" of the '609 patent. (A25.)

Using the district court's construction, a reasonable jury would—or at least could—find that the flat, bordered paths on the base of the mamaRoo are "guiding elements" because they are tracks that direct movement of the wheels on the bottom of the double-scissor mechanism.




Indeed, the district court found that "a reasonable jury could conclude that the top surface [of the base] controls or directs the vertical movement of the wheels because the top surface would limit the vertical movement of the wheels . . ." (A79.)

Nonetheless, the district court found that flat, bordered paths are not "guiding elements" based on an erroneous interpretation of the term "track".[4] In particular, the district court effectively found that an element is only a "track" if it has "a groove, rail, or other physical component extending from this surface that could . . . potentially engage with or direct movement of the wheel." In other

[4] Ironically, the term "track" does not appear anywhere in the '609 patent specification or claims, but rather is a term found only in the district court's construction of "guiding elements."

words, the court found that a track encompasses only a structure that provides guidance in not only a vertical direction, but also in a horizontal direction. This finding is not justified in view of the ordinary meaning of the term "track", which is well known to encompass flat surfaces that provide only vertical guidance (*e.g.*, a running track). Indeed, the term "track" includes many definitions, including "the course along which something moves". (A487.)

If the district court had followed its own construction of "guiding elements," then there would be no basis for a finding of non-infringement claim 14.

**b. The district court granted of summary judgment based on an erroneous construction for the claim term "guiding elements".**

To the extent that the term "track" is found to exclude flat surfaces, and require guidance in both a vertical and horizontal direction, the district court erred in construing the claim term "guiding elements" as being limited to "tracks." Indeed, the term "guiding elements," in the context of the '609 patent, has a plain and ordinary meaning to persons of ordinary skill in the art of infant rocker design: a set of pathways which control or direct movement.

Several of the claims (*i.e.*, claims 1, 2, 4-6, 8, 9, 11, 19 and 20) use the term "guide path unit" which is made up in part of "guiding elements." The term "guide path unit" is not a disputed term, but the use of the term "path" is a strong indicator that the term "guiding elements" is appropriately defined using the term 'pathway"

instead of "track". "'A word or phrase used consistently throughout a claim should be interpreted consistently.'" *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030-31 (Fed. Cir. 2002) (*quoting Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998)). Ironically, the district court's construction of "guiding element" would preclude a "path" from serving as a "guiding element" of a "guide *path* unit."

It is improper to limit a claim term in a patent to a particular structure simply because there is only one example of the structure shown in the specification. *Phillips,* 415 F.3d at 1323; *Enzo Biochem, Inc. v. Applera Corp.,* 599 F.3d 1325 (Fed. Cir. 2010); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Yet, the district court took this erroneous approach with respect to "guiding elements," when it effectively construed the term "guiding element" to be limited to the "rod" embodiment disclosed in the '609 patent, a particular form of guiding element that is not claimed. Unlike the district court, this Court should simply rely on the ordinary meaning of the words themselves in the context of the '609 patent, and construe the term "guiding elements" to mean a set of pathways which control or direct movement.

Reference to a "path" or "pathway" in the construction of "guiding elements" is particularly appropriate given the use of the term "guide path unit" throughout that specification of the '609 patent. Moreover, Wonderland's proposed

construction is consistent with the reexamination file history. In particular, the Examiner found that flat surfaces constitute "guiding elements." As discussed in the statement of facts, the Examiner concluded that Surbaugh's runways 14 (and ***not*** the adjacent shoulders 16) are guiding elements. (A2507.) Surbaugh's runways 14 are nothing more than flat paths.




(A1067.)

Because the district court erred in construing the term "guiding element," summary judgment of claim 14 should be vacated.

## VII. CONCLUSION

The district court erred in construing the "crank" and "connected fixedly" limitations of claim 1. The district court also erred by failing to apply its construction of the "for driving" limitation and by misconstruing the term

"between" of claim 12. Finally, the district court erred either by failing to apply its construction of the "guiding elements" limitation of claim 14, or by misconstruing that term. Accordingly, stipulated judgment of non-infringement of claim 3 and summary judgment of claim 14 should be vacated and the case remanded for further proceedings upon legally correct constructions.

Dated: October 5, 2015

/s/ Daniel A. Tallitsch
David I. Roche
Daniel A. Tallitsch
BAKER & McKENZIE LLP
300 East Randolph Street
Suite 5000
Chicago, Illinois 60601
(312) 861-8000
*Attorneys for Appellant Wonderland Nurserygoods Co., Ltd.*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS


| Date Filed | Docket Number | Document Description | Page Number |
|---|---|---|---|
| 01/11/13 | 58 | Opinion regarding construction for disputed claim terms | A0001-A0029 |
| 01/11/13 | 59 | Claim Construction Order | A0030-A0031 |
| 03/13/13 | 66 | Stipulation for Entry of Order Granting Partial and Non-Final Judgment of Non-Infringement | A0032-A0035 |
| 03/14/13 | 67 | Order granting Stipulation for Entry of Order Granting Partial and Non-Final Judgment of Non-Infringement | A0036 |
| 12/19/13 | 157 | Memorandum Opinion on Motions for Summary Judgment | A0037-A0081 |
| 12/19/13 | 158 | Order on Motions for Summary Judgment | A0082-A0083 |
| 07/06/15 | 269 | Final Judgment | A0084-A0085 |
| --- | --- | United States Patent Number 8,047,609 | A0086-A0106 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WONDERLAND NURSERYGOODS CO., LTD., | ) | |
| Plaintiff, | ) | Civil Action No. 12-196 |
| vs. | ) | Judge Nora Barry Fischer |
| THORLEY INDUSTRIES, LLC, *d/b/a* 4MOMS, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

## I. BACKGROUND

This is a patent infringement action brought by Wonderland Nurserygoods Co., Ltd ("Wonderland") against Thorley Industries, LLC *d/b/a* 4Moms ("Thorley"). (Docket No. 1). Wonderland filed this case on February 16, 2012, alleging the infringement of U.S. Patent No. 8,047,609 ("the '609 Patent"), entitled "Infant Rocking Chair and Driving Device for Driving the Same." (*Id.* at ¶ 8). The technologies at issue are mechanical driving devices to create an infant chair that moves both up-and-down and back-and-forth. (*Id.*)

Wonderland is a Taiwanese company that designs, manufactures and distributes products for infants and young children. (*Id.* at ¶ 4, 7). Wonderland is the assignee of the '609 Patent. (*Id.* at ¶ 8). Thorley is a Pennsylvania corporation, with its offices in Pittsburgh, which makes infant rocking chairs (the "Accused Product") under the brand name "mamaRoo". (Docket Nos. 1 at ¶ 10; 19 at 3)

Thorley asserts five affirmative defenses against Wonderland's infringement claim: failure to state a claim, noninfringement, invalidity, estoppel, and failure to provide notice.

(Docket No. 19 at ¶¶ 15-19). Thorley asserts counterclaims for non-infringement and invalidity. (*Id.*at 4-5). Wonderland answers that its patent is valid and infringed. (Docket No. 21). It asserts the affirmative defenses of failure to state a claim of non-infringement, (*id.* at ¶ 15), and failure to state a claim of invalidity. (*Id.* at ¶ 16).[1]

On March 14, 2012, the Court denied Thorley's Motion to Stay Proceedings Pending Reexamination of the patent by the USPTO because the Court found that Plaintiff would be unduly prejudiced if this Court were to grant a stay.[2] (Docket No. 23).

Accordingly, the parties filed a "Joint Disputed Claim Terms Chart" pursuant to LPR 4.2 of the Local Patent Rules for the United States District Court for the Western District of Pennsylvania on June 21, 2012.[3] (Docket No. 39). Opening claim construction briefs, along with exhibits in support, were filed on July 20, 2012 and August 10, 2012 by Wonderland and Thorley, respectively. (Docket Nos. 39-42). Wonderland filed a reply brief and supporting declarations on August 24, 2012. (Docket No. 43). On September 6, 2012, the Court ordered the parties to meet and confer to determine if there were any claim terms to which there were no substantive disputes. (Docket No. 44). Accordingly, the parties filed a corrected "Revised Joint Disputed Claim Terms Chart" pursuant to said order on September 25, 2012. (Docket No. 46)

As scheduled in the Initial Patent Scheduling Order, a technology tutorial and a *Markman*[4] claim construction hearing were held on September 27, 2012. (Docket Nos. 30, 47).

---

1 Paragraph 16 is incorrectly numbered as an additional paragraph 15. (Docket No. 21)

2 The status of the reexamination as of January 11, 2013 is "Ready for examiner action after owner/requester comments period after ACP" (Action Closing Prosecution). *See* Patent Application 95/001,871. The Court also notes as this *inter partes* reexamination was filed before September 16, 2012, the America Invents Act does not affect this Court's analysis. Leahy–Smith America Invents Act, Public Law 112–29 §6(c) ("America Invents Act"); *see also* USPTO AIA Frequently Asked Questions. http://www.uspto.gov/aia_implementation/faqs_inter_partes_reexam.jsp.

3 The Local Patent Rules for the United States District Court for the Western District of Pennsylvania can be found at http://www.pawd.uscourts.gov/Documents/Forms/lrmanual.pdf (last updated December 1, 2009).

4 *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377-90 (1996).

The transcript of said hearing was filed on November 7, 2012 (Docket No. 51). Both parties then filed post-hearing claim construction briefs on November 15, 2012. (Docket Nos. 53, 54). The parties further met and conferred in accordance with the Court's November 9, 2012 Order; however, as stated in their Joint Status Report filed on November 29, 2012, they were unable to reach agreements on any remaining disputed terms. (Docket Nos. 52, 57). As such, this matter is ripe for disposition.

## II. LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2005)); *see also Zircon Corp. v. Stanley Black & Decker, Inc*., 452 F. App'x 966 (Fed. Cir. 2011), *reh'g denied* (Dec. 7, 2011); *N.A. Water Sys., LLC v. Aquatech Int'l Corp.*, 2012 WL 3597825 (W.D. Pa. Aug. 20, 2012). In patent infringement litigation, the court is to first determine, as a matter of law, the proper construction, or meaning, of the disputed patent claims. *Id.* Once the claim terms have been properly construed, the fact finder must then determine whether the accused product or method infringes the asserted claims as so construed. *See Markman*, 517 U.S. 370.

The decision by the United States Court of Appeals for the Federal Circuit in *Phillips* provides a blueprint for the court's claim construction analysis:

> A court construing a patent claim seeks to [afford] a claim the [ordinary and customary] meaning it would have to a person of ordinary skill in the art at the time of the invention....
>
> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction ... involves little more

> than the application of the widely accepted meaning of commonly understood words ....
>
> In many cases ..., however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning ... as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean .... Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art ....
>
> Within the class of extrinsic evidence, the court has observed that dictionaries and treatises can be useful in claim construction .... We have especially noted the help ... technical dictionaries may provide to a court to better understand the underlying technology and the way in which one of skill in the art might use the claim terms .... Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art .... Such evidence, we have held, may be considered if the court deems it helpful in determining the true meaning of [the] language used . . . .
>
> [Although] ... extrinsic evidence in [a] general [sense is] less reliable than [intrinsic evidence] in determining how to read claim terms, .... encyclopedias and treatises [can be] particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms [so long as they are considered within the context of the intrinsic evidence].

*Phillips*, 415 F.3d at 1303, 1313, 1314, 1318-19 (citations and internal quotations omitted).

In looking to the intrinsic evidence, the court considers the language of the claim, the specification and the prosecution history. *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The claim itself is of primary importance since "it is that language that

the patentee chose to use to 'particularly point[ ] out and distinctly [ ] claim the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (Fed. Cir. 2000) (quoting 35 U.S.C. § 112, ¶ 2). However, the Federal Circuit advises in *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005), that "[w]e cannot look at the ordinary meaning of the term ... in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."

Next, the Court must look to the specification in the patent. As to the specification, the Federal Circuit has stated that it "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of the disputed claim." *Vitronics*, 90 F.3d at 1582; *Phillips*, 415 F.3d at 1315; *Zircon*, 452 Fed. Appx. at 972. The Federal Circuit states that "it is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1317. However, the Federal Circuit cautions that there is a danger in reading limitations from the specification into the claim. *Id.* at 1323 (citing *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification")). While the specification may be the best guide in interpreting a disputed term, the court must be careful to use the specification only to ascertain its meaning and not to impose a limit on a claim term. *Id.; see also Abbott Lab. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) (courts may not limit broad claim language to that described in even a single embodiment absent a clear intention by the patentee to so limit the claim scope); *Karlin Technology, Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 973 (Fed. Cir.

1999) ("The general rule . . . is that the claims of a patent are not limited to the preferred embodiment" of the invention described in the specification).

The final piece of intrinsic evidence which the Court may consider is the prosecution or file history. *Zircon,* 452 F. App'x. at 972. The prosecution history "consists of all express representations made by or on behalf of the applicant to the [patent] examiner to induce a patent grant." *Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) (internal quotations and citations omitted). The prosecution history, therefore, can provide some insight into the scope of the invention, as understood by the inventor and the USPTO, as well as whether that scope is narrower than the claim language would otherwise indicate. *Phillips*, 415 F.3d at 1317. A caveat to the use of the prosecution history is that it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*. As a result, in order for a limitation of the scope of the claims to be read from the prosecution history, the inventor must have made a "clear and unmistakable disavowal" of a broader scope of protection during prosecution. *See Purdue Pharma L.P. v. Endo Pharms. Inc*., 438 F.3d 1123, 1136 (Fed. Cir. 2006).

If the meaning of a claim's terms cannot be ascertained through interpretation of the intrinsic evidence a court may look to extrinsic evidence, "which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d 967, 980 (Fed. Cir. 1995)); *see also Zircon,* 452 F. App'x. at 972; *N.A. Water Sys.,* 2012 WL 3597825. Although extrinsic evidence "can shed useful light on the relevant art," such evidence is less significant in defining a claim term than intrinsic evidence. *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp*., 388 F.3d 858, 862 (Fed. Cir. 2004) (internal

quotation omitted)). This is because "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term," and "[i]n such circumstances, it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583. Therefore, extrinsic evidence "may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language" or the other intrinsic evidence. *Id.* at 1584.

## III. ANALYSIS

The '609 Patent, entitled "Infant Rocking Chair and Driving Device for Driving the Same", was filed on June 28, 2007 and issued on November 1, 2011. '609 Patent col. 1. ln. 1-12. The terms still in dispute are: (A) "infant rocking chair"; (B) "bottom seat"; (C) "motor shaft"; (D) "crank"; (E) "guiding elements; (F) "connected fixedly" and "attached fixedly". (Docket Nos. 46, 57). The Court will now construe each of these terms, in turn.

### A. Infant Rocking Chair

The parties dispute the construction of the term "infant rocking chair" found in the preamble to claims 1, 12, and 19. (Docket No. 46). The parties' proposed constructions are as follows:

| Term | Wonderland (Modified) [1] | | AGREED CONSTRUCTION | Thorley (Modified) [1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| infant rocking chair (claims 1, 12, 19) | a **baby seat or chair-like**[2] device that is designed to hold an infant and that moves in two directions at the same time. | The titles, abstracts and figures of art cited and relied upon by the Examiner in the original prosecution, i.e., US 5,123,701 US 5,183,457 US 496,531 US 2002-0113469 US 2006-0012230 | | a seat or chair-like device that is capable of holding an infant which moves or sways back and forth. | Patent-in-Suit: 1:15-42; 4:66-5:4; 5:53-6:10. Feb. 14, 2012 Office Action in the reexamination at pgs. 2-3, 5, and 10. |

(Docket No. 46).

The Court addresses the following arguments: (1) whether the disputed term is a limitation on the claims since it is found in the preamble; (2) whether the "chair" must be designed to hold an infant or just be capable of holding an infant; and (3) whether the "chair" must move in two directions at the same time. (*Id.*).

1. Preamble Language

Claims 1 and 19 both start with preambles stating: "A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising:…". '609 Patent col. 6. ln. 47-50; col. 8. ln. 39-41. Correspondingly, Claim 12's preamble starts "An infant rocking chair comprising…". '609 Patent col. 7. ln. 58.

Wonderland argues that the preamble defines two important components of the invention the "seat body" and the "bottom seat". '609 Patent at col. 1, ln. 48-50 and col. 8, ln. 39-41. Wonderland also insists that the term "infant rocking chair" is not background information; rather, it is the "antecedent basis for two essential components of the infant rocking chair, the 'seat body' and the 'bottom seat'" and is, therefore, limiting. (Docket No. 43 at 1- 4).

On the other hand, Thorley claims that the preamble terminology is not limiting because the body of Claims 1 and 19 refer to the "driving device for use in an infant rocking chair." (Docket No. 41 at 8) (emphasis added). Thorley asserts that this driving device is not dependent on the "infant rocking chair" language, as it explains the device's intended use or purpose. (*Id.*). Additionally, Thorley contends that the body of Claim 12, which follows the word "comprising," offers a complete invention without reference to the preamble. (*Id.* at 9).

A preamble to a claim may be a limitation if it recites a limitation or is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Such limitation is "determined on the facts of each case in light of

the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history." *Deere & Co. v. Bush Hog, LLC*, 2012 WL 6013405 (Fed. Cir. Dec. 4, 2012) (internal citations omitted). "No litmus test defines when a preamble limits claim scope," but "[i]n general, a preamble limits the claimed invention if it recites essential structure or steps, or if the preamble is used in the prosecution history to limit the scope of the claim." *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1347 (Fed. Cir. 2002). The preamble is not regarded as limiting when the patent claim otherwise describes a complete invention, when the preamble is merely duplicative of limitations in the body, or when it operates only as an introduction to the general field of the invention. *See, e.g., Am. Med. Sys., Inc. v. Biolitic, Inc.*, 618 F.3d 1354, 1358-59 (Fed. Cir. 2010) (preamble not limiting if the patent "describes a structurally complete invention in the claim body and uses the preamble only to state a purpose…"); *Symantec Corp. v. Computer Associates Int'l., Inc.*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008); *Hearing Components, Inc. v. Shure, Inc.*, 600 F.3d 1357, 1366 (Fed. Cir. 2010) (preamble not limiting when it is "simply an introduction to the general field of the claim.") The Federal Circuit recently stated that a limiting preamble term is one that describes a "fundamental characteristic of the claimed invention" that informs one with skill in the art as to the structure required by the claim. *Deere & Co.*, 2012 WL 6013405 at *7 (holding that in a patent disclosing an "easy clean dual wall deck" for a rotary cutter, the preamble phrase, "rotary cutter deck" was a limitation as it was necessary to understand the subject matter encompassed by the claim; the specification also repeatedly referred to the "present invention" as "an improved deck for a rotary cutter," or a "rotary cutter deck"; and the title of the patent, the summary of the invention, and every drawing described the invention as a deck for a rotary cutter.)

In this instance, the Court finds the preamble language limiting. The term "infant rocking chair" is referred to as the antecedent basis for certain elements of the claim body. Without the preamble language, there is no seat body or bottom seat of the "infant rocking chair" to which the various claim elements attach. '609 Patent col. 6. ln. 47-50; col. 8. ln. 39-41; col. 7. ln. 58. Recitation of "infant rocking chair" in Claims 1, 12, and 19 is necessary to understand the subject matter encompassed by the claim. *See Deere & Co.*, 2012 WL 6013405, at *7. While Thorley argues the claims are directed at the driving device only, the intrinsic evidence plainly demonstrates that the claims are directed at both the driving device and rocking chair. To this end, pertinent intrinsic evidence is that: the title of the patent is "<u>Infant Rocking Chair</u> <u>and</u> Driving Device for Driving the Same," 12 of the 15 figures show the "chair" feature and the summary of the invention includes the description of the "infant rocking chair". (Docket No. 53 at 5); '609 Patent col. 1. ln. 1 (emphasis added); ln. 39-41. Even considering the driving device alone, the patent shows that the driving device does not just happen to be used in infant rocking chairs; its fundamental purpose is to provide motion that mimics a person holding an infant in his or her arms, "resulting in <u>infant</u> comfort". 609 Patent col. 1. ln. 20-38; (Docket No. 51at 56). Thus, the preamble term, "infant rocking chair" "give[s] life" to the claim and shall be considered limiting. *Pitney Bowes, Inc.* 182 F.3d at 1305.

Having found the term "infant rocking chair" limiting, the Court now construes the term in light of the parties' competing arguments.

2. <u>"Infant Rocking Chair" as Capable or Designed to Hold an Infant</u>

Wonderland maintains that an "infant rocking chair" should be <u>designed</u> to hold an infant, not merely capable of holding an infant "so long as one could set an infant on it." (Docket No. 43 at 7). In support, Wonderland offers examples of inventions that could conceivably fit

Thorley's proposed definition of "a seat or chair-like device capable of holding an infant…" (*Id.*). These examples include a barber chair, a motion simulator chair, a drafting stool, and a circular saw feeder.[5] (*Id.;* Docket No. 54 at 1-3*).*

Thorley counters that to the extent "infant rocking chair" is limiting, it should be defined only as capable of holding an infant. Thorley points out that its proposed definition was supported by the Examiner during the reexamination. (Docket No. 53 at 6).[6] Thorley also argues that "infant" is ambiguous and undefined. (Docket No. 46; 51 at 32 ln 17-25) ("And then what is an infant rocking chair? I mean how -- how old does the kid have to be? How much does it have to weigh? What is the height?")

The Court disagrees with Thorley that the term "infant" is ambiguous, as it takes its ordinary meaning.[7] In this case, where the ordinary meaning to all, whether or not skilled in the art, is readily apparent, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Joy MM Delaware, Inc. v. Cincinnati Mine*

---

[5] The circular saw feeder was a more appropriate example when Thorley's proposed definition was "a device that is capable of holding an infant…" (Docket Nos. 36, 46). This definition was later amended in the Revised Joint Disputed Claims Chart. (*Id.*).

[6] The examiner stated that an "infant rocking chair" "must at least be capable of seating an infant." (Docket No. 41-1 at 51). In considering comments made by the examiner during the reexamination process, the Court is mindful that "PTO examination procedures have distinctly different standards, parties, purposes, and outcomes compared to civil litigation". *In re Swanson,* 540 F.3d 1368, 1377 (Fed. Cir. 2008) (internal citations omitted). As the Federal Circuit holds, "in reexamination proceedings, claims are given their broadest reasonable interpretation, consistent with the specification." *Id.* at 1378-1379. Therefore, "considering an issue at the district court is not equivalent to the PTO having had the opportunity to consider it." *Id.* at 1378-1379; *see also In re Baxter Int'l, Inc.,* 678 F.3d 1357, 1361 (Fed. Cir. 2012).

[7] As the Court indicated in hearing this matter, to the extent any product is considered an "infant" chair, government regulation is extrinsic evidence of its ordinary meaning. (Docket No. 51 at 32-33). To that end, the Court takes judicial notice that infant products, such as the rockers in suit, are regulated by the U.S. Consumer Product Safety Commission, a fact those in this industry and field of art would be well aware. 15 U.S.C.A. § 2056a; FED. R. EVID. 201; *Estate of Patterson v. City of Pittsburgh*, CIV.A. 11-1021, 2011 WL 4860003 (W.D. Pa. Oct. 13, 2011); *Caha v. United States*, 152 U.S. 211, 222 (1894); *Cotapaxi Custom Design & Mfg., LLC v. Corporate Edge, Inc*., CIV A 06-5183 (JAG), 2007 WL 2908265 (D.N.J. Oct. 1, 2007) *aff'd,* 284 F. App'x 809 (Fed. Cir. 2008) (taking judicial notice of the two patent drawings). Under these safety standards the term "durable infant or toddler product" is "a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years," and includes high chairs, infant carriers, swings, bassinets, and cradles among others. 15 U.S.C.A. § 2056(a) (emphasis added).

*Mach., Co.*, 2012 WL 5439885 (Fed. Cir. Nov. 8, 2012). Therefore, the Court finds Thorley's definition inappropriate, as almost any seat or chair is capable of holding an infant dependent on the size of seat or chair and the size of the infant. Because a chair could possibly hold an infant, such a chair is not an "infant chair." Instead, the Court is persuaded that "infant rocking chair" means a seat or chair-like device designed for infants, as Wonderland suggests. Moreover, this construction, the parties' agreement on "seat or chair-like device," and the use of the term "infant" throughout the '609 patent, make Wonderland's proposed addition of the word "baby" before "seat" unwarranted.

3. Movement of an "Infant Rocking Chair"

Regarding the movement of an "infant rocking chair," Wonderland submits patents U.S. 5,123,701, U.S. 5,183,457, U.S. 496,531, U.S. 2002-0113469, and U.S. 2006-0012230 that the Examiner cited and relied upon in the original prosecution filing. (Docket No. 37). These five patents generally show devices that move across a curved surface to create a rocking movement. (Docket No. 39 at 7-8). Wonderland claims that such rocking action is movement in two directions. (*Id.*). Wonderland illustrates the two directional movement of a "conventional rocking chair" as follows:




(Docket No. 43 at 10).

On the other hand, Thorley contends Wonderland contradicts its own definition in the background of the ‘609 patent, which states that conventional infant rocking chairs can only move in one direction. (Docket No. 41 at 10). Wonderland counters that only “conventional infant rocking chairs” move in one direction and that its invention is not covered by such a definition. (Docket No. at 43 at 8). However, this statement is immediately contradicted by Wonderland’s explanation (using an illustration of a traditional rocking chair) of how rocking chairs move in two directions at the same time as seen above. (*Id.* at 9, 10)

Secondly, Thorley argues that because the patent repeatedly states the invention can be locked to move in only one direction, the ‘609 Patent negates the notion that an “infant rocking chair” must move in two directions. (Docket No. 41 at 10; 53 at 7); ‘609 Patent col. 1 ln. 39-41; col. 4 ln. 66-col. 5 ln. 4; col 5 ln. 53-57; col. 8 ln. 33-38. Thorley further proffers the dictionary meaning of “rocking” defined as “to move back and forth.” (Docket No. 42 at 8; Ex. A).

Given the multiple intrinsic references within the claims, and the plain understanding of the term “rocking,” the Court does not find the need to limit rocking chairs to those that move in two directions at the same time. Such a limitation is unfounded and contradicted by evidence from the patent, as well as by common sense. Using this part of Thorley’s definition (“which moves or sways back and forth”) does not exclude chairs that move in two directions as Wonderland contends.

4. <u>Construction</u>

Accordingly, the Court concludes that the construction of the preamble term “infant rocking chair” is as follows:

**Infant Rocking Chair** means “a seat or chair-like device that is designed to hold an infant and which moves or sways back and forth.”

**B. Bottom Seat**

The parties next dispute the construction of the term "bottom seat" found in claims 1, 12, and 19. (Docket No. 46). The parties' proposed constructions are as follows:

| Term | Wonderland (Modified) [1] | | AGREED CONSTRUCTION | Thorley (Modified) [1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| bottom seat (claims 1, 12, 19) | a generally planar structure with substantial surface area at the bottom of an object upon which the object sits or rests ~~capable of cooperating with a cover to form a chamber.~~ | '609 patent at Col 5, lines 15-21 + Figs. 1, 2 and 11 | | a structure at the bottom of an object upon which the object sits or rests. | Patent-in-Suit: Figures 1, 2, 7 and 11. April 16, 2012 Patent Owner Response in the reexamination, at pgs. 6 and 22. |

(Docket No. 46).

Claims 1 and 19 both state: "A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising:…" '609 Patent col. 6. ln. 47-50; col. 8. ln. 39-41 (emphasis added). Claim 12's preamble starts: "An infant rocking chair comprising: a seat body; a bottom seat…". '609 Patent col. 7. ln. 59-61 (emphasis added).

Wonderland offers the Webster's Ninth New Collegiate Dictionary definitions of both "seat" and "bottom" along with the language of the claim to infer that "bottom seat" is defined as planar and having a substantial surface area.[8] (Docket No. 39 at 10). Wonderland argues that the specification and figures describe the planar nature and substantial surface area of the "bottom seat." (Docket No. 43 at 10-12; 54 at 7). It further explains that this feature is required to accommodate a "cover body", element 13, to form a "chamber", element 14, as shown below in Figure 6.[9] (*Id.*).

---

[8] The proffered Webster's definition of "seat": "5. a: a part at or forming the base of something". (Docket No. 39 at Ex. 3) The proffered Webster's definition of "bottom": "1. b: a surface designed to support something resting on it". (Docket No. 39 at Ex. 3)

[9] Neither "cover body" nor "chamber" are disputed terms.




'609 Patent Fig. 6. In its post hearing brief, to support the proposition of a planar structure, Wonderland offers the definition of "seat" and "base" from freedictionary.com.[10] (Docket No. 54 at 5).

Thorley counters that the patent does not state that the "bottom seat" needs to be planar or with substantial surface area. (Docket No. 41 at 14). Thus, the definition additions proffered by Wonderland are, at most, an inference based on the patent's figures. (*Id.*).

As held in *Abbott Lab.* 566 F.3d at 1288, the Court should not limit claim language from the specification absent a clear intention by the patentee to so limit the claim scope. In this Court's opinion, the claims do not contain the requirements that the "bottom seat" have a "generally planar structure", "with a substantial surface area". In fact, the figures that show such embodiments do not demonstrate a clear intent to limit the scope of the claims. *See* '609 Patent

[10] The proffered freedictionary.com's definition of "seat": "5. a: a part serving as the base of something else; b: the surface or part on which another part sits or rests." (Docket No. 54 at 5). The proffered freedictionary.com's definition of "base": "3. a: a supporting part or layer; a foundation". (Docket No. 54 at 6).

Figures 1, 2, and 11. Without this limitation, the parties agree that a "bottom seat" is "a structure at the bottom of an object upon which the object sits or rests".

Construction

Therefore, the Court concludes that the construction of the term "bottom seat" is as follows:

**Bottom Seat** means "a structure at the bottom of an object upon which the object sits or rests."

### C. Motor Shaft

The parties next dispute the construction of the term "motor shaft" found in claim 1. (Docket No. 46). The parties' proposed constructions are as follows:

| Term | Wonderland (Modified) [1] | | AGREED CONSTRUCTION | Thorley (Modified) [1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| motor shaft (claim 1) | a component which rotates to transfer power from the motor. | Patent-in-Suit: Fig. 12 and the corresponding description of the "vertical motor shaft" at Col. 4, lines 50-55. | | a cylindrical piece that is part of the motor which rotates to output power from the motor. | Patent-in-Suit: 2:56-3:13; 4:50-65; 5:22-40; Figures 1, 2-5, and 7-15. |

(Docket No. 46).

Claim 1 states: " A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising: …a motor for driving said first movable member, wherein said motor includes: a motor shaft, …". '609 Patent col. 6. ln. 47-61. (emphasis added)

The disputes are (1) the shape of the "motor shaft" (must it be cylindrical) and (2) the source of the "motor shaft" (does it come from the motor or is it part of the motor). (Docket No. 46). Wonderland contends that "motor shaft", as used in claim 1 of the '609 patent, is a "component which rotates to transfer power from the motor." (Docket No. 39 at 22) (emphasis

added). Thorley offers that it is a "cylindrical piece that is part of the motor which rotates to output power from the motor." (Docket No. 41 at 29) (emphasis added).

1. Shape of the "Motor Shaft"

Wonderland maintains that shafts "come in all sizes and shapes, including round, square, and hexagonal". (Docket No. 43 at 21). It then offers a sampling of patents with "motor shafts" that are triangular, square, pentagonal, hexagonal, heptagonal, and octagonal. *See, e.g.,* U.S. Pat. No. 7,739,870 at col. 18 ln. 31-33 (Exhibit 14), ln. 55-59 and Figure 4; U.S. Pat. No. 7,722,344 at col. 2, ln 67-col. 3 ln 55 and Figures 2-7 (Exhibit 15). Wonderland does not add to its position on this dispute in its post-hearing brief. (Docket No. 54).

In reply, Thorley insists that the "motor shaft" is a cylindrical piece as displayed in Figure 1. Thorley also avers that it must be cylindrical by necessity, since the claim states the "motor shaft" rotates while fixed to a crank at one end. (Docket No. 41 at 25) ('609 Col. 6 ln. 61-66) ("crank connected fixedly to said motor shaft at one end thereof"). Thorley also offers Webster's Dictionary and McGraw-Hill Dictionary of Scientific Terms definitions as extrinsic evidence that a "motor shaft" is "cylindrical" by definition. (Docket No. 41-1 Ex. A at 10; Ex. B at 4). Since Wonderland had previously argued for "generally planar" with respect to the term "bottom seat", the Court inquired if Wonderland could agree to "generally cylindrical". (Docket No. 51 at 86). Wonderland's counsel represents that while "in [his] experience geometrical terms like cylindrical and planar can be extremely specific and extremely limiting"…patent authors thus "often put in a softener, if you will, in the form of the word 'generally'", in this instance Wonderland could not agree to using "generally" and maintained that "cylindrical is out." (*Id.*). In its post-hearing brief, Thorley confirms it is amenable to the term "generally cylindrical". (Docket No. 53 at 12).

2. <u>Location of the "Motor Shaft"</u>

Wonderland states that the "motor shaft" in the '609 patent is not part of the motor as evidenced by Figures 1, 11, 12 as well as Col. 4, lines 50-55. (Docket No. 39 at 21). Instead, the "motor shaft" is a vertical component separated from the motor by a series of gears as seen in Figure 12. (*Id.)* (as annotated by Wonderland).




**Fig. 12 (partial + annotated)**

(*Id.* at 22). Additionally, since the claim states that "said motor includes… a crank … and a link," both of which are obviously not "part of" the motor in Wonderland's view, the phrase "the motor includes..." was intended "to mean that the recited structures are merely associated with the motor, and not "part of" the motor." (Docket No. 43 at 23).

Thorley believes that the Court should look at the words of the claims to prove that a "motor shaft" is part of the motor. (Docket No. 41 at 26-29). Thorley offers Claim 1 which reads "wherein said motor includes: a motor shaft." '609 Patent at col. 6. ln 60-61. Next, it cites the specification which reads "a variable speed motor including a vertical motor shaft." '609 col 4. ln 50-51. Finally, Thorley maintains that Wonderland's definition is overbroad since "components which rotate[ ] to transfer power from motor" could conceivably include the crank, the threaded rod, and even the gears. (Docket No. 41 at 28). All of which it posits are

components the author of the ‘609 Patent considered as separate elements, and never labeled as “motor shafts”. (*Id.*).

The Court observes that Wonderland’s position regarding “motor” does not appear to be supported. In its annotation of Figure 12, Wonderland asserts that “power mechanism” and “motor” are synonymous. Throughout the specification, “6” is called either a “power mechanism” or “motion mechanism.” ‘609 Patent col. 4. ln 50-col 5. ln 7; col 5 ln 29; col 5 ln 43; col 5 ln 59; col 6 ln 11; col 6 ln 38-40. The only use of the word “motor” in the specification is in the description of the first preferred embodiment wherein the “power mechanism 6 is configured as a variable speed motor including a vertical motor shaft 60”. ‘609 Patent col. 4. ln 50-51. Figure 12 shows the third preferred embodiment, and there is no use of the word “motor” in its description. ‘609 Patent col. 6. ln 15-40. Further, while claim 1 uses the term “motor,” claims 8 and 9 use the term “power mechanism.” ‘609 Patent col. 6. ln 60; col. 7 ln. 36-49. Keeping in mind the doctrine of claim differentiation, which holds that “there is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims,” the Court observes that “motor” and “power mechanism” are used in different contexts. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1335 (Fed. Cir. 2011). Hence, as claimed, the “motor shaft” is part of the “motor”, but distinct and independent from the “power mechanism”.

3. <u>Analysis</u>

The Court finds that the intrinsic evidence of the claims, specification, and figures depict the “motor shaft” in the ‘609 Patent as cylindrical. However, the Court is mindful that it should “not limit broader claim language to that single application ‘unless the patentee has demonstrated

a clear intention to limit the claim scope.'" *Abbott Lab.*, 566 F.3d at 1288. Both parties bring before the Court extrinsic evidence to support their respective theories, which the Court considers secondary to the intrinsic evidence of the patent. (Docket No. 41, 43). The Court finds that while a "motor shaft" need not be cylindrical *per se*, there needs to be a physical descriptor of the component in the claims, or the term "motor shaft" could reasonably include any device that happens to rotate. Thus, the Court modifies the term "cylindrical" to "generally cylindrical," agreeing with Wonderland's counsel that the use of term "generally" can be a "softener" to strict geometric terms. (Docket No. 51 at 86 lines 12-20). Again, Thorley does not oppose the use of the term "generally cylindrical." (Docket No. 53 at 12). Since the term is not just "shaft" but "motor shaft", the Court also finds that the construction of "motor shaft" should express the component's proximity to the motor. On this, Wonderland's definition is too broad, possibly covering any component that transfers power, no matter how distant from the motor. The Court, therefore, adopts Thorley's definition, which is consistent with Claim 1 and the specification. '609 Patent col 4. ln 50-51; col. 6 ln 60-61 ("wherein said motor includes: a motor shaft" and "a variable speed motor including a vertical motor shaft").

4. Construction

As a result, the Court concludes that the construction of the term "motor shaft" is as follows:

**Motor Shaft** means "a generally cylindrical piece that is part of the motor which rotates to transfer power from the motor."

**D. Crank**

The parties next dispute the construction of the term "crank" found in claim 1. (Docket No. 46). The parties' proposed constructions are as follows:

| Term | Wonderland (Modified) [1] | | AGREED CONSTRUCTION | Thorley (Modified) [1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| crank (claim 1) | a device or part of a device for communicating motion or for converting reciprocating motion into rotary motion or vice versa. <u>OR</u> <u>a link in a mechanical linkage or mechanism that can turn about a center of rotation.</u> | Patent-in-Suit: Col. 4 line 55-57 | | an arm attached at a right angle to a shaft which turns about the axis of the shaft. | Patent-in-Suit: 2:56-3:13; 4:50-65; 5:22-40; Figures 1, 2-5, and 7-15. |

(Docket No. 46).

Claim 1 states: "A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising: … a motor for driving said first movable member, wherein said motor includes: a motor shaft, a <u>crank</u> connected fixedly to said motor shaft at one end thereof, …" '609 Patent col. 6. ln. 47-62; (emphasis added).

Wonderland proposes a broad construction of "a device converting rotary motion into reciprocating motion." (Docket No. 46). It supports this position with extrinsic dictionary definitions from Dictionary.com as well as Webster's Unified Dictionary and Encyclopedia.[11] (Docket No. 39 at 23-24; Ex. 2; Ex 3). Wonderland offers the Hierapolis Sawmill as an example of a non-right angled arm "crank". (Docket No. 43 at 26). As a compromise in the Revised Joint Claims Chart, Wonderland proposes its second option for the definition of "crank" derived from the McGraw-Hill Dictionary of Scientific and Technical Terms. (Docket No. 43 at 27; Docket No. 45). In its post-hearing brief, Wonderland also submits mechanical engineering treatises, *Design of Machinery* by Robert L. Norton and *Marks' Standard Handbook for Mechanical*

[11] Dictionary.com definition of "crank": "1. *Machinery*. any of several types of arms or levers for imparting rotary or oscillatory motion to a rotating shaft, one end of the crank being fixed to the shaft and the other end receiving reciprocating motion from a hand, connecting rod, etc." (Docket No. 39 at 23; Ex 2). Webster's Unified Dictionary and Encyclopedia definition of "crank": "*n.* 1. A device for turning rotary motion into back-and-forth motion, or vice versa. 2. A bent handle, fixed or detachable, for turning things, as the crank of an automobile engine…" (Docket No. 39 at 24; Ex 3).

*Engineers*, to support its position that a "crank" can take any form. (Docket No. 54 at 9-11; Ex. 1; Ex. 2).

In reply, Thorley contends that a "crank" is a device with an arm attached at a right angle and offers the Merriam Webster definition of "crank" as evidence.[12] (Docket No. 41 at 29). Thorley also argues that the '609 Patent figures prove that a "crank" is attached at a right angle. (*Id.* at 30). In its post-hearing brief, Thorley maintains that Wonderland's proposed definition is overly broad, contrary to the ordinary meaning, and unsupported by the intrinsic evidence. (Docket No. 53 at 17-18).

Upon review, the Court finds Wonderland's extrinsic evidence unconvincing. Specifically, the Hierapolis Sawmill is not only dated (the Sawmill dates back to the 3rd century), but in the proffered picture, the "crank" appears to contain a right angled arm. (Docket No. 43 at 26). *See* Wikipedia, *Crank*, http://en.wikipedia.org/wiki/Crank_(mechanism) (last visited January 10, 2013). Ironically, at the top of this article it states that "[a] crank is an arm attached at right angles to a rotating shaft by which reciprocating motion is imparted to or received from the shaft." *Id.*

Wonderland's second definition imposes the term "link," which offers little clarification of the term in question, "crank," and is already a term used elsewhere in the patent. '609 Patent col. 6. ln. 64. The distinction Wonderland attempts to show in its reliance on the *Norton Engineering* treatise is unclear, as the treatise points to the arms as the "crank", not the entire disk as Wonderland appears to urge. (Docket No. 54 at Ex. 1). Further, *Mark's Standard's*

---

12 Wonderland in its reply brief accuses Thorley of dictionary shopping, using an array of dictionaries throughout its brief to choose the best definition available. (Docket No. 43 at 26-27). While this is frowned upon, both parties have used multiple dictionary resources throughout their briefs and the Court considers them only as extrinsic evidence secondary to the intrinsic evidence presented. (Wonderland: Dictionary.com, Webster's Ninth New Collegiate Dictionary; Webster's Unified Dictionary; Thorley: Merriam-Webster's Collegiate Dictionary, McGraw-Hill Dictionary of Scientific and Technical Terms.) *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322 (Fed. Cir. 2005)("A claim should not rise or fall based upon the preferences of a particular dictionary editor…"). (Docket Nos. 40, 42).

definition is at least one degree removed, as it defines "links" not "cranks." (*Id.* at Ex. 2). Even considering these two additional resources, the Court agrees with Thorley that in light of its use in the patent and the ordinary meaning, a "crank" is an arm attached at a right angle to the rotating shaft. '609 Patent col. 4. ln. 51-53; col. 5 ln. 27; Figure 7.

Construction

Thus, the Court concludes that the construction of the term "crank" is as follows:

**Crank** means "an arm attached at a right angle to a shaft which turns about the axis of the shaft."

**E. Guiding Elements**

The parties next dispute the construction of the term "guiding elements" found in claims 2, 3, 13, 14, and 20. (Docket No. 46). The parties' proposed constructions are as follows:

| Term | Wonderland (Modified) [1] | | AGREED CONSTRUCTION | Thorley (Modified) [1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| guiding elements (claims 2, 3, 13, 14 and 20) | a set of pathways which control or direct movement. | The use of the term "guide path unit" in other claims (e.g., 1, 2, 4-6,8,9,11,19 and 20) | | a set of tracks forming a predefined path which direct movement. | Patent-in-Suit: 4:21-49; 4:66-5:14; 5:41-64; Figures 1, 2-5, and 7-15. |

(Docket No. 46)

Wonderland and Thorley's dispute centers on whether the term "guiding elements" refers to a set "of pathways" or a "set of tracks forming a predefined path". (*Id.*).

Wonderland believes that "pathways" is the correct construction, because it is a component of the undisputed term "guide path unit", "wherein said guide path unit includes a pair of spaced-apart guiding elements." '609 Patent. col 7. ln 2-3; (Docket No. 39 at 25). Thorley refutes the use of "pathways" since the specification and figures identify the "guiding elements" as a set of "parallel guiding rods". (Docket No. 41 at 33); '609 Patent col. 4. ln 23-25; col. 5. ln 41-42; Figure 7, element 81. Thorley then argues that "a 'pathway' is typically

understood to reference the course or path itself." (*Id.* at 34). Hence, it suggests that the term in question is directed "to the elements which guide the moveable members along this path or course." (*Id.*). Wonderland insists that while the '609 Patent only shows rods, a Court should not limit a claim "to its preferred embodiment simply because that is all that is shown." (Docket No. 43. at 28). At the hearing and in its post-hearing brief, Wonderland reiterates that the Court should use the term "path" in its construction since it appears in the specification and the claims of the '609 Patent. (Docket No. 54 at 12). In response, Thorley posits in its post-hearing brief that Wonderland's proposed definition as "a set of pathways" would not even cover the guiding rods disclosed in the '609 patent. (Docket No. 53 at 21).

This term is disputed because the Accused Product does not use "rods" like the '609 Patent, but instead uses "wheels turning on a flat surface". (Docket No. 43 at 28); (Docket No. 1 at Ex. B). Wonderland contends that these flat "bearing surfaces" guide the vertical motion mechanism and, therefore, fall under the term "guiding elements."[13] Wonderland further insists that Thorley is judicially estopped from contending that "flat bearing surfaces on which wheels roll" are not "guiding elements", since it argued the opposite in its successful request for USPTO reexamination of the '609 Patent. (Docket No. 43 at 28).

Judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The focus of this decision, however, is claim construction. In construing terms, the Court considers the claims, specification, and plain meanings of same, before considering such extraneous arguments.[14] *See Phillips* 415 F.3d 1303.

---

[13] This argument is best left for the infringement phase of this case.

[14] To the extent that Wonderland would press judicial estoppel, the Supreme Court listed the primary factors for determining whether it should apply, the first being that a party's later position must be "clearly inconsistent" with its earlier position. *New Hampshire* 532 US at 750-51. Even if this Court considers judicial estoppel based on

In the Court's estimation, the author of the '609 Patent uses the terms "guide path unit" to express the idea of a guided path. Therefore, the term "guiding elements" refers to the actual pieces that make up that "unit." The intrinsic evidence of the '609 specification and most figures persuade the Court that the preferred embodiment of the invention has the "guiding elements" as rods. '609 Patent Figures 1-5, 7-15. However, in the claims themselves, the term "rods" is not used; rather, the term, "guiding elements" is the chosen term. '609 Patent claims 2, 3, 13, 14, and 20. As noted earlier, the Court should "not limit broader claim language to that single application unless the patentee has demonstrated a clear intention to limit the claim scope." *Abbott Lab.,* 566 F.3d at 1288 (internal citations omitted). With the use of the term "guiding elements" instead of "rods" in the claims, there does not appear to be a clear intent to limit the claim scope to "rods" alone. The Court, thus, agrees with Thorley that construing the term "guiding elements" as a set of "tracks" is appropriate to define the physical components of the "guide path unit," but allows for a broader definition beyond the embodied parallel rods.

Both parties in the Revised Joint Claim Construction Chart have agreed to use "direct movement" as part of this construction. (Docket No. 46). The Court concurs and limits the definition consistent with their agreement.

<u>Construction</u>

---

an earlier request for reexamination, Thorley is not estopped. In its request for reexamination, Thorley contended that the Sarbaugh patent (U.S. Patent 3,993,280) invalidates claim 20 of the '609 patent because Sarbaugh's drafting stool "includes a pair of spaced apart track runways". (Docket No. 43 at Ex. 6). This is not <u>clearly</u> inconsistent with its present assertion that "guiding elements" be construed as a "set of tracks forming a predefined path which direct movement". (Docket No. 46). Additionally, in declining to apply judicial estoppel, the Court is cognizant of the different standards between litigation proceedings and reexaminations, and the Federal Circuit's limitations on claim construction judicial estoppel. *In re Swanson*, 540 F.3d at 1377; *SanDisk Corp. v. Memorex Products, Inc.,* 415 F.3d 1278, 1291-92 (Fed. Cir. 2005)(holding that a party was not judicially estopped from asserting certain claim constructions that differed from those asserted to the trial court for a preliminary injunction); *see also Fitness Quest, Inc. v. Monti,* 330 F. App'x 904, 914 (Fed. Cir. 2009).

Accordingly, the Court concludes that the construction of the term "guiding elements" is as follows:

**Guiding Elements** means "a set of tracks which direct movement."

### F. Connected Fixedly and Attached Fixedly

The parties next dispute the construction of the terms "connected fixedly" and "attached fixedly" found in claims 1 and 14. (Docket No. 46). The parties agree that "connected fixedly" and "attached fixedly" have the same meaning, so the Court will decide the construction of these terms together. (*Id.*). The parties' proposed constructions are as follows:

| Term | Wonderland (Modified)[1] | | AGREED CONSTRUCTION | Thorley (Modified)[1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| connected fixedly (claim 1) | ~~integrated into or joined at a set location.~~ joined or linked securely | | | separate pieces joined or linked securely to one another ~~wherein the pieces cannot move, pivot, or rotate relative to one another.~~ | Patent-in-Suit: 3:36-41; 3:57-62; 4:40-43; 4:50-55; 5:22-40; 6:15-40; claim 1. |
| attached fixedly (claim 14) | ~~integrated into or joined at a set location.~~ joined or linked securely | | | separate pieces joined or linked securely to one another ~~wherein the pieces cannot move, pivot, or rotate relative to one another.~~ | Patent-in-Suit: 3:36-41; 3:57-62; 4:40-43; 4:50-55; 5:22-40; 6:15-40. |

(Docket No. 46).

Claim 1 states: "a driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising: … a motor for driving said first movable member, wherein said motor includes: a motor shaft, a crank connected fixedly to said motor shaft at one end thereof, …" '609 Patent col. 6. ln. 47-62; (emphasis added). Claim 14 states: "the infant rocking chair as claimed in claim 13, wherein said second motion mechanism includes… a supporting frame attached fixedly to the bottom end of said supporting element." '609 Patent col 8. ln 18-21.

In the Revised Joint Claims Chart, the parties narrowed their dispute to whether the terms should reflect that the connection must be between two separate pieces. (Docket No. 46). Thorley first offers the definition of "connected" from Merriam Webster's Dictionary as meaning "joined or linked together," and the definition of "connecting" as meaning "join[ing] or fasten[ing] together usually by something intervening." (Docket No. 41 at Ex. A). Thorley proffers that the '609 Patent uses "connected" only to describe two pieces being joined together, without exception. (*Id.* at 38); (Docket No. 53 at 23); '609 Patent col. 3. ln 28-29; col. 3. ln 36-38; col 3. ln 40-42; col 4. ln 44-45. Further, it insists that the author of the '609 Patent used "integrally" elsewhere, and thus, its exclusion from claim 1 shows the author's intent that there must be separate pieces "connected fixedly." (Docket No. 53 at 23). Wonderland responds that Thorley incorrectly "wants the Court to hold that the term 'connected fixedly' could never be used to describe two pieces that are seamlessly joined or formed." (Docket No. 43 at 30).

The Court disagrees with Wonderland's proposed definition, especially in light of the Court's view that it has failed to provide relevant intrinsic or extrinsic evidence to support its argument.[15] *Phillips* 415 F.3d at 1317, 1319 ("we have emphasized the importance of intrinsic evidence in claim construction" and "we have also authorized district courts to rely on extrinsic evidence."…and "in weighing all the evidence bearing on claim construction, the court should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly."). The Court also finds that the terms "connected fixedly" and "attached fixedly" imply to any person, whether of ordinary skill in the art or not,[16] that there is a connection of separate pieces and that such an understanding is supported by the evidence contained within the patent. '609

[15] Wonderland's counsel proffered analogies of the connectedness of bottle caps and the Great Lakes, which while interesting, are not relevant intrinsic or extrinsic evidence on this point. (Docket No. 51 at 27).

[16] The parties have not agreed upon a precise definition of a person skilled in the art for this case. (Docket No. 51 at 63). The parties appear to tentatively agree that it would be at least someone with a mechanical engineering background. (*Id.*).

Patent col. 3. ln 28-29; col. 3. ln 36-38; col 3. ln 40-42; col 4. ln 44-45. While one might expect agreement on the meaning of these terms, given the current parties' dispute, the Court explicitly construes the terms to reference the connection or attachment of separate pieces, as proposed by Thorley.

Construction

As a result, the Court concludes that the construction of the terms "connected fixedly" and "attached fixedly" are as follows:

**Connected Fixedly** means "separate pieces joined or linked securely to one another."

**Attached Fixedly** means "separate pieces joined or linked securely to one another."

## IV. CONCLUSION

For the aforementioned reasons, the following are adopted as the proper constructions for the disputed claim terms contained within the Revised (and Corrected) Joint Disputed Claim Terms Chart. (Docket No. 46).

**Infant Rocking Chair** means "a seat or chair-like device that is designed to hold an infant and which moves or sways back and forth."

**Bottom Seat** means "a structure at the bottom of an object upon which the object sits or rests."

**Motor Shaft** means "a generally cylindrical piece that is part of the motor which rotates to transfer power from the motor."

**Crank** means "an arm attached at a right angle to a shaft which turns about the axis of the shaft."

**Guiding Elements** means "a set of tracks which direct movement."

**Connected Fixedly** means "separate pieces joined or linked securely to one another."

**Attached Fixedly** means "separate pieces joined or linked securely to one another."

An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: January 11, 2013
cc/ecf: All Counsel of Record

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WONDERLAND NURSERYGOODS CO., LTD., | ) | |
| Plaintiff, | ) | Civil Action No. 12-196 |
| vs. | ) | Judge Nora Barry Fischer |
| THORLEY INDUSTRIES, LLC, *d/b/a* 4MOMS, | ) | |
| Defendant. | ) | |

## CLAIM CONSTRUCTION ORDER

AND NOW, on this 11th day of January, 2013, for the reasons set forth in the accompanying Opinion, it is ORDERED that the following disputed claim terms are construed as follows:

**Infant Rocking Chair** means "a seat or chair-like device that is designed to hold an infant and which moves or sways back and forth."

**Bottom Seat** means "a structure at the bottom of an object upon which the object sits or rests."

**Motor Shaft** means "a generally cylindrical piece that is part of the motor which rotates to transfer power from the motor."

**Crank** means "an arm attached at a right angle to a shaft which turns about the axis of the shaft."

**Guiding Elements** means "a set of tracks which direct movement."

**Connected Fixedly** means "separate pieces joined or linked securely to one another."

**Attached Fixedly** means "separate pieces joined or linked securely to one another."

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: All Counsel of Record

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Wonderland Nurserygoods Co., Ltd.,<br><br>Plaintiff,<br>v.<br><br>Thorley Industries, LLC (dba 4Moms)<br><br>Defendant | C.A. No.: 2:12-CV-00196<br><br>The Honorable Nora Barry Fischer<br><br>Electronic Filing<br><br>**Jury Trial Demanded** |

**STIPULATION FOR ENTRY OF ORDER**

**GRANTING PARTIAL AND NON-FINAL JUDGMENT OF NON-INFRINGEMENT OF CLAIMS 1-3 OF US PATENT 8,047,609**

1. This is a lawsuit for the alleged infringement of U.S. Patent No. 8,047,609 ("the '609 patent"). Plaintiff, Wonderland Nurserygoods Co., Ltd., ("Wonderland" ) has asserted that defendant Thorley Industries LLC ("Thorley") infringe claims 1-3, 12-14 and 19-20 of the '609 Patent.

2. On January 11, 2013, the Court issued its Memorandum Opinion, construing certain terms of the asserted claims ("Markman Order"). Specifically, among other things, the Court determined that:

A. **Crank** means "an arm attached at a right angle to a shaft which turns about the axis of the shaft."

B. **Connected Fixedly** means "separate pieces joined or linked securely to one another."

3. While Wonderland disagrees with the foregoing constructions, Wonderland has concluded that the foregoing claim constructions preclude it from obtaining a

judgment in its favor with respect to asserted claims 1-3. Thorley agrees and further submits that there are additional bases for non-infringement of these claims. Accordingly, the parties stipulate that a non-final partial judgment in the form of the attached shall be entered forthwith in favor of Thorley.

4. The parties shall have the same right of appeal they would have had in the event a judgment of non-infringement had been entered following either a dispositive ruling by the Court or a jury verdict. The intent of this stipulation is to preserve Wonderland's right to appeal the Court's construction of the terms "crank" and "connected fixedly".

Dated: March 13, 2013

/s/ Kent E. Baldauf, Jr
Kent E. Baldauf, Jr., PA ID No. 70793
Bryan P. Clark, PA ID No. 205708
Anthony W. Brooks PA ID No. 307446
THE WEBB LAW FIRM
One Gateway Center
420 Ft. Duquesne Blvd, Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 471-8815
Facsimile: (412) 471-4094

ATTORNEYS FOR THORLEY INDUSTRIES, LLC

/s/ David I. Roche
David I. Roche (admitted *pro hac vice*)
David.Roche@bakermckenzie.com
/s/ Daniel A. Tallitsch
Daniel A. Tallitsch (admitted *pro hac vice*)
Daniel.Tallitsch@bakermckenzie.com
Baker & McKenzie LLP
300 E. Randolph Street, Suite 5000
Chicago, IL 60601
Telephone: 312-861-8000
Facsimile: 312-861-2899

ATTORNEYS FOR PLAINTIFF, WONDERLAND NURSERYGOODS CO., LTD.

**Certificate of Service**

I hereby certify that on March 13, 2013, I electronically filed this document (and the Exhibits mentioned herein) pursuant to Local Rule 7.1.1 of the Western District of Pennsylvania with the Clerk of Court using the CM/ECF system which constitutes service of the same upon counsel for Thorley Industries LLC as follows:

**Kent E. Baldauf** KBaldaufjr@webblaw.com

**Anthony W. Brooks** abrooks@webblaw.com, arotharmel@webblaw.com, litigation@webblaw.com

**Bryan P. Clark** bclark@webblaw.com, jburgess@webblaw.com

/s/ David I. Roche
David I. Roche (admitted *pro hac vice*)
David.Roche@BakerMcKenzie.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Wonderland Nurserygoods Co., Ltd.,<br><br>Plaintiff,<br>v.<br><br>Thorley Industries, LLC (dba 4Moms)<br><br>Defendant | C.A. No.: 2:12-CV-00196<br><br>The Honorable Nora Barry Fischer<br><br>Electronic Filing<br><br>**Jury Trial Demanded** |

**[PROPOSED] ORDER
GRANTING PARTIAL AND NON-FINAL JUDGMENT
OF NON-INFRINGEMENT OF CLAIMS 1-3 OF US PATENT 8,047,609**

Plaintiff, Wonderland Nurserygoods Co., Ltd., ("Wonderland" ) and Defendant, Thorley Industries LLC ("Thorley"), by and through their respective counsel, hereby stipulate to entry of a partial, non-final judgment of non-infringement of claims 1-3 of U.S. Patent No. 8,047,609 ("the '609 patent") based on the Court's Memorandum Opinion of January 11, 2013, and the parties Stipulation for Partial And Non-Final Judgment Of Non-Infringement.

ENTER:

___________________________
Nora Barry Fischer
United States District Judge

DATED:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Wonderland Nurserygoods Co., Ltd.,<br><br>Plaintiff,<br>v.<br><br>Thorley Industries, LLC (dba 4Moms)<br><br>Defendant | C.A. No.: 2:12-CV-00196<br><br>The Honorable Nora Barry Fischer<br><br>Electronic Filing<br><br>**Jury Trial Demanded** |

**ORDER**
**GRANTING PARTIAL AND NON-FINAL JUDGMENT**
**OF NON-INFRINGEMENT OF CLAIMS 1-3 OF US PATENT 8,047,609**

Plaintiff, Wonderland Nurserygoods Co., Ltd., ("Wonderland") and Defendant, Thorley Industries LLC ("Thorley"), by and through their respective counsel, hereby stipulate to entry of a partial, non-final judgment of non-infringement of claims 1-3 of U.S. Patent No. 8,047,609 ("the '609 patent") based on the Court's Memorandum Opinion of January 11, 2013, and the parties Stipulation for Partial And Non-Final Judgment Of Non-Infringement.

ENTER:

Nora Barry Fischer
Nora Barry Fischer
United States District Judge

DATED: March 14, 2013

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WONDERLAND NURSERYGOODS CO., LTD., Plaintiff, | ) | |
| vs. | ) | Civil Action No. 12-196 Judge Nora Barry Fischer |
| THORLEY INDUSTRIES, LLC, *d/b/a* 4MOMS, Defendant. | ) | |

**MEMORANDUM OPINION**

## I. INTRODUCTION

Plaintiff Wonderland Nursery Goods Co. ("Wonderland") brings this action against Defendant Thorley Industries, LLC d/b/a 4MOMS ("Thorley") for the alleged infringement of U.S. Patent No. 8,047,609 (the "'609 Patent") (filed Dec. 3, 2010), (Docket No. 1-2 at 2). The '609 Patent is entitled "Infant Rocking Chair and Driving Device for Driving the Same." *Id.*, (Docket No. 1-2 at 2). Presently pending before the Court are three motions for summary judgment, consisting of Thorley's Motion for Summary Judgment of Invalidity of Claims 12-14 and 19-20, (Docket No. 108), and the parties' Cross Motions for Summary Judgment of Non-Infringement, (Docket No. 104), and Infringement, (Docket No. 95), of the aforementioned claims. Upon consideration of the parties' positions, and for the following reasons, these Motions are GRANTED, in part and DENIED, in part; they are GRANTED as to non-infringement of Claims 12-14 only, in favor of Thorley, and DENIED in all other respects.

## II. BACKGROUND

Wonderland brings this action against Thorley based on the alleged infringement of Claims 12-14 and 19-20 of the '609 Patent by the accused mamaRoo variable motion infant

rocking chair. (Docket No. 1 at 1-2). Wonderland, the assignee of the '609 Patent, is a Taiwanese company that manufactures products for infants and young children, such as baby strollers, play-yards, car safety seats, and high-chairs. *See* Hampton Rep. at 6, (Docket No. 114-1 at 10). Thorley is a Pennsylvania corporation based in Pittsburgh that manufactures and sells the mamaRoo and other infant products. (Docket No. 19 at 2-3). The Court provides a brief summary of the '609 Patent, the relevant prior art references, and the accused mamaRoo device.

**A. The '609 Patent**

The '609 Patent is directed at "infant rocking chairs," with "a driving device for driving a seat body of an infant rocking chair to move back and forth as well as up and down." *See* '609 Patent col. 1 ll.15-19, (Docket No. 1-2 at 19). The patent discloses that "conventional infant rocking chairs" produce only "back-and-forth" or "up-and-down" motion, whereas a "curved swinging motion in which a back-and-forth motion is combined with an up-and-down motion" is preferable to "impart greater comfort to the infant." *Id.* col. 1 ll.21-27, (Docket No. 1-2 at 19).

The '609 Patent has three independent claims: 1, 12, and 19. Claims 1 and 19 and their dependent claims are directed at a "driving device for an infant rocking chair." *Id.* col. 6 l.48, col. 8 l.39, (Docket No. 1-2 at 21-22). Claim 12 and its dependent claims reach "an infant rocking chair." *Id.* col. 7 l.59, (Docket No. 1-2 at 22). The specification describes three preferred embodiments in a Summary of the Invention, *id.* col. 1 l.32 to col. 2 l.48, (Docket No. 1-2 at 19), and a Detailed Description, *id.* col. 3 l.15 to col. 6. l.45, (Docket No. 1-2 at 20-21).

Independent Claim 12 is reproduced below:

> An **infant rocking chair** comprising:
> a seat body;
> a **bottom seat**;
> a base disposed between said seat body and said bottom seat and movable on said bottom seat;

> a supporting element connected to said base for supporting said seat body;
>
> a **first motion mechanism disposed between** said base and said bottom seat **for driving** said base to move back and forth on said bottom seat; and
>
> a **second motion mechanism** disposed between said supporting element and said bottom seat **for driving** said supporting element to move up and down relative to said base.

*See* '609 Patent col. 7 l.59 to col. 8 l.11, (Docket No. 1-2 at 22) (emphasis added). In its Claim Construction Order, (Docket No. 59), the Court defined the term "infant rocking chair" to denote "a seat or chair-like device that is designed to hold an infant and which moves or sways back and forth." The Court also construed the claim term "bottom seat" to be "a structure at the bottom of an object upon which the object sits or rests." *Id.* As for the claim term "motion mechanism," the parties stipulated to the definition of "a combination of machine parts." *See* Revised (and corrected) Joint Disputed Claim Terms Chart, (Docket No. 46). The parties also agreed that no claim construction was necessary for the claim terms: "for driving" and "between." *See id.*

Claim 14, which is dependent on Claim 12, further includes, among other elements, a "second pair of guiding elements spaced apart from each other." *See* '609 Patent col. 8 ll.18-24, (Docket No. 1-2 at 22). During claim construction, the Court construed "guiding elements" to denote "a set of tracks which direct movement." Claim Construction Order, (Docket No. 59).

Independent Claim 19 is also reproduced below:

> A **driving device** for an **infant rocking chair**, the infant rocking chair including a seat body and a **bottom seat**, said driving device comprising:
>
> a base adapted to be disposed between the seat body and the bottom seat;
>
> a supporting element connected to said base and adapted to support the seat body;
>
> a **first motion mechanism** including a horizontal first guide path unit adapted to be **disposed at the bottom seat**, and a first movable member disposed on said base and movable along said first guide path unit; and

> a **second motion mechanism** adapted to be disposed between the seat body and the bottom seat **for driving** said supporting element to move up and down relative to said first movable member.

*See* '609 Patent col. 8 ll.39-59, (Docket No. 1-2 at 22) (emphasis added). As with the claim term "for driving," the parties did not seek claim construction of the term "driving device." *See* Revised (and corrected) Joint Disputed Claim Terms Chart, (Docket No. 46).

**B. Prior Art References**

Thorley first asserts that U.S. Patent No. 5,022,708 ("Nordella") (filed Nov. 16, 1989) anticipates the '609 Patent.[1] *See* Nordella, (Docket No. 111-2). Nordella is a "Mechanical Seat Apparatus for Simulating Motion" that includes a "novel spherical bearing located below each seat for providing realistic simulation of motion in the yaw, pitch and roll directions." *Id.* at 2, (Docket No. 111-2 at 2). The supporting structure of Nordella "enables movement of each seat in the backward and forward, side to side, and upward and downward directions." *Id.* Nordella provides "[c]ommon hydraulics" to "simultaneously impart motion to a plurality of seats." *Id.*

Thorley also believes that Nordella, in combination with U.S. Patent No. 5,711,045 ("Caster") (filed Feb. 28, 1996), make the '609 Patent obvious to a person of ordinary skill in the art. *See* Caster, (Docket No. 111-7). Caster is an "apparatus for inducing relaxation or sleep in infants including a base, [and] a platform mounted on the base such that the platform is movable with at least three degrees of freedom of motion relative to the base." *Id.* at 2, (Docket No. 111-7 at 2). Caster includes "a child retainer provided on the platform, a device for moving the platform in the at least three degrees of freedom of motion and a driving source for driving the device for moving the platform in the at least three degrees of freedom of motion." *Id.*

[1] For a more detailed discussion and drawings of the first and second motion mechanisms allegedly disclosed by the Nordella reference, see sections IV.A.3-4, *infra*.

### C. The Accused mamaRoo Device

The accused mamaRoo[2] is an infant rocking chair "designed to hold an infant" that "moves and sways back and forth." (Docket No. 123 at 2-3). It contains a seat body, a bottom seat, and a base, with "a driving device comprising a base adapted to be disposed between the seat body and the bottom seat." *Id.* at 3, 13. The bottom seat is "at the bottom of the mamaRoo upon which other objects sit or rest." *Id.* at 3. The base is "disposed between said seat body and said bottom seat and movable on said bottom seat." *Id.* at 4. Connected to the base is a "supporting element" identified as a "double scissor mechanism," which supports the seat. *Id.*

The mamaRoo has a "first motion mechanism," including "wheels and rails," which is "disposed between the base and the bottom seat," and which is "part of what cause[s] the base to move back and forth on the bottom seat." *Id.* at 4-5. The mamaRoo further contains "gearing and linkage," which are "for driving the base to move back and forth on the bottom seat." (Docket No. 142 at 2-3). The parties do not agree, however, on whether the first motion mechanism requires the gear and linkage, (Docket No. 130 at 10-11), and on whether the gear and linkage are "disposed between the base and the bottom seat," (Docket No. 142 at 3).

The mamaRoo also has a "second motion mechanism," which is identified as a "double scissor mechanism and bearing surfaces upon which the wheels ride," and which is "disposed between the supporting element and the bottom seat." (Docket No. 123 at 6). As with the first motion mechanism, however, the parties disagree on the function of the double scissor mechanism. (Docket No. 142 at 4-5). They contest whether the double scissor mechanism is "for driving" the platform containing the seat body to move up and down and whether a "coil spring" constitutes part of the second motion mechanism. *Id.* at 4-7.

---

[2] For a more detailed discussion and photographs illustrating the mamaRoo's alleged first and second motions mechanism, see sections IV.C.3-4, *infra*.

Additionally, the parties dispute whether the mamaRoo has a "second pair of guiding elements." *Id.* at 7. Although the mamaRoo has "indication lines" that "are spaced apart from each other," (Docket No. 123 at 11), these lines "do not serve any functional purpose with respect to guiding or directing movement of the wheel," (Docket No. 142 at 8). Thus, the indication lines do not "constitute the second pair of guiding elements." *Id.* However, the parties continue to contest whether the "top surface of the base" constitutes a second pair of guiding elements that "direct[s] movement of the wheels" or "provide[s] any horizontal (side to side) restraint on the movement of the wheels." *Id.* at 8-9.

Having briefly summarized the '609 Patent, the Nordella and Caster prior art references, and the accused mamaRoo device, the Court now turns to the procedural history of this case.

**D. Procedural History**

Wonderland filed its complaint against Thorley for infringement of the '609 Patent by the accused mamaRoo device on February 12, 2012. (Docket No. 1). On January 11, 2013, the Court issued a Memorandum Opinion and Claim Construction Order, (Docket Nos. 58-59), following the receipt of the Revised Claim Construction Chart, the transcript of the Markman Hearing, and the Pre-Hearing and Post-Hearing Briefs. (Docket Nos. 39-43, 45-47, 51, 53-54). On March 13, 2013, the parties entered into a stipulation of non-infringement of Claims 1-3 of the '609 Patent, (Docket No. 66), based on the Court's Claim Construction, for which the Court granted entry of Partial and Non-Final Judgment of Non-Infringement, (Docket No. 67).

Meanwhile, on March 14, 2013, Wonderland filed an early Motion for Summary Judgment of Infringement of Claims 12-14 and 19-20, (Docket Nos. 68-72, 76-79, 81-83), which the Court denied without prejudice to be re-filed on July 1, 2013, (Docket No. 84). On April 12,

2013, Wonderland also filed a Motion to Strike Portions of the Expert Report of William W. Clark, (Docket Nos. 73-75, 80, 88, 91), which the Court denied, (Docket No. 93).

On July 1, 2013, the parties filed four (4) Cross-Motions for Summary Judgment on the issues of invalidity based on anticipation and obviousness, invalidity under 35 U.S.C. § 112, infringement, and non-infringement, as well as a Motion to Strike the Expert Report of Scott D. Hampton. (Docket Nos. 95, 100, 104, 108, 112). The Court denied Thorley's Motion to Strike the Expert Report of Mr. Hampton on December 5, 2013, (Docket Nos. 150-51), and denied Thorley's Motion for Summary Judgment of Invalidity under § 112 on December 16, 2013, (Docket Nos. 155-56). The Court now turns to the parties' remaining three motions.

Thorley filed its Motion for Summary Judgment of Invalidity on July 1, 2013, (Docket Nos. 108-11), to which Wonderland filed an Opposition, (Docket Nos. 126-28), and Thorley filed a Reply, (Docket Nos. 138-39). The parties also filed their Cross-Motions for Summary Judgment of Non-Infringement, (Docket Nos. 104-07), and Infringement, (Docket Nos. 95-98), on July 1, 2013. They filed their Opposition papers on July 29, 2013, (Docket Nos. 122-25, 129-31), and their Reply papers on August 14, 2013, (Docket Nos. 135, 140-42), and on August 26, 2013, the Court heard oral argument on said Motions,[3] (Docket Nos. 143-45).

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Rule 56, a district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

[3] The Court secured the preparation of and considered the transcript, (Docket No. 145), as well as a videotape of the arguments.

*Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must "view the evidence in a light most favorable to the party opposing the motion with doubts resolved in favor of the opponent." *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). In addition, an issued patent "is presumed valid, 35 U.S.C. § 282, and this presumption can be overcome only by clear and convincing evidence to the contrary." *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1320 (Fed. Cir. 2011).

When a non-moving party would have the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Celotex*, 477 U.S. at 323. The moving party need not produce any evidence showing the absence of a genuine issue of material fact. *Id.* at 325. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* After the moving party has satisfied this low burden, the adverse party must provide facts showing that there is a genuine issue for trial to avoid summary judgment. *Id.* at 324.

## IV. DISCUSSION

The Court addresses anticipation in view of Nordella, obviousness in light of the combination of Nordella and Caster, and infringement by the accused mamaRoo device, in turn.

### A. Anticipation

Thorley moves for summary judgment of invalidity of the '609 Patent based on anticipation by way of the Nordella reference. (Docket No. 109 at 5). Under 35 U.S.C. § 102, "[a] person shall be entitled to a patent unless—(1) the claimed invention was patented … before

the effective filing date of the claimed invention." 35 U.S.C. § 102(a). "Anticipation requires clear and convincing proof that a single prior art reference 'not only disclose[s] all of the elements of the claim within the four corners of the document, but ... also disclose[s] those elements arranged as in the claim.'" *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1351 (Fed. Cir. 2013) (quoting *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008)).

"In order to anticipate a claimed invention, a prior art reference must enable one of ordinary skill in the art to make the invention without undue experimentation." *Impax Labs., Inc. v. Aventis Pharm., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008). "[W]hen an accused infringer asserts that a prior art patent anticipates specific patent claims, the infringer enjoys a presumption that the anticipating disclosure also enables the claimed invention." *Id.* at 1316. "However, the patentee may overcome that presumption with persuasive evidence showing that the prior art patent does not enable the claimed invention." *Id.* "Whether a prior art reference is enabling presents a question of law based upon underlying factual findings. *Id.* at 1315.

In the instant case, Thorley argues that Nordella "discloses an apparatus for imparting motion in the backward and forward, side to side, and upward and downward directions to a seat." (Docket No. 109 at 23). Thorley asserts that Nordella anticipates Claim 12 of the '609 Patent because it contains each of the following seven limitations, (*see* Figures 1 and 2, *infra*):

(1) An infant rocking chair;
(2) A seat body;
(3) A bottom seat;
(4) A base disposed between said seat body and said bottom seat and movable on said bottom seat;
(5) A supporting element connected to said base for supporting said seat;
(6) A first motion mechanism disposed between said base and said bottom seat for driving said base to move back and forth on said bottom seat; and

> (7) A second motion mechanism disposed between said supporting element and said bottom seat for driving said supporting element to move up and down relative to said base.

(Docket No. 109 at 8-14). Thorley presents similar arguments for dependent Claims 13 and 14, independent Claim 19, and dependent Claim 20. (Docket No. 109). As for Claim 14, Thorley further asserts that Nordella meets the limitation of "guiding elements." *Id.* at 15.




Figure 1: Nordella prior art reference. *See* Nordella fig. 1, (Docket No. 111-2 at 3).




Figure 2: Nordella prior art reference. *See* Nordella fig. 2, (Docket No. 111-2 at 4).

Wonderland opposes anticipation based on Nordella with respect to the following five limitations: (1) the infant rocking chair; (2) the bottom seat; (3) the first motion mechanism disposed between; (4) the second motion mechanism; and (5) the second pair of guiding elements. (Docket No. 126 at 2). The Court now turns to the aforementioned five limitations.

**1. Infant Rocking Chair**

Thorley first argues that Nordella teaches an infant rocking chair. (Docket No. 109 at 8). Thorley relies on its expert, William W. Clark,[4] who finds that Nordella discloses a "moving chair, designed to hold a person, including an infant, such as a larger-sized infant." Clark Rep. at 35, (Docket No. 138-1 at 6). Thorley also relies on the United States Patent and Trademark Office's ("USPTO") finding that Nordella "is capable of permitting a smaller person, including an infant, to be seated therein." USPTO Right of Appeal Notice at 44, (Docket No. 111-4 at 20). Wonderland, however, relies on the Court's construction of "infant rocking chair" as a device "designed to hold" an infant. *See* Memorandum Opinion at 13, (Docket No. 58 at 13). Wonderland maintains that Nordella cannot be designed to hold an infant simply because (1) Nordella is designed to hold a person, and (2) an infant is a person. (Docket No. 126 at 8).

In this Court's estimation, Thorley has not established by clear and convincing evidence that Nordella contains an infant rocking chair. During claim construction, the Court construed "infant rocking chair" to denote "a seat or chair-like device that is designed to hold an infant and which moves or sways back and forth." Claim Construction Order, (Docket No. 59). Thorley proposed an alternate construction of "capable of holding an infant," but the Court found that "almost any seat or chair is capable of holding an infant dependent on the size of seat or chair and the size of the infant." Memorandum Opinion at 12, (Docket No. 58 at 10-12). The Court also noted that a different standard governs reexamination proceedings, (Docket No. 58 at 11 n.6), as compared with the courts. *See In re Swanson*, 540 F.3d 1368, 1377-78 (Fed. Cir. 2008)

---

[4] Dr. Clark is a Professor of Mechanical Engineering and Materials Science in the Swanson School of Engineering at the University of Pittsburgh, having joined the faculty as an Assistant Professor in 1992. Clark Rep. at 3, (Docket No. 138-1 at 4). He received his B.S., M.S., and Ph. D degrees in Mechanical Engineering from Virginia Polytechnic Institute and State University. *Id.* He has been retained by Thorley to examine the validity of Claims 12, 13, 14, 19, and 20 of the '609 Patent. *Id.* He has also been retained by Thorley to examine infringement of the aforementioned claims by the accused mamaRoo device. Clark Rebuttal Rep. at 2, (Docket No. 107-4 at 3).

(internal quotation marks omitted) ("And unlike in district courts, in reexamination proceedings claims are given their broadest reasonable interpretation, consistent with the specification ….").

Therefore, the "infant rocking chair" element is a necessary limitation for all of the claims at issue, and Thorley has failed to present clear and convincing evidence of anticipation. To that end, the Court denies Thorley's Motion for Summary Judgment of Invalidity in view of Nordella because Nordella may not contain the necessary "infant rocking chair" limitation.

**2. Bottom Seat**

For completeness, however, the Court also considers the other four limitations at issue. Thorley asserts that the term "bottom seat" is met by Nordella's rectangular frame (identified as #64). (Docket No. 109 at 10). Thorley relies on the USPTO's finding that the rectangular frame corresponds to a bottom seat. *See* USPTO Right of Appeal Notice at 31-32, (Docket No. 111-4 at 7-8). Thorley maintains that the "bottom seat" does not need to be at the *absolute bottom* of an apparatus, as long as the bottom seat is at the bottom of "some object, upon which the object sits, regardless if that object is the entire apparatus or only a portion of it." (Docket No. 109 at 10). Wonderland, by contrast, believes that the key feature of the "bottom seat" is its location in reference to the apparatus, i.e., the bottom seat must be at the *bottom*. (Docket No. 126 at 8). Thus, Wonderland contends that the frame (64) cannot be the *bottom seat* because there is additional structure below the frame (64), e.g., wheels (68), brackets (70), and tracks (72). *Id.*

In its Claim Construction Order, the Court did not specify that the bottom seat must be at the absolute bottom of the device, only that it must be at the bottom of some object. (Docket No. 59). Nevertheless, Thorley has not demonstrated by clear and convincing evidence that summary judgment should be entered against Wonderland because a reasonable jury could conclude that the tracks (72) are the bottom seat because they are below the frame (64).

### 3. First Motion Mechanism Disposed Between the Base and Bottom Seat




Figure 3: Nordella prior art reference. *See* Nordella fig. 1, (Docket No. 111-2 at 3).

Turning now to the "first motion mechanism disposed between the base and bottom seat," Thorley contends that Nordella "shows guide wheels (83) and channels (86) disposed on the upper surface of horizontal frame (64), i.e., the 'bottom seat.'" (Docket No. 109 at 11). For clarity, the Court reproduces the first figure from Nordella with labels for these elements. *See* Figure 3, *supra*. Thorley asserts that the "guide wheels (83) are mounted to the frame (76) and positioned below the support (78), i.e., the 'base,' and roll forward and backward within the

channels (86) positioned on top of the frame (64) when the associated cylinder is activated." (Docket No. 109 at 11). Thorley also relies on the USPTO's finding that Nordella anticipates the first motion mechanism. *See* USPTO Right of Appeal Notice at 32, (Docket No. 111-4 at 8).

Wonderland, however, argues that Thorley does not account for the springs (61) and the hydraulic cylinder (162), which help drive the base back and forth, but which are not "disposed between" the base (78) and the bottom seat (64). Wonderland charges Thorley with using different constructions for invalidity and infringement: if Thorley contends that the gear and linkage of the mamaRoo must be part of the "first motion mechanism disposed between the base and bottom seat," *see* § IV.C.2, *infra*, Thorley must also include the springs (61) and hydraulic cylinder (162) of Nordella as part of the first motion mechanism. (Docket No. 126 at 9-10).

As a threshold matter, to the extent that Thorley asserts that the so-called springs (61) are not springs, but plastic covers to prevent a user from interacting with the mechanics of the chair, (Docket No. 138 at 7), Thorley is incorrect because Nordella labels the safety cover as #60, whereas the so-called springs are labeled "accordion type folds (61)," which "accommodate for movement of the mechanical seat apparatus (50)." *See* Nordella col. 3 ll.25-31, (Docket No. 111-2 at 8). A reasonable jury could conclude that the so-called springs (61) are springs because they *accommodate for movement of the mechanical seat apparatus*. The so-called springs (61) could thus constitute a necessary part of the first motion mechanism. Even without considering the so-called springs (61), Thorley also fails to address in its Reply, (Docket No. 138), the argument that the hydraulic cylinder (162) must be part of the first motion mechanism.

The Court further notes that "[i]t is axiomatic that claims are construed the same way for both invalidity and infringement." *E.g.*, *Source Search Technologies, LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009). As explained in section IV.C.1.b, *infra*, the inventors of

the ’609 Patent used the term “between” within the claim language to specify the precise location of the first motion mechanism. Although Wonderland relies on the MERRIAM WEBSTER dictionary for the definition of the claim term “between,” extrinsic sources are not as persuasive as intrinsic evidence contained within the claim terms. Under *Phillips v. AWH Corp.*,

> [J]udges are free to consult dictionaries and technical treatises at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.

415 F.3d 1303, 1322-23 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). One reason for precision in specifying the location of the first motion mechanism could be to distinguish prior art references, such as Nordella. To that end, a reasonable jury could find that the first motion mechanism must include either or both the so-called springs (61) and the hydraulic cylinder (162), and that these elements are not disposed between the base and the bottom seat. Therefore, Thorley has not established by clear and convincing evidence that Nordella contains the first motion mechanism disposed between the base and the bottom seat.

**4. Vertical Motion in the Context of the Second Motion Mechanism**

As for the second motion mechanism, Thorley argues that Nordella enables vertical motion because it describes channels (94) that “permit up and down motion of the seat stage assembly 56 via guide wheels 90 positioned therein.” (Docket No. 138 at 7). Thorley believes that even if the channels (94) are not labeled in the drawings of the Nordella reference, the written description of Nordella sufficiently explains how the vertical motion mechanism operates because Nordella is simple mechanical technology, prior art is presumed to be enabled, and no authority requires the elements of prior art references to be disclosed in drawings. (Docket Nos.

109 at 13-14; 138 at 7-8). Thorley also relies on the USPTO's finding that Nordella discloses a second motion mechanism. *See* USPTO Right of Appeal Notice at 32, (Docket No. 111-4 at 8).




Figure 4: Nordella prior art reference. *See* Nordella fig. 1, (Docket No. 111-2 at 3).

Wonderland nevertheless asserts that Nordella does not enable vertical motion because its drawings do not show channels (94) to guide the upward motion of the seat stage assembly (56), and the frame members (82) are fixed in length and do not move up and down. (Docket No. 126 at 13). Wonderland cites inconsistencies between the first figure of Nordella, *see* Figure 4, *supra*, which shows the guide wheels (90), and the second one, *see* Figure 2, *supra*, which does

not. *Id.* Wonderland also argues that Thorley's expert, Dr. Clark, conceded that these drawings do not show vertical guiding channels (94). Clark Dep. 33:24-34:9, (Docket No. 128-1 at 10).

The Court finds that despite Thorley's arguments to the contrary that the guide wheels (90) permit up and down motion of the seat stage assembly (56), with the wheels (90) moving along the (unlabeled) channels (94), Thorley has not demonstrated how Nordella achieves this vertical motion mechanism. *See* Figure 4, *supra*. According to Nordella, the "seat stage assembly 56 preferably includes eight guide wheels 90, each of which may be mounted at a corner of the frame 88 by pins and/or brackets (not shown, but similar to brackets 70) to enable the seat stage assembly 56 to roll upward and downward within the intermediate stage assembly along channels located on the frame members 82." Nordella col. 4 ll.4-11, (Docket No. 111-2 at 8). Nordella also states: "As the hydraulic cylinder 166 is activated or deactivated, the seat stage assembly 56 moves upward or downward as the guide wheels 90 of the seat stage assembly roll along the channels 94 of the intermediate stage assembly 54." *Id.* col. 6 ll.22-26, (Docket No. 111-2 at 9). However, not only does Nordella not show the "brackets (70)" in the drawings, but it also fails to explain how the wheels (90) move or roll (vertically) within (unlabeled) channels (94) that are narrower than the diameter of the wheels (90) themselves. *See* Figure 4, *supra*.

Thus, Wonderland has presented persuasive evidence showing that, after viewing the facts in the light most favorable to Wonderland, Nordella may not enable vertical motion. *See Impax Labs., Inc.*, 545 F.3d at 1315-16. At minimum, the factual question of what Nordella discloses as a prior art reference is one properly reserved for the jury. *See ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1324 (Fed. Cir. 2012) (citing *Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1345-46 (Fed. Cir. 2001)) ("What a prior art reference discloses is a factual question. We think the resolution of this factual dispute was up to the jury.").

#### 5. Second Pair of Guiding Elements

With regard to Claim 14 only, Thorley further asserts that Nordella discloses a "second pair of guiding elements" because the specification of Nordella describes channels (94), which are spaced apart from each other. (Docket No. 109 at 15). Thorley argues that the wheels (90) of the seat stage assembly (56) roll "along channels located on the frame members (82)," and these channels are "tracks which direct movement." *Id.* at 15-16. Thorley contends that the absence of labels is insufficient to overcome the presumption that Nordella is enabled. *Id.* at 16.

In this Court's estimation, Nordella cannot meet the "second pair of guiding elements" limitation unless Nordella also meets the requirements for the second motion mechanism discussed above, *see* § IV.A.4, *supra*, because the second pair of guiding elements assumes that vertical motion exists before the guiding elements can guide that vertical motion. Thorley, moreover, fails to address the second pair of guiding elements in its Reply. (Docket No. 138).

Accordingly, as with the second motion mechanism, the Court denies Thorley's Motion for Summary Judgment of Invalidity based on the second pair of guiding elements because Thorley has not established by clear and convincing evidence that Nordella discloses the guiding elements. At minimum, this issue is a factual question of what Nordella discloses as a prior art reference, which should go to the jury. *See ArcelorMittal France*, 700 F.3d at 1324.

In sum, Thorley's Motion for Summary Judgment of Invalidity based on anticipation by way of the Nordella reference is denied because Thorley has not established clear and convincing evidence that Nordella discloses an infant rocking chair. Thorley has also not demonstrated that after viewing the facts in the light most favorable to Wonderland, no reasonable jury could find that Nordella fails to disclose (1) a bottom seat, (2) a first motion mechanism disposed between the base and the bottom seat, (3) a second motion mechanism, or (4) a second pair of guiding

elements. To the extent that Thorley raises additional arguments relating to other limitations, those issues are not dispositive given that Thorley has not established by clear and convincing evidence that Nordella meets all of the aforementioned limitations.

**B. Obviousness**

Even in the event that Nordella does not meet the limitations discussed above, *see* § IV.A, *supra*, the Court must still consider whether the '609 Patent is obvious in light of Nordella in combination with the Caster reference. Under § 103, "[a] patent for a claimed invention may not be obtained … if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious … to a person having ordinary skill in the art." 35 U.S.C. § 103. "Whether a claim is invalid for obviousness is determined from the perspective of one of ordinary skill in the art." *Cheese Sys., Inc.*, 725 F.3d at 1352. "Even when all claim limitations are found in prior art references, the fact-finder must determine what the prior art teaches, whether prior art teaches away from the claimed invention, and whether there was motivation to combine teachings from separate references." *Id.* "Obviousness is a question of law based on underlying findings of fact." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010). "The underlying factual inquiries include: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." *Id.*

Here, the level of ordinary skill in the art and relevant secondary considerations are not at issue. The primary factual issues in dispute are (1) whether the Nordella prior art reference constitutes analogous art with respect to the '609 Patent, and (2) whether there was sufficient motivation to combine the prior art references. The Court addresses each issue, in turn.

**1. Whether the Nordella Reference Constitutes Analogous Art**

"To qualify as prior art for an obviousness analysis, a reference must qualify as 'analogous art,' i.e., it must satisfy one of the following conditions: (1) the reference must be from the same field of endeavor; or (2) the reference must be reasonably pertinent to the particular problem with which the inventor is involved." *K-TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1375 (Fed. Cir. 2012); *see also Wyers*, 616 F.3d at 1237. "Whether a reference in the prior art is 'analogous' is a fact question." *Wyers*, 616 F.3d at 1237; *see also ArcelorMittal France*, 700 F.3d at 1324 (internal citations omitted) ("Whether a particular technology is analogous art is a question of fact. As with the evidence about whether a skilled artisan would read Bano to disclose pre-coating, we think this factual dispute was for the jury to resolve."). "A reference is reasonably pertinent if it, as a result of its subject matter, 'logically would have commended itself to an inventor's attention in considering his problem.'" *K-TEC, Inc.*, 696 F.3d at 1375 (quoting *Innovention Toys, LLC*, 637 F.3d at 1321).

In the instant case, Thorley believes that Nordella and Caster both "relate to moving seats," and it would be obvious to combine Nordella and Caster in creating an infant rocking chair that "impart[s] motion in the backward and forward, side to side, and upward and downward directions to a seat." (Docket No. 109 at 23). Thorley relies on *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007), for the principle that it would be "common sense" to combine Nordella and Caster to arrive at the claimed invention in the '609 Patent. (Docket No. 109 at 22). To establish that Caster is within the field of moving seats, Thorley argues that Caster discloses a device for "inducing relaxation or sleep in infants" that includes:

(1) a base;
(2) a platform mounted on the base;
(3) such that the platform is movable with at least three degrees of freedom of motion relative to the base;

(4) a child retainer provided on the platform;
(5) a device for moving the platform in the at least three degrees of freedom of motion; and
(6) a driving source for driving the device for moving the platform in the at least three degrees of freedom of motion.

*Id.* at 23. Thorley relies on the USPTO's finding that the "Caster and Nordella patents are in the same field of endeavor (i.e., rocking seats)." USPTO Right of Appeal Notice at 81, 84, (Docket No. 111-6 at 3, 6). Thorley further argues that market forces can prompt a person of ordinary skill to look beyond "conventional infant rocking chairs" because the '609 Patent discloses that it was solving the problem that conventional infant rocking chairs produce only back-and-forth motion or up-and-down motion. (Docket No. 109 at 24). Thorley believes that a person of ordinary skill would have "looked to a broader field of movable chairs." *Id.* To the extent that components require adjusting, Thorley maintains that those adjustments would be common sense and a necessary task in designing an infant rocking chair. *Id.* at 23-24.

Wonderland, by contrast, argues that the field of invention of "moving seats" is overbroad and includes "trains, planes and automobiles." (Docket No. 126 at 17). Wonderland asserts that the field of invention should be simulating "motion usually made by a person taking care of and holding an infant, and to do so as quietly as possible." *Id.* at 18. Wonderland contends that the field of invention of simulated motion for viewing videos is completely different from that for infant rocking chairs, which precludes Nordella from the first prong of analogous art: being in the same field of endeavor. *Id.* Wonderland also believes that Nordella is not reasonably pertinent to the problem that the '609 Patent addressed, "both with respect to the target user and the objective or purpose." *Id.* at 18-19. Wonderland maintains that Nordella targets adults and entertains or teaches, whereas the '609 Patent targets infants and induces sleep. *Id.* at 19.

The Court finds that there is at minimum a factual issue, *see ArcelorMittal France*, 700 F.3d at 1324, concerning whether Nordella is analogous prior art because Nordella and the '609 Patent may not be in the same field of endeavor, and they may not attempt to solve similar problems. In this Court's estimation, Nordella focuses on adults rather than infants and simulates motion for teaching or entertainment rather than for inducing sleep. Caster's Field of Invention, for instance, is more similar to that of the '609 Patent than is Nordella's. Caster discloses that it "relates to apparatuses similar to infant rockers and more particularly to apparatuses which impart motion to an infant to assist the infant in relaxing or going to sleep." Caster col. 1 ll.8-12, (Docket No. 111-7 at 8). Similarly, the '609 Patent discloses that it "relates to an infant rocking chair, and more particularly, to a driving device for driving a seat body of an infant rocking chair to move back and forth as well as up and down." '609 Patent col. 1 ll.15-19, (Docket No. 1-2 at 19). Nordella, by contrast, discloses that it "relates to a mechanical seat apparatus, and more particularly, to a mechanical seat apparatus designed to simulate motion for a person viewing a video or other program." Nordella col. 1 ll. 6-10, (Docket No. 111-2 at 7).

To the extent that Thorley argues that prior art need not be analogous art, Thorley is incorrect because under post-*KSR* Federal Circuit law, "[a] reference qualifies as prior art for a determination under § 103 when it is analogous to the claimed invention." *Innovention Toys, LLC*, 637 F.3d at 1321; *see also K-TEC, Inc.*, 696 F.3d at 1375 ("To qualify as prior art for an obviousness analysis, a reference must qualify as 'analogous art.'"); *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011) ("A reference qualifies as prior art for an obviousness determination under § 103 only when it is analogous to the claimed invention.").

To that end, Thorley must establish that Nordella is analogous prior art, but it relies only on *KSR* for the principle that market forces can prompt variations of prior art references in the

same or different field. *See KSR*, 550 U.S. at 417. Thorley does not account for post-*KSR* Federal Circuit precedent setting forth the still-valid requirements for analogous art. *See, e.g.*, *Wyers*, 616 F.3d at 1237; *Innovention Toys, LLC*, 637 F.3d at 1321; *K-Tec, Inc.*, 696 F.3d at 1375. Thus, Thorley has not shown by clear and convincing evidence that no reasonable jury could find that Nordella is not analogous prior art. *See ArcelorMittal France*, 700 F.3d at 1324.

**2. Whether There Was a Motivation to Combine**

Notwithstanding the above analysis, the Court also considers whether there was a motivation to combine Caster and Nordella. Thorley relies on the USPTO's finding that a person of ordinary skill in the art "would have found it obvious to replace the drive mechanism disclosed in the infant rocking seat of the Caster patent with the drive mechanism disclosed in the Nordella patent because the drive mechanism disclosed in the Nordella patent is configured to simulate motion that 'realistically provides numerous different degrees of movement' to the user." USPTO Right of Appeal Notice at 82, (Docket No. 111-6 at 4). Thorley also relies on its expert, Dr. Clark, who opines that incorporating all of Nordella's hydraulics into Caster is not necessary to render the '609 Patent obvious. Clark Dep. 69:1-12, (Docket No. 128-1 at 19).

Wonderland, however, finds no reason to consult Nordella, since Caster already provides "three degrees of freedom." (Docket No. 126 at 20). Wonderland asserts that Nordella is "not for infants," is "for entertainment (flight simulation), rather than inducing sleep," and is "heavy, expensive and … completely impractical to combine with Caster, a device with small electric motors." *Id.* Wonderland also relies on Thorley's expert, Dr. Clark, who stated: "I would see the Nordella patent as a very viable candidate to create that motion. I would not necessarily bring with that the hydraulic part." Clark Dep. 68:6-69:12, (Docket No. 128-1 at 18-19).

In this Court's estimation, Thorley has not established invalidity by clear and convincing evidence. Caster itself discloses that "imparting movement to a child will relax the child and possibly induce sleep," and that prior devices "move the infant in a repetitive simple motion involving a limited number of degrees of freedom, typically two degrees of freedom or less." Caster col. 1 ll.14-15, 27-30, (Docket No. 111-7 at 8). Caster claims to recognize and solve the problem of inducing sleep in infants by way of an "apparatus for inducing sleep in an infant which creates a complex motion with three or more degrees of freedom." *Id.* col. 1 ll.42-45, (Docket No. 111-7 at 8). Thorley presents no argument as to why Caster would be ineffective at inducing sleep in infants or any problem in Caster requiring improvement by way of Nordella.

To the extent that Thorley relies on the USPTO's Right of Appeal Notice indicating that Nordella "realistically provides numerous different degrees of movement," USPTO Right of Appeal Notice at 82, (Docket No. 111-6 at 4), neither Thorley nor the USPTO explains why a person of ordinary skill in the art would attempt to use Nordella to improve Caster, which already provides "complex motion with three or more degrees of freedom." Caster col. 1 ll.42-45, (Docket No. 111-7 at 8). The lack of explanation suggests that both Thorley and the USPTO are improperly using the '609 Patent as a roadmap to reconstruct the claimed invention based on hindsight. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir. 2012) (quoting *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008)) ("While the Supreme Court made clear that a mechanical application of the teaching-suggestion-motivation test, requiring an explicit teaching in the prior art, is inappropriate, '[w]e must still be careful not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention.'"). Even under *KSR*, "a patent composed of several elements is not proved obvious

merely by demonstrating that each of its elements was, independently, known in the prior art." *Kinetic Concepts, Inc.*, 688 F.3d at 1369 (quoting *KSR Int'l Co.*, 550 U.S. at 418)).

Here, Thorley does not explain how or why a person of ordinary skill would attempt to improve Caster by looking to Nordella. Thorley has only established that each element of the '609 Patent was "independently, known in the prior art." *See KSR Int'l Co.*, 550 U.S. at 418. That is insufficient to establish that the '609 Patent was obvious under a theory of motivation to combine. *See Cheese Sys., Inc.*, 725 F.3d at 1352 ("Obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention." (internal quotation marks omitted)). Therefore, Thorley's Motion for Summary Judgment of Invalidity based on a theory of motivation to combine is unavailing.

In sum, Thorley has not established by clear and convincing evidence that no reasonable jury could find that Nordella constitutes non-analogous art, i.e., that Nordella is analogous art as a matter of law. Nor has Thorley established by clear and convincing evidence that a person of ordinary skill in the art would be motivated to combine the "hydraulics" of Nordella with the "infant rocking chair" of Caster to create the claimed invention of the '609 Patent. To that end, Thorley's Motion for Summary Judgment of Invalidity based on obviousness is denied.

**C. Infringement**

Having addressed Thorley's arguments on invalidity, the Court now turns to the parties' Cross-Motions for Summary Judgment on the issue of infringement. Thorley moves for summary judgment of non-infringement of claims 12-14 and 19-20 of the '609 Patent by the accused mamaRoo device, (Docket No. 104), whereas Wonderland moves for summary judgment of infringement of each of the aforementioned claims, (Docket No. 95).

Direct infringement of a U.S. patent occurs whenever a party, "without authority makes, uses, offers to sell, or sells any patented invention, within the United States." 35 U.S.C. § 271(a). For each infringement analysis, there are two steps: "The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Solvay S.A. v. Honeywell Int'l, Inc.*, 622 F.3d 1367, 1379 (Fed. Cir. 2010) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)).

"Direct infringement requires proof by preponderant evidence that the defendant performs (if a method claim) or uses (if a product claim) each element of a claim, either literally or under the doctrine of equivalents." *Cheese Sys., Inc.*, 725 F.3d at 1348. "Whether an accused device meets all the limitations of those claims is a factual question." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357 (Fed. Cir. 2006). "To prove infringement, the patentee must show that an accused product embodies all limitations of the claim." *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id.*

In the instant case, Thorley raises three arguments in its Motion for Summary Judgment of Non-Infringement and in opposition to summary judgment of infringement:

1. The mamaRoo does not have a first motion mechanism for driving the base back and forth that is disposed between the base and bottom seat as required by Claims 12-14;
2. The alleged second motion mechanism in the mamaRoo is not for driving the supporting element up and down as required by Claims 12-14 and 19-20; and
3. The mamaRoo does not have a second set of guiding elements as required by Claim 14.

(Docket Nos. 105 at 4; 122 at 8-23). The Court first addresses supplemental claim construction, followed by the first and second motion mechanisms, and then the guiding elements.

### 1. Supplemental Claim Construction

As a threshold issue, Wonderland asserts that the Court must issue a supplemental claim construction for two claim terms: "for driving" and "between."[5] (Docket Nos. 129 at 5; 140 at 4). During claim construction, the parties had agreed that no construction of the claim terms, "for driving said base to move back and forth on said bottom seat," was necessary. *See* Revised (and corrected) Joint Disputed Claim Terms Chart, (Docket No. 46). The parties also stipulated that the claim term "motion mechanism" denotes "a combination of machine parts." *Id.*

Nevertheless, Wonderland now asserts a new issue of claim construction concerning whether the "for driving" limitation must include *all* or *only some* of the components of the first and second motion mechanisms. (Docket No. 140 at 4). Thorley opposes a supplemental claim construction because the parties previously agreed that the plain and ordinary meaning of "for driving" should control, and the jury should determine whether the construed claim reads on the accused product. (Docket Nos. 105 at 12; 122 at 9; 135 at 4-5, 10).

The Court first notes that it may engage in a rolling claim construction. *See Pressure Products Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010) ("As this court has recognized, district courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." (internal quotation marks omitted)). Even after a trial has begun, "a trial judge may learn more about the technology during the trial that necessitates some clarification of claim terms before the jury deliberates." *Id.* at 1315. "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Thus,

[5] As noted earlier in Section II.A, *supra*, Claim 12 of the '609 Patent requires, for example, "a first motion mechanism **disposed between** said base and said bottom seat **for driving** said base to move back and forth on said bottom seat." *See* '609 Patent col. 8 ll.5-8, (Docket No. 1-2 at 22) (emphasis added).

the Court must resolve the scope of the claims if a supplemental construction is necessary, but such constructions need not delay trial. *Pressure Products Med. Supplies, Inc.*, 599 F.3d at 1315.

With regard to claim construction, "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted). In *Phillips v. AWH Corp.*, the Federal Circuit provided a blueprint for claim construction:

> A court construing a patent claim seeks to [afford] a claim the [ordinary and customary] meaning it would have to a person of ordinary skill in the art at the time of the invention....
>
> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction ... involves little more than the application of the widely accepted meaning of commonly understood words ….
>
> In many cases …, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning ... as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean .... Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art ….
>
> Within the class of extrinsic evidence, the court has observed that dictionaries and treatises can be useful in claim construction .... We have especially noted the help ... technical dictionaries may provide to a court to better understand the underlying technology and the way in which one of skill in the art might use the claim terms …. Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art …. Such evidence, we have

> held, may be considered if the court deems it helpful in determining the true meaning of [the] language used ….
>
> [Although] ... extrinsic evidence in [a] general [sense is] less reliable than [intrinsic evidence] in determining how to read claim terms, .... encyclopedias and treatises [can be] particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms [so long as they are considered within the context of the intrinsic evidence].

*Phillips,* 415 F.3d at 1303, 1313, 1314, 1318-19 (citations and internal quotation marks omitted).

In looking to the intrinsic evidence, the court considers the language of the claim, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The claim itself is of primary importance since "it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2). However, the Federal Circuit advised in *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005), that "[w]e cannot look at the ordinary meaning of the term ... in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."

Next, the Court must look to the specification in the patent. As to the specification, the Federal Circuit has stated that it "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of the disputed claim." *Vitronics*, 90 F.3d at 1582; *Phillips*, 415 F.3d at 1315; *Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 F. App'x 966, 972 (Fed. Cir. 2011). "[I]t is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1317. However, there is a danger in reading limitations from the specification into the claim. *Id.* at 1323. While the specification may be the

best guide in interpreting a disputed term, the court must be careful to use the specification only to ascertain its meaning and not to impose a limit on a claim term. *Id.*

The final piece of intrinsic evidence which the Court may consider is the prosecution or file history, if it is in evidence. *Zircon,* 452 F. App'x at 972. The prosecution history "consists of all express representations made by or on behalf of the applicant to the [patent] examiner to induce a patent grant." *Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) (internal quotation marks omitted). The prosecution history can provide insight into the scope of the invention, as understood by the inventor and the USPTO. *Phillips*, 415 F.3d at 1317. A caveat to the use of the prosecution history is that it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

If the meaning of a claim's terms cannot be ascertained through intrinsic evidence, a court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* Although extrinsic evidence "can shed useful light on the relevant art," such evidence is less significant than intrinsic evidence. *Id.* "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term," and "[i]n such circumstances, it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583. Extrinsic evidence "may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language" or the other intrinsic evidence. *Id.* at 1584.

**a. For Driving**

Turning to the constructions at issue, the Court first addresses the construction of the claim term "for driving," for which Wonderland proposes two alternative definitions:

(1) "contributes to or facilitates driving" (Wonderland); or

(2) "each and every component that contributes to driving" (Thorley's position, according to Wonderland).

(Docket No. 140 at 4). As a threshold issue, Thorley asserts that the definition of the term "driving" is not contested because Wonderland still uses "driving" in its proposed construction. (Docket No. 135 at 4-5). Thorley believes that Wonderland's construction of "for driving" would read the "for driving" limitation out of the claim entirely. *Id.* at 10. Thorley also maintains that the construction of "for driving" must include a power mechanism, since "for driving" is associated with the "power mechanism" in the specification. (Docket No. 122 at 12).

Wonderland, however, contends that the term "for driving" should not require all of the components that contribute to a motion mechanism. (Docket No. 140 at 4-7). Wonderland argues that a power mechanism was "deliberately left out of claims 12 and 19, and it would be improper to import a 'power mechanism' limitation into those claims." (Docket No. 129 at 13). Wonderland then asserts that because Claim 1 separates the "motion mechanism" from the "motor," the '609 Patent draws a bright line distinction between these claim terms, and the "motion mechanism" cannot include a "motor." (Docket No. 140 at 5-6). To that end, Wonderland does not rely on claim differentiation, but relies on the internal consistency of the claims and specification of the '609 Patent. (Docket Nos. 129 at 4, 13, 17; 140 at 6).

After reviewing the intrinsic evidence, the Court finds that the term "for driving" appears frequently throughout the claim terms and the specification. Several examples include: (1) the entire invention of the '609 Patent is held out to be a "driving device" for infant rocking chairs; (2) Claim 1 recites "a motor for driving said first movable member"; (3) Claims 12-14 recite "a first motion mechanism … for driving said base to move back and forth on said bottom seat"; and (4) Claims 12-14 and 19-20 recite "a second motion mechanism … for driving said supporting element to move up and down relative to said base." *See* '609 Patent col. 6 l.48 to

col. 8 l.59, (Docket No. 1-2 at 21-22). The first example suggests that "driving" refers to the concept of "powering or creating motion," the second example suggests that "driving" may not automatically include a "motor," and the third and fourth examples suggest that "driving" refers to "controlling or directing motion." Claims 19-20 further recite a first motion mechanism without the "for driving" limitation. *See id.* col. 8 ll.46-49, (Docket No. 1-2 at 22).

The claim drafters, moreover, used the term "for driving," rather than "contribute to or facilitate driving," which suggests that "for driving" should mean more than just contributing to or facilitating driving. At the same time, the claim drafters did not require "for driving" to include "each and every component that contributes to driving" because the drafters separately recited a "motor for driving" in Claim 1, and this motor includes both a "crank" and a "link." *See id.* col. 6 ll.60-67, (Docket No. 1-2 at 21). Therefore, the Court adopts an intermediate construction, "controlling or directing motion," that does not require all of the components that contribute to driving, but still requires a minimum level of control or direction of the motion.

<u>Construction</u>

The Court construes the term "for driving" to denote "controlling or directing motion."

**b. Between**

Wonderland argues, in the alternative, that should the Court adopt a construction that requires a motion mechanism to include all the components that contribute to driving, the Court must also construe the term "between." The two potential constructions, according to Wonderland, are:

(1) "in intermediate relation to" (Wonderland); or
(2) "in the space that separates"
(Thorley's position, according to Wonderland).

(Docket No. 140 at 4). Wonderland maintains that "the motor and gearing of the embodiments of the '609 Patent (like that of the MamaRoo device) are not directly below the base," and "thus are at least arguably not 'between' the base and the bottom seat." *Id.* at 7. Wonderland also asserts that Thorley has admitted that most (but not all) of the driving components are "between" the base and the bottom seat. *Id.* at 7-9.

The Court finds that the claim drafters used precise language to specify the location of the first motion mechanism of Claim 12, i.e., the first motion mechanism is "disposed between said base and said bottom seat." *See* '609 Patent col. 8 ll.5-6, (Docket No. 1-2 at 22). This precise location does not appear to be an accident because "between" appears frequently throughout the claim language. Two other examples in Claim 12 are: (1) the "second motion mechanism disposed between said supporting element and said bottom seat"; and (2) the "base disposed between said seat body and said bottom seat." *Id.* col. 8 ll.1-2, 8-9, (Docket No. 1-2 at 22). The claim drafters could have placed the first motion mechanism between the *supporting element* and the bottom seat as they set forth for the second motion mechanism, but they did not do so. One reason drafters may have specified the precise location of the first motion mechanism could be to distinguish prior art, e.g., Nordella, which appears to contain a power mechanism that may not be disposed between a "base" and "bottom seat." *See* § IV.A.3, *supra*.

Claim 19, moreover, does not use the term "between" to limit the first motion mechanism, but it indicates that the motion mechanism is "disposed at the bottom seat." *See* '609 Patent col. 8 ll.46-47, (Docket No. 1-2 at 22). Claim 19 indicates that (1) the claim drafters were aware of their use of the term "between," and (2) they used the terms, "disposed at the bottom seat" to specify a more approximate location of "at the bottom seat." For similar reasons, Wonderland's argument that the motor and gearing are not "directly below the base" in the

preferred embodiments of the '609 Patent is unavailing. All of the preferred embodiments could map to claims other than Claims 12-14 because Claims 12-14 require the first motion mechanism to be disposed between the base and the bottom seat. Claims 19-20, however, do not have this precise location requirement and may correspond to the aforementioned preferred embodiments.

Construction

Therefore, the Court finds that the claim drafters used the term "between" with precision to specify the location of an object "in the space that separates."

**2. First Motion Mechanism Disposed Between … For Driving**

Turning now to the "first motion mechanism disposed between … for driving" limitation, Thorley argues that (1) the mamaRoo's wheels and rails do not meet the first motion mechanism because they do not include the gear and linkage, and (2) the gear and linkage of the mamaRoo is not disposed between the base and the bottom seat. (Docket Nos. 122 at 9-13; 105 at 13-16). Because Wonderland does not dispute that the "gearing and linkage … are for driving the base to move back and forth on the bottom seat," (Docket No. 142 at 2-3), the dispositive issues here concern whether the first motion mechanism *must include* the gearing (or gear) and linkage, and whether the gear and linkage is disposed *between* the base and the bottom seat. (Docket No. 140 at 5-9). As noted earlier, the parties agreed that "motion mechanism" denotes a "combination of machine parts," *see* Revised (and corrected) Joint Disputed Claim Terms Chart, (Docket No. 46), and the Court construed the term "for driving" to mean "controlling or directing motion," and the term "between" to denote "in the space that separates," *see* § IV.C.1, *supra*.

Wonderland contends that the first motion mechanism need not by itself drive the base back and forth, i.e., it need not include the motor and every machine part that contributes to the back and forth motion of the base. (Docket No. 140 at 6). Wonderland relies on Thorley's

expert, Dr. Clark, who admitted: "One might consider an actuator to be part of a motion mechanism, but it doesn't have to be." Clark Dep. at 68:16-69:12, (Docket No. 128-1 at 18-19). Wonderland alternatively argues that should the Court find that the first motion mechanism must include all of the components that are "for driving," it should still find that all of these components are disposed "between" the base and the bottom seat. (Docket No. 140 at 9).




Figure 5: Gear and linkage from the accused mamaRoo device. (Docket No. 142 at 2-3).




Figure 6: Base and bottom seat from the accused mamaRoo device. *See* Hopke Decl. ¶ 9, (Docket No. 107-5 at 6).

In this Court's estimation, however, no reasonable jury could find that the mamaRoo contains a first motion mechanism, because Wonderland has admitted that "the gearing and linkage identified in the image below [*see* Figure 5, *supra*] are for driving the base to move back and forth on the bottom seat." (Docket No. 142 at 2-3). Even if the motor or actuator is not part of the first motion mechanism, as Wonderland asserts, Claim 12 of the '609 Patent expressly recites that the first motion mechanism is "for driving said base to move back and forth on said bottom seat." *See* '609 Patent col. 8 ll.6-8, (Docket No. 1-2 at 22). The gear and linkage therefore read directly onto the claim language for Claim 12 in the same way as the first motion mechanism. *See id.* Given Wonderland's admission that the gearing and linkage are "for driving" in the precise manner set forth in Claim 12, the Court finds that no reasonable jury could conclude that the gearing and linkage are not part of the first motion mechanism.

To the extent that Wonderland argues that the gearing and linkage should be associated with the motor rather than with the first motion mechanism, Wonderland is incorrect because the Court finds that the motor is not necessary for the gearing and linkage to "control or direct" the first motion mechanism. *See* § IV.C.1.a, *supra*. Even when the motor is removed or turned off, the gear and linkage still "control or direct" the first motion mechanism because the range of the back and forth motion is confined within a preset path based on the diameter of the gear and length of the linkage. *See* Figure 5, *supra*. The first motion mechanism can thus include the gear and linkage even though it need not by itself drive the base back and forth, i.e., it need not include the motor and every machine part that contributes to the back and forth motion.

The Court further finds that the aforementioned gearing and linkage are not "disposed between said base and said bottom seat," *see* '609 Patent col. 8 ll.6-8, (Docket No. 1-2 at 22), because the gearing and linkage are not "in the space that separates" the base and the bottom

seat, *see* § IV.C.1.b, *supra*. Even Wonderland's own expert, Larry Drobinski,[6] admitted in deposition testimony that the gear and linkage, *see* Figure 5, *supra*, are not disposed between the base and the bottom seat, *see* Figure 6, *supra*. *See* Drobinski Dep. at 18:7-18 (as to the linkage), 19:16-20:7 (as to the gear), and 20:4-14 (as to location between the base and the bottom seat), (Docket No. 124-6 at 19-21). Accordingly, the Court finds that the mamaRoo does not contain a first motion mechanism because the first motion mechanism includes the gear and linkage, and the gear and linkage are not disposed between the base and bottom seat. Because Claims 13-14 are dependent on Claim 12, moreover, the Court also finds that the mamaRoo does not infringe Claims 13-14. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed."). To that end, the Court grants Thorley's Motion for Summary Judgment of Non-Infringement with respect to Claims 12-14, and denies Wonderland's Motion with respect to the aforementioned claims.

**3. Second Motion Mechanism**

As for the second motion mechanism, Thorley asserts that the double scissor mechanism is not "for driving," but only for supporting the platform. Thorley contends that the motor and gearing cause the crank and link to rotate, which powers the platform's up and down motion, as illustrated in Figure 7, *infra*, (Docket No. 122 at 16), and as presented by Thorley's engineer, Mr. Hopke,[7] *see* Hopke Decl. at ¶¶ 5-10, (Docket No. 107-5 at 3-6). Thorley maintains that the

---

[6] Mr. Drobinski is the President of Global Development and Sourcing, Inc. ("GDS") and has been with GDS since 1994. Drobinski Rep. at 8, (Docket No. 124-7 at 10). He received an M.S. in mechanical and management engineering and a B.S. in chemical engineering from Newark College of Engineering. *Id.* Prior to GDS, he worked at Graco Children's Products from 1985 to 1994, serving as General Manager of West Coast Operations, Vice President of Product Development, and Vice President and General Manager. *Id.* at 9, (Docket No. 124-7 at 11).

[7] Mr. Hopke is the Director of Engineering at Thorley. Hopke Decl. at ¶ 1, (Docket No. 107-5 at 2). He received a B.S. in mechanical engineering from Carnegie Mellon University and an M.S. in mechanical engineering from Johns Hopkins University. *Id.* at ¶ 1, (Docket No. 107-5 at 2). At Thorley, Mr. Hopke was involved in "virtually every

double scissor mechanism only moves up and down in unison with the platform because of the way in which it is attached to the platform, i.e., the double scissor mechanism does not "drive" the platform up and down. (Docket No. 122 at 16-17). Thorley relies on its expert, Dr. Clark, who opines that the double scissor mechanism "is not for driving the platform to move up and down," based on his "solid model of the device using Inventor™ software by AutoDesk™" and "measurements from an existing mamaRoo device." Clark Rebuttal Rep. at 5-6, (Docket No. 107-4 at 6-7). Thorley also relies on Wonderland's expert, Mr. Drobinski, who stated that the second motion mechanism is probably not for driving the supporting element up and down, but to counterbalance the weight of a child. *See* Drobinski Dep. at 33:20-34:19, (Docket No. 107-6 at 34-35). Thorley, therefore, argues that even though the supporting platform does move up and down, that motion is not "caused" by the double scissor mechanism. (Docket No. 105 at 10).




Figure 7: Double scissor mechanism, gearing, crank, link, platform, and coil spring from the accused mamaRoo device. *See* Hopke Decl. ¶ 5, (Docket No. 107-5 at 3).

---

aspect relating to updating, redesigning, and troubleshooting the mamaRoo, and [he has] worked on each commercial version of the mamaRoo." *Id.* at ¶ 3, (Docket No. 107-5 at 2).

However, Thorley's argument that the double scissor mechanism only supports the platform without contributing to its motion is not persuasive to the Court because even absent the motor and gearing, the platform's motion would be confined to a predefined path of up and down as a result of the double scissor mechanism. The double scissor mechanism could serve the same function as the wheels and rails of the first motion mechanism, because both motion mechanisms control or direct motion along a preset path. Thorley's own patent application corresponding to the mamaRoo,[8] for example, indicates that the "[v]ertical reciprocating assembly 63 includes a double scissor mechanism having a first double scissor mechanism 95 operatively coupled to a second double scissor mechanism 97 such that their movement is synchronized." *See* Thorley Publ. Patent Appl. at 4, (Docket No. 107-7 at 23). Although Thorley denies that its patent application is material to infringement, the application nevertheless shows that a reasonable jury could find that the double scissor mechanism is "for driving" the up and down movement of the platform by "controlling or directing" vertical movement.

The Court also finds that Thorley's argument concerning the coil spring is not convincing despite Thorley's position that Wonderland did not raise this argument at an earlier time. (Docket Nos. 122 at 18; 135 at 7-8). "[C]oncerns in waiver relate to issues such as … whether there was an adequate opportunity for response and evidentiary development by the opposing party at trial." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1347 (Fed. Cir. 2001) (holding that arguments "based on a specification in evidence and that are in support of an existing claim construction are not barred by the doctrine of waiver for the sole reason that they were not first presented to the trial court"). Although "Federal Circuit law controls waiver in the context of claim construction arguments," the Federal Circuit has also noted that "[w]aiver is a

[8] Thorley admitted that it has filed Patent Application US 2010/0052376, which generally relates to features of the commercial mamaRoo product. (Docket No. 123 at 2).

procedural issue." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1250-51 (Fed. Cir. 2005). To that end, the Third Circuit has "previously stated that an argument omitted before the district court may nevertheless be considered where it "is closely related to arguments that [the parties] did raise in that court." *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 417 (3d Cir. 2011).

Here, the picture of Nordella, *see* Figure 7, *supra*, illustrates that the coil spring could counteract the effect of gravity, by "reducing" the speed of the platform on the way down, and "assisting" the motor in pushing the platform back up. The coil spring argument is "closely related" to that of the double spring mechanism. *See Tri-M Grp., LLC*, 638 F.3d at 417. Even though Thorley asserts prejudice from a "new infringement theory," (Docket No. 135 at 8), the Court is not convinced because any "solid model" analysis of the mamaRoo's double scissor mechanism, *see* Clark Rebuttal Rep. at 5-6, (Docket No. 107-4 at 6-7), without consideration of the impact of the coil spring on the mechanism would be incomplete. Thorley's patent application, moreover, indicates that "the resistive mechanical element 123 comprises a compression spring (not shown) … to assist vertical expansion of the double scissor mechanism and resist vertical contraction of the double scissor mechanism." *See* Thorley Publ. Patent Appl. at 4, (Docket No. 107-7 at 23). Given the content of Thorley's patent application, a reasonable jury could find that the coil spring assists in the vertical expansion and contraction of the double scissor mechanism, thereby controlling or directing the up and down movement of the platform. *See id.*

Thorley may have even designed the mamaRoo with the coil spring in mind to counteract the effects of gravity (and the baby's weight) on the motor. *See id.*, (Docket No. 107-7 at 23) ("Resistive mechanical element 123 also has the benefit of counteracting the effects of gravity because it acts to reduce downward movement."). The coil spring could be a safety feature to

prevent the platform from a precipitous drop should the motor suddenly malfunction. The combination of the double scissor mechanism and coil spring could further control or direct motion by gradually reducing the speed of the up and down motion of the platform after the motor is shut off. Nevertheless, the coil spring probably does not provide all of the power for vertical motion because the motor provides external power through the gear, crank, and link. *See* Clark Rebuttal Rep. at 7, (Docket No. 107-4 at 8).

In sum, the Court finds that the second motion mechanism does not clearly resolve in favor of either party at summary judgment. A reasonable jury could find that the double scissor mechanism and coil spring materially assist in driving the up and down motion of the platform. *See Conoco, Inc.*, 460 F.3d at 1357. That jury could also find that the double scissor mechanism and coil spring do not drive the up and down motion of the platform. Therefore, the Court denies both parties' motions for summary judgment on the issue of infringement with regard to the second motion mechanism.

**4. Guiding Elements**

Having addressed both the first and second motion mechanisms, the Court last considers whether the accused mamaRoo does not infringe Claim 14 based on the "guiding elements" limitation. Thorley argues that the mamaRoo does not meet the "guiding elements" limitation because (1) the top surface of the base does not "direct movement of the wheels," and (2) Wonderland admits that the visible "indication lines" are not guiding elements. (Docket No. 122 at 19-23). In its Claim Construction Order, the Court construed "guiding elements" as "a set of tracks which direct movement." (Docket No. 59). To the extent that Wonderland maintains that the Court must again construe the term "track," (Docket No. 140 at 4), Wonderland is incorrect because "track" does not appear within the claim terms of the '609 Patent, *see* '609

Patent col. 6 l.48 to col. 8 l.59, (Docket No. 1-2 at 21-22). The Court also explained in its Claim Construction Opinion that the term "tracks" is "appropriate to define the physical components of the 'guide path unit,' but allows for a broader definition beyond the embodied parallel rods." (Docket No. 58 at 25). Even though a broader definition may be appropriate, Wonderland's example of a racing track, (Docket No. 140 at 13), does not sway the Court because a racing track does not guide runners by limiting their vertical movement any more than the surface of the Earth limits their vertical movement. The surface of the Earth limits the vertical movement of the runners regardless of the existence of the racing track on that surface.

Turning to the second pair of guiding elements allegedly contained within the mamaRoo, Thorley argues that the top surface of the base platform does not direct movement of the wheels because the wheels would still move in the same path even without the surface. To the extent that Thorley argues that the surface only "incidentally coincides" with the path of the wheels, (Docket No. 122 at 22), Thorley appears to be incorrect. A reasonable jury could conclude that the top surface controls or directs the vertical movement of the wheels because the top surface would limit the vertical movement of the wheels, even absent the double scissor mechanism, e.g., if the double scissor mechanism fails. Even though Wonderland's own expert, Mr. Drobinski, admits that "the bearing surface merely supports and keeps the rollers positioned or rolling on the/a horizontal plane" and that "[t]he scissors mechanism and its rigidity maintain side to side stability," Drobinski Rep. at 4, (Docket No. 124-7 at 6), the Court finds that, at a minimum, determining whether the top surface plays any role, albeit minimal, in the vertical—or lack of vertical—movement of the wheels is a factual issue for the jury.

Nevertheless, Thorley also argues that there "is no groove, rail, or other physical component extending from or embedded within this surface that could even potentially engage

with or direct movement of the wheel." (Docket No. 122 at 21). Given that Wonderland has admitted that the "indication lines" are not the accused guiding elements, (Docket No. 142 at 8), the Court finds that there are no other tracks—visible or otherwise—contained on the top surface of the base platform that could serve as guiding elements. Although the Court decided during claim construction that a broader definition than parallel rods was appropriate for the term "guiding elements," (Docket No. 58 at 25), the Court agrees with Thorley that a finding that the top surface of the base platform meets the "guiding elements" limitation would read that limitation out of the claim language. (Docket No. 122 at 22). To that end, the Court finds that the mamaRoo does not contain the "guiding elements" limitation as required by Claim 14.

Finally, to the extent that Wonderland contends that Thorley's request for reexamination weighs in favor of infringement, (Docket No. 96 at 5), this argument confuses the issues because infringement is a separate inquiry from invalidity. "Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity." *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed. Cir. 1983); *see also Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96 (1993) ("A party seeking a declaratory judgment of invalidity presents a claim independent of the patentee's charge of infringement."); *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 320 F.3d 1354, 1364 (Fed. Cir. 2003) ("Supreme Court precedent and our cases make clear that patent infringement and patent validity are treated as separate issues."). Therefore, Wonderland's argument to the contrary is meritless.

## V. CONCLUSION

As there are genuine issues of material fact between the parties concerning whether the Nordella prior art reference satisfies all of the limitations of Claims 12-14 and 19-20 of the '609

Patent, whether Nordella constitutes analogous art, and whether there was sufficient motivation to combine Nordella and the Caster prior art references, Thorley's Motion for Summary Judgment of Invalidity, (Docket No. 108), is DENIED. As for the parties' Cross-Motions for Summary Judgment on the issue of infringement of Claims 12-14 and 19-20 by the accused mamaRoo device, (Docket Nos. 95, 104), these Motions are GRANTED, in part and DENIED, in part; they are GRANTED as to non-infringement of Claims 12-14 only, in favor of Thorley, and DENIED in all other respects. An appropriate Order follows.

*<u>/s Nora Barry Fischer</u>*
Nora Barry Fischer
United States District Judge

Date: December 19th, 2013
cc/ecf: All counsel of record

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WONDERLAND NURSERYGOODS CO., LTD., Plaintiff, vs. THORLEY INDUSTRIES, LLC, *d/b/a* 4MOMS, Defendant. | ) | Civil Action No. 12-196<br>Judge Nora Barry Fischer |

**ORDER**

AND NOW, this 19th day of December, 2013, upon consideration of:

1. Defendant's Motion for Summary Judgment of Invalidity, (Docket Nos. [108], [109], [110], [111]), Plaintiff's Response, (Docket Nos. [126], [127], [128]), and Defendant's Reply, (Docket Nos. [138], [139]);
2. Defendant's Motion for Summary Judgment of Non-Infringement, (Docket Nos. [104], [105], [106], [107]), Plaintiff's Response, (Docket Nos. [129], [130], [131]), and Defendant's Reply, (Docket No. [135]);
3. Plaintiff's Motion for Summary Judgment of Infringement, (Docket Nos. [95], [96], [97], [98]), Defendant's Response, (Docket Nos. [122], [123], [124], [125]), and Plaintiff's Reply, (Docket Nos. [140], [141], [142]); and
4. The parties' arguments presented at the Motion Hearing held on August 29, 2013, (Docket Nos. [143], [144], [145]), and in accordance with the foregoing Memorandum Opinion,

IT IS HEREBY ORDERED that,

1. Defendant's Motion for Summary Judgment of Invalidity [108], is **DENIED**.
2. Defendant's Motion for Summary Judgment of Non-Infringement [104], is **GRANTED**, in part, and **DENIED**, in part. Said Motion [104] is **GRANTED** as to Non-Infringement of Claims 12-14 only, and **DENIED**, in all other respects.
3. Plaintiff's Motion for Summary Judgment of Infringement [95], is **DENIED**.

IT IS FURTHER ORDERED that all other provisions of the Court's previously entered Pretrial Order, dated January 16, 2013, (Docket No. [63]), remain in effect.

*/s Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: All counsel of record

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Wonderland Nurserygoods Co., Ltd.,<br><br>Plaintiff,<br>v.<br><br>Thorley Industries, LLC (dba 4Moms)<br><br>Defendant | C.A. No.: 2:12-CV-00196<br><br>The Honorable Nora Barry Fischer<br><br>Electronic Filing |

## [~~PROPOSED~~] ORDER AND FINAL JUDGMENT

Based upon the parties' Joint Motion to Lift Stay and Enter Final Judgment, **IT IS HEREBY ORDERED AND ADJUDGED:**

1. That the stay entered in the Court's February 24, 2014, Memorandum Opinion and Order (Docket No. 234) is hereby lifted;

2. That Thorley does not infringe claims 3 and 14 of United States Patent No. 8,047,609 pursuant to the stipulation of the parties (Docket Nos. 66-67) and Order of the Court (Docket No. 157), respectively;

3. That final judgment with prejudice is hereby entered in favor of Defendant Thorley Industries, LLC ("Thorley") and against Plaintiff Wonderland Nurserygoods Co., Ltd. ("Wonderland") on Wonderland's Claim for Relief of Infringement of U.S. Patent No. 8,047,609 and on Thorley's Counterclaim for a Declaration of Non-Infringement of United States Patent No. 8,047,609; and,

4. That Thorley's Counterclaim for the Declaration of Invalidity of United States Patent No. 8,047,609 is hereby dismissed without prejudice as moot, subject to reinstatement

after appeal upon remand.

It is understood that Wonderland reserves the right to take a timely appeal from this Order and Final Judgment, and that Thorley reserves the right to file any appropriate cross-appeal.

**IT IS SO ORDERED.**

Nora Barry Fischer
United States District Judge

US008047609B2

(12) **United States Patent**
**Chen et al.**

(10) **Patent No.: US 8,047,609 B2**
(45) **Date of Patent: *Nov. 1, 2011**

(54) **INFANT ROCKING CHAIR AND DRIVING DEVICE FOR DRIVING THE SAME**

(75) Inventors: **Shun-Min Chen**, Taipei (TW); **Jun-Xu Jin**, Taipei (TW)

(73) Assignee: **Wonderland Nursery Good Co., Ltd.**, Taipei (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/959,873**

(22) Filed: **Dec. 3, 2010**

(65) **Prior Publication Data**

US 2011/0074196 A1 Mar. 31, 2011

**Related U.S. Application Data**

(62) Division of application No. 11/819,643, filed on Jun. 28, 2007, now Pat. No. 7,845,728.

(30) **Foreign Application Priority Data**

Jan. 26, 2007 (CN) ...................... 2007 2 0002699 U

(51) **Int. Cl.**
***A47D 13/10*** (2006.01)
***A63G 13/00*** (2006.01)

(52) **U.S. Cl.** .................. **297/274**; 297/260.1; 297/260.2; 297/261.1; 297/261.2; 472/97; 472/135

(58) **Field of Classification Search** ............... 297/258.1, 297/260.2, 261.1, 261.2, 261.3, 274, 275; 472/47, 95, 96, 97, 135
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 496,531 | A * | 5/1893 | McCurdy | 297/260.2 X |
| 1,686,145 | A * | 10/1928 | Cook | 297/260.2 X |
| 1,985,131 | A * | 12/1934 | Wilke | 297/260.2 |
| 3,210,076 | A | 10/1965 | Walker | |
| 4,258,446 | A | 3/1981 | McAllister et al. | |
| 5,085,425 | A | 2/1992 | Collins et al. | |
| 5,123,701 | A * | 6/1992 | Bottamiller et al. | 297/261.1 |
| 5,183,457 | A | 2/1993 | Gatts et al. | |
| 5,303,433 | A | 4/1994 | Jang | |
| 5,711,045 | A | 1/1998 | Caster et al. | |
| 6,505,361 | B1 | 1/2003 | Ogawa | |
| 6,519,792 | B2 | 2/2003 | Chen | |
| 7,036,880 | B1 * | 5/2006 | Goodman | 297/260.2 X |
| 7,845,728 | B2 * | 12/2010 | Chen et al. | 297/260.2 X |
| 2002/0113469 | A1 | 8/2002 | Stern et al. | |
| 2002/0140263 | A1 | 10/2002 | Sato et al. | |
| 2006/0012230 | A1 * | 1/2006 | Kennedy et al. | 297/261.3 |
| 2007/0007804 | A1 | 1/2007 | Pemberton et al. | |
| 2007/0129596 | A1 | 6/2007 | Dickie | |
| 2007/0205646 | A1 | 9/2007 | Bapst et al. | |

* cited by examiner

*Primary Examiner* — Rodney B White
(74) *Attorney, Agent, or Firm* — Pillsbury Winthrop Shaw Pittman, LLP

(57) **ABSTRACT**

A driving device is adapted for an infant rocking chair. The rocking chair includes a seat body and a bottom seat. The driving device includes a base, a supporting element, first and second motion mechanisms, and a power mechanism. The first motion mechanism includes a horizontal first guide path unit disposed at the bottom seat, and a first movable member disposed on the base and movable along the first guide path unit. The second motion mechanism includes a vertically varying second guide path unit disposed at the bottom seat, and a second movable member movable along the second guide path unit and vertically relative to the base. The supporting element interconnects fixedly the seat body and the second movable member. The power mechanism drives reciprocal movement of the first and second movable members.

**20 Claims, 16 Drawing Sheets**




247
245
25
241
244
246
243
242
23
24
247
33
31
32
3
1
2
22
21
26
42
421
422
421
421
26
422
421
521
523
4
52
5
522
51
511
511
411
411
41
512
12
60
6
61
62
512

FIG. 1




FIG. 1A




FIG. 2




FIG. 3




FIG. 4




FIG. 5




FIG. 6




FIG. 7




FIG. 8




FIG. 9




FIG. 10




FIG. 11




FIG. 12




FIG. 13




FIG. 14




FIG. 15

# INFANT ROCKING CHAIR AND DRIVING DEVICE FOR DRIVING THE SAME

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a divisional to U.S. application Ser. No. 11/819,643, filed Jun. 28, 2007, which claims the benefit and priority of Chinese Application No. 200720002699.0, filed on Jan. 26, 2007. The entire contents of the applications are incorporated herein by reference in their entireties.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to an infant rocking chair, and more particularly to a driving device for driving a seat body of an infant rocking chair to move back and forth as well as up and down.

2. Description of the Related Art

Conventional infant rocking chairs can only produce either only a back-and-forth motion or an up-and-down motion. However, a curved swinging motion in which a back-and-forth motion is combined with an up-and-down motion so as to simulate the motion usually made by a person taking care of and holding an infant in his or her arms, is able to impart greater comfort to the infant. Furthermore, conventional driving devices for driving infant rocking chairs include interconnected gears, which generate a large amount of noise during operation.

## SUMMARY OF THE INVENTION

An object of this invention is to provide a driving device for driving a seat body of an infant rocking chair to reciprocate back and forth as well as up and down in such a manner that only little noise is generated, thereby resulting in infant comfort.

Another object of this invention is to provide a rocking chair that includes a seat body, which can be operated selectively in a back-and-forth motion or a curved swinging motion.

According to an aspect of this invention, a driving device for an infant rocking chair is provided. The infant rocking chair includes a seat body and a bottom seat. The driving device is adapted to drive the seat body to reciprocate relative to the bottom seat back and forth as well as up and down, and comprises:

a base adapted to be disposed between the seat body and the bottom seat;

a supporting element extending through the base and having a top end adapted to be connected to the seat body;

a first motion mechanism including a horizontal first guide path unit disposed at the bottom seat, and a first movable member disposed on the base and movable along the first guide path unit; and

a second motion mechanism including a vertically varying second guide path unit disposed at the bottom seat, and a second movable member disposed fixedly on a bottom end of the supporting element and movable along the second guide path unit.

According to another aspect of this invention, an infant rocking chair comprises:

a seat body;

a bottom seat;

a base adapted to be disposed between the seat body and the bottom seat;



a supporting element mounted movably on the base and having a top end adapted to be connected to the seat body;

a first motion mechanism including a first guide path unit disposed at the bottom seat, and a first movable member disposed on the base and movable along the first guide path unit; and

a second motion mechanism including a second guide path unit disposed at the bottom seat, and a second movable member disposed fixedly on a bottom end of the supporting element and movable along the second guide path unit;

wherein, when the base is moved back and forth relative to the bottom seat along the first guide path unit, an assembly of the seat body and the supporting element is moved up and down relative to the base.

According to still another aspect of this invention, an infant rocking chair comprising:

a seat body;

a bottom seat;

a supporting element having a top end adapted to be connected to the seat body;

a base adapted to be disposed between the seat body and the bottom seat and including a mounting member permitting the supporting element to be mounted movably thereon, and a locking unit for locking the supporting element relative to the mounting member;

a first motion mechanism including a first guide path unit disposed at the bottom seat, and a first movable member disposed on the base and movable along the first guide path unit so that the seat body is movable relative to the bottom seat in a first direction;

a second motion mechanism including a second guide path unit disposed at the bottom seat, and a second movable member disposed fixedly on a bottom end of the supporting element and movable along the second guide path unit so that the seat body is movable relative to the base in a second direction different from the first direction; and

a power mechanism for driving the base to reciprocate relative to the bottom seat along the first guide path unit in the first direction;

the supporting element and the locking unit being operable so as to convert the supporting element between a released state where the second movable member is in contact with the second guide path unit so as to allow the seat body to move relative to the base in the second direction when the base is moved relative to the bottom seat in the first direction, and a locked state where the second movable member is removed from the second guide path unit so as to allow the seat body to move relative to the bottom seat in only the first direction.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other features and advantages of this invention will become apparent in the following detailed description of the preferred embodiments of this invention, with reference to the accompanying drawings, in which:

FIG. **1** is a partly exploded perspective view of the first preferred embodiment of a driving device for driving an infant rocking chair according to this invention;

FIG. **1A** is a fragmentary side view of the first preferred embodiment, illustrating a locking unit;

FIG. **2** is an assembled perspective view of the first preferred embodiment;

FIGS. **3**, **4**, and **5** are schematic partly sectional views of the first preferred embodiment, illustrating the reciprocal movements of first and second movable members;

FIG. **6** is a perspective view of the infant rocking chair including the first preferred embodiment;

FIG. **7** is a partly exploded perspective view of the second preferred embodiment of a driving device for an infant rocking chair according to this invention;

FIGS. **8**, **9**, and **10** are schematic partly sectional views of the second preferred embodiment, illustrating the reciprocal movements of first and second movable members;

FIG. **11** is a partly exploded perspective view of the third preferred embodiment of a driving device for an infant rocking chair according to this invention; and

FIGS. **12**, **13**, **14**, and **15** are schematic partly sectional views of the third preferred embodiment, illustrating the reciprocal movements of first and second motion mechanisms.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Before the present invention is described in greater detail in connection with the preferred embodiments, it should be noted that similar elements and structures are designated by like reference numerals throughout the entire disclosure.

FIGS. **1** and **2** show the first preferred embodiment of a driving device **1** for an infant rocking chair **10** according to this invention. The infant rocking chair **10** includes a seat body **11** and a bottom seat **12**. The driving device **1** drives the seat body **11** to reciprocate relative to the bottom seat **12** back and forth as well as up and down. The driving device **1** includes a base **2**, an upright supporting rod **3** having a top end connected to the seat body **11**, a sleeve tube **31** sleeved around the supporting rod **3** so as to allow for synchronous horizontal movement of the supporting rod **3** and the base **2**, first and second motion mechanisms **4**, **5**, and a power mechanism **6**.

The base **2** is disposed between the seat body **11** and the bottom seat **12**, and includes a substantially rectangular plate **21**, a frustoconical connecting member **22** disposed fixedly on and above a central portion of the plate **21**, a tubular rod-mounting member **23** inserted into and connected fixedly to the connecting member **22**, and a locking unit **24**. The rod-mounting member **23** is formed with a central bore **25** therethrough. The sleeve tube **31** is inserted into and connected fixedly to the rod-mounting member **23**. The supporting rod **3** is movable axially within the sleeve tube **31**. The supporting rod **3** and the sleeve tube **31** are formed respectively with two aligned holes **32**, **33**.

With further reference to FIG. **1**A, the locking unit **24** includes a spring-accommodating portion **241** extending laterally from the rod-mounting member **23** and in spatial communication with the central bore **25** in the rod-mounting member **23**, a coiled compression spring **242** disposed within the spring-accommodating portion **241**, a movable pin **243**, and a rotary knob **244** sleeved on a right end of the spring-accommodating portion **241**. The movable pin **243** extends through the spring-accommodating portion **241** and the spring **242** and into the rotary knob **244**, and is aligned with the hole **33** in the sleeve tube **31**. A flange **245** extends radially and outwardly from a left end portion of the movable pin **243**. The coil compression spring **242** is disposed between the flange **245** and a shoulder **241'** of the spring-accommodating portion **241**. A fastening pin **246** extends through a right end of the movable pin **243**, and is connected fixedly to the rotary knob **244** so as to allow for synchronous movement and rotation of the movable pin **243** and the rotary knob **244**. As such, the rotary knob **244** is biased by the spring **242** to move on the spring-accommodating portion **241** toward the rod-mounting member **23**. Thus, when the supporting rod **3** is moved within the sleeve tube **31** to a predetermined axial position shown in FIG. **1**A to thereby align the hole **32** in the supporting rod **3** with the hole **33** in the sleeve tube **31**, the left end portion of the movable pin **243** is urged by the spring **242** into the holes **32**, **33** in the supporting rod **3** and the sleeve tube **31**. As a result, the supporting rod **3** is locked within the sleeve tube **31** at the predetermined axial position. In other words, the supporting rod **3** is maintained in a locked state.

Each of the spring-accommodating portion **241** and the rotary knob **244** is formed with two inclined guiding surfaces **247** at two opposite side portions thereof. The inclined guiding surfaces **247** of the spring-accommodating portion **241** abut respectively against the inclined guiding surfaces **247** of the rotary knob **244** such that, when a force is applied to the rotary knob **244** for rotating the same in a direction, the rotary knob **244** moves away from the spring-accommodating portion **241** to thereby remove the movable pin **243** from the holes **32**, **33**. Hence, the supporting rod **3** is movable within the sleeve tube **31**. In other words, the supporting rod **3** is converted into a released state. When the force is released, the left end portion of the movable pin **243** is biased by the spring **242** to contact an annular wall surface of the supporting rod **3**.

The first motion mechanism **4** includes a horizontal first guide path unit **41** and a first movable member **42** movable along the first guide path unit **41**. The first guide path unit **41** includes a pair of spaced-apart straight guiding rods **411** disposed on and above the bottom seat **12**. The first movable member **42** includes two parallel rows of first rollers **421** disposed respectively on two opposite sides of the base **2** and movable respectively along the straight guiding rods **411**. In this embodiment, each of the first rollers **421** is sleeved rotatably on an axle **422**. The axles **422** are connected respectively to four supporting legs **26** extending respectively and integrally from four corners of the plate **21**.

The second motion mechanism **5** includes a vertically varying second guide path unit **51** and a second movable member **52** movable along the second guide path unit **51** when the supporting rod **3** is in the released state. The second guide path unit **51** includes a pair of vertically curved guiding rods **511** parallel to and spaced apart from each other along a horizontal direction. Each of the curved guiding rods **511** has a sunken rod segment **512** at a middle portion thereof. The second movable member **52** includes a supporting frame **521** attached fixedly to a bottom end of the supporting rod **3**, and a pair of second rollers **522**. The second rollers **522** are sleeved rotatably on an axle **523** connected fixedly to the supporting frame **521**. When the supporting rod **3** is converted from the locked state into the released state, it moves downwardly within the sleeve tube **31** by gravity until the second rollers **522** come into contact with the curved guiding rods **511**, respectively, as shown in FIGS. **3** and **5**.

The power mechanism **6** is configured as a variable speed motor including a vertical motor shaft **60**. The driving device **1** further includes a crank **61** connected fixedly to the motor shaft **60** at one end thereof, and a link **62** having two ends connected respectively and pivotally to the base **2** and the other end of the crank **61**. As such, rotation of the motor shaft **60** results in reciprocal movement of the first and second movable members **42**, **52**. Due to the presence of the crank **61** and the link **62** interconnected between the power mechanism **6** and an assembly of the first and second movable members **42**, **52**, the power mechanism **6** is capable of driving the first movable member **42** and, thus, the base **2** to reciprocate back and forth along the first guide path unit **41**, and of driving the second movable member **52** along the second guide path unit **51** so as to allow an assembly of the supporting rod **3** and the seat body **11** to reciprocate up and down relative to the base **2**.

With particular reference to FIG. **4**, when the supporting rod **3** is in the locked state and when the power mechanism **6**

is operated, the second rollers **522** are spaced respectively apart from the curved guiding rods **511**. This prevents movement of the seat body **11** relative to the base **2**, thereby resulting in only a back-and-forth motion of the seat body **11**.

With particular reference to FIGS. **3** and **5**, when the supporting rod **3** is in the released state and when the power mechanism **6** is operated, the second rollers **522** are in contact with the curved guiding rods **511**, respectively. This allows for movement of the seat body **11** relative to the base **2**, thereby resulting in a curved swinging motion of the seat body **11** in which the back-and-forth motion is combined with an up-and-down motion so as to simulate the motion usually made by a person taking care of and holding an infant in his or her arms.

FIG. **6** shows the infant rocking chair **10** configured to further include a cover body **13**. The cover body **13** cooperates with the bottom seat **12** (see FIG. **1**) so as to define an accommodating chamber **14** therebetween. The driving device **1** (see FIG. **1**) is disposed within the accommodating chamber **14** such that the base **2** and the supporting rod **3** extend partially and upwardly from the cover body **13**.

FIGS. **7**, **8**, **9**, and **10** show the second preferred embodiment of a driving device for an infant rocking chair according to this invention, which is similar in construction to the first preferred embodiment. In this embodiment, a threaded rod **7** is added, and the curved guiding rods **511** (see FIG. **1**), the crank **61** (see FIG. **1**), and the link **62** (see FIG. **1**) are omitted. The threaded rod **7** is disposed between the bottom seat **12** and the base **2**, and is rotatable by the power mechanism **6**. The threaded rod **7** has two end portions disposed respectively and rotatably on the bottom seat **12** by two supporting units **73**, and an annular outer surface formed with an annular first helical slot **71** having a variable depth, and an annular second helical slot **72** having a uniform depth. The first helical slot **71** constitutes the second guide path unit. The supporting rod **3** is formed with a first projecting tooth **91** that extends from a bottom end thereof into the first helical slot **71** and that constitutes the second movable member. The base **2** is formed with a second projecting tooth **27** that extends downwardly therefrom into the second helical slot **72**.

The first motion mechanism **8** includes the straight guiding rods **81** and the first rollers **82**. When the threaded rod **7** is rotated by the power mechanism **6**, the second projecting tooth **27** of the base **2** is moved along the second helical slot **72**. Hence, the first rollers **82** reciprocate along the straight guiding rods **81**, thereby resulting in a back-and-forth motion of the base **2** relative to the bottom seat **12**.

The second motion mechanism **9** includes the first helical slot **71** and the first projecting tooth **91**. When the first projecting tooth **91** is moved along the first helical slot **71**, the supporting rod **3** reciprocates up and down relative to the base **21**.

When the supporting rod **3** is in the locked state and when the power mechanism **6** is operated, the first projecting tooth **91** is spaced apart from the first helical slot **71**. This prevents movement of the seat body **11** relative to the base **2**, thereby resulting in only a back-and-forth motion of the seat body **11**.

When the supporting rod **3** is in the released state and when the power mechanism **6** is operated, the first projecting tooth **91** comes into contact with the threaded rod **7**, and slides along the first helical slot **71** in the threaded rod **7**. This allows for movement of the seat body **11** relative to the base **2**, thereby resulting in a curved swinging motion of the seat body **11**.

In an alternative design, the second helical slot **72** and the second projecting tooth **27** are omitted, and the shape of the first projecting tooth **91** is changed such that, when the supporting rod **3** is in the locked state, the first projecting tooth **91** is spaced apart from the bottom wall defining the first helical slot **71**, and is in slidable contact with one of the lateral walls defining the first helical slot **71**, thereby allowing the one of the lateral walls to perform the same function as the second helical slot **72** (see FIG. **7**). That is, when the supporting rod **3** is in the locked state and when the power mechanism **6** is operated, the first projecting tooth **91** slides along the one of the lateral walls so as to allow for the back-and-forth motion of the seat body **11**; and when the supporting rod **3** is in the released state and when the power mechanism **6** is operated, the first projecting tooth **91** slides along both the bottom wall and the one of the lateral walls so as to allow for the curved swinging motion of the seat body **11**.



FIGS. **11** and **12** show the third preferred embodiment of a driving device for an infant rocking chair according to this invention, which is similar in construction to the first preferred embodiment. In this embodiment, the second motion mechanism **5** further includes a resilient damping unit **54**, and each of the curved guiding rods **53** has a pivot end **531** connected pivotally to the bottom seat **12**, and a free end **532** pivotable upwardly and downwardly about the pivot end **531**. The resilient damping unit **54** includes two coiled compression springs **541**, two spring-receiving members **542**, and a spring-retaining member **543**. The spring-receiving members **542** are disposed fixedly on the bottom seat **12** for receiving the springs **541**, respectively. The spring-retaining member **543** is attached to the bottom seat **12** for preventing removal of the springs **542** from the spring-receiving members **542**, respectively. The springs **541** are disposed between the bottom seat **12** and the free ends **532** of the curved guiding rods **53** for biasing the free ends **532** of the curved guiding rods **53** to pivot upwardly away from the bottom seat **12**. With further reference to FIGS. **13**, **14**, and **15**, when the second rollers **522** are moved from the pivot ends **531** toward the free ends **532**, the springs **542** store return forces for biasing the free ends **532** to pivot upwardly when the second rollers **522** are moved from the free ends **532** toward the pivot ends **531**. Thus, the output power that must be supplied by the motion mechanism **6** can be reduced.

With this invention thus explained, it is apparent that numerous modifications and variations can be made without departing from the scope and spirit of this invention. It is therefore intended that this invention be limited only as indicated by the appended claims.

We claim:

**1**. A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising:

a base adapted to be disposed between the seat body and the bottom seat;

a supporting element connected to said base and adapted to support the seat body;

a first motion mechanism including a horizontal first guide path unit adapted to be disposed at the bottom seat, and a first movable member disposed on said base and movable along said first guide path unit; and

a motor for driving said first movable member,

wherein said motor includes:

a motor shaft,

a crank connected fixedly to said motor shaft at one end thereof, and

a link having two ends connected respectively and pivotally to said base and the other end of said crank such that rotation of said motor shaft results in reciprocal movement of said first movable member.

**2**. The driving device as claimed in claim **1**, wherein said first guide path unit includes a pair of spaced-apart guiding elements, said first movable member including two parallel rows of rollers that are disposed respectively on two opposite sides of said base and that are movable respectively along said guiding elements.

**3**. The driving device as claimed in claim **2**, further comprising a second motion mechanism, adapted to be disposed between the seat body and the bottom seat, for driving said supporting element to move up and down relative to said first movable member.

**4**. The driving device as claimed in claim **3**, wherein the second motion mechanism includes a vertically varying second guide path unit adapted to be disposed at the bottom seat, and a second movable member disposed fixedly on a bottom end of said supporting element and movable along said second guide path unit.

**5**. The driving device as claimed in claim **4**, wherein said base includes a mounting member permitting said supporting element to be mounted movably thereon, and a locking unit for locking said supporting element relative to said mounting member parallel to said first guide path unit.

**6**. The driving device as claimed in claim **4**, wherein said second guide path unit includes a pair of parallel vertically curved guiding elements spaced apart from each other, said second movable member including a supporting frame attached fixedly to the bottom end of said supporting element, and a pair of rollers that are disposed rotatably on said supporting frame and that are movable respectively along said curved guiding elements.

**7**. The driving device as claimed in claim **6**, wherein each of said curved guiding elements has a sunken rod segment at a middle portion thereof.

**8**. The driving device as claimed in claim **7**, further comprising a power mechanism for driving said first movable member and, thus, said base to reciprocate back and forth along said first guide path unit and for driving said second movable member along said second guide path unit so as to allow said supporting element to reciprocate up and down relative to said base.

**9**. The driving device as claimed in claim **8**, further comprising a threaded rod that is adapted to be disposed between the bottom seat and said base and that is rotatable by said power mechanism, said threaded rod having an annular outer surface formed with an annular first helical slot that has a variable depth and that constitutes said second guide path unit, said second movable member being configured as a first projecting tooth extending from said bottom end of said supporting element into said first helical slot in said threaded rod.

**10**. The driving device as claimed in claim **9**, wherein said annular outer surface of said threaded rod is further formed with an annular second helical slot having a uniform depth, said base being formed with a second projecting tooth that extends downwardly therefrom into said second helical slot in said threaded rod and that is movable along said second helical slot.

**11**. The driving device as claimed in claim **4**, wherein said second guide path unit is parallel to said first guide path.

**12**. An infant rocking chair comprising:

a seat body;

a bottom seat;

a base disposed between said seat body and said bottom seat and movable on said bottom seat;

a supporting element connected to said base for supporting said seat body;

a first motion mechanism disposed between said base and said bottom seat for driving said base to move back and forth on said bottom seat; and

a second motion mechanism disposed between said supporting element and said bottom seat for driving said supporting element to move up and down relative to said base.

**13**. The infant rocking chair as claimed in claim **12**, wherein said first motion mechanism includes a first pair of guiding elements spaced apart from each other, and two parallel rows of rollers that are disposed respectively on two opposite sides of said base and that are movable respectively along said first pair of guiding elements.

**14**. The infant rocking chair as claimed in claim **13**, wherein said second motion mechanism includes a second pair of guiding elements spaced apart from each other, a supporting frame attached fixedly to the bottom end of said supporting element, and a pair of rollers that are disposed rotatably on said supporting frame and that are movable respectively along said second pair of guiding elements.

**15**. The infant rocking chair as claimed in claim **14**, wherein each of said second pair of guiding elements is parallel to each of said first pair of guiding elements.

**16**. The infant rocking chair as claimed in claim **14**, wherein each of said second pair of guiding elements is curved.

**17**. The infant rocking chair as claimed in claim **16**, further comprising a resilient damping unit.

**18**. The infant rocking chair as claimed in claim **12**, wherein said base includes a mounting member permitting said supporting element to be mounted movably thereon, and a locking unit for locking said supporting element relative to said mounting member to limit said seat body to move back and forth only.

**19**. A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising:

a base adapted to be disposed between the seat body and the bottom seat;

a supporting element connected to said base and adapted to support the seat body;

a first motion mechanism including a horizontal first guide path unit adapted to be disposed at the bottom seat, and a first movable member disposed on said base and movable along said first guide path unit; and

a second motion mechanism adapted to be disposed between the seat body and the bottom seat for driving said supporting element to move up and down relative to said first movable member.

**20**. The driving device as claimed in claim **19**, wherein said first guide path unit includes a pair of spaced-apart guiding elements, said first movable member including two parallel rows of rollers that are disposed respectively on two opposite sides of said base and that are movable respectively along said guiding elements.

* * * * *

# United States Court of Appeals for the Federal Circuit

WONDERLAND NURSERYGOODS CO. V. THORLEY INDUSTRIES , LLC,
2015-1878

## CERTIFICATE OF SERVICE

I, Rose E. Olejniczak, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by BAKER & MCKENZIE LLP, Attorneys for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On **October 5, 2015**, Counsel for Plaintiff-Appellant has authorized me to electronically file the foregoing **CORRECTED BRIEF AND ADDENDUM OF PLAINTIFF-APPELLANT** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to the following counsel registered as CM/ECF users:

Kent E. Baldauf, Jr.
Daniel H. Brean
Bryan P. Clark
The Webb Law Firm
Suite 1200
One Gateway Center
420 Ft. Duquesne Boulevard
Pittsburgh, PA 15222
kbaldaufjr@webblaw.com
dbrean@webblaw.com
bclark@webblaw.com

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

October 5, 2015

/s/Rose E. Olejniczak
Counsel Press

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 10,990 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Dated: October 5, 2015

/s/ Daniel A. Tallitsch
Daniel A. Tallitsch
*Counsel for Plaintiff-Appellant*
*Wonderland Nursery Goods Co., Ltd.*